IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| DAVID DUVALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 3:19-cv-00624-DSC |
| | ) | |
| NOVANT HEALTH, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Novant Health, Inc. ("NH") respectfully submits this Memorandum in Support of its Motion for Summary Judgment.

## I.      INTRODUCTION

In this lawsuit, David Duvall first asserts claims for discrimination despite testifying (1) that he never felt discriminated against during his employment at NH and (2) that no person at NH discriminated against him in his termination.

Next, Duvall asserts a claim based on a severance policy that (1) was not in effect at the time of his termination and (2) even if it was, Duvall would not have triggered the objective measure for additional severance.

Given the foregoing uncontroverted facts as well as the evidence presented herein, Plaintiff's lawsuit is subject to dismissal as a matter of law.

## II.  STATEMENT OF UNDISPUTED MATERIAL FACTS

### a.  *Duvall's Employment With NH*

NH hired Duvall as its Senior Vice President ("SVP") of Marketing and Communications in Charlotte, North Carolina.  (Dkt. Entry 1 ¶¶ 9-10).  Duvall began on August 5, 2013 and held the same position throughout his employment with NH.  (*Id.*)  Though Duvall was a highly compensated leader at NH, he was an at-will employee.  (Defendant's Motion ("MSJ"), Exhibit 1 ("Pl. Dep.") 64:10-20, 76:6-17, 127:9-21).

Jesse Cureton, NH's Executive Vice President ("EVP") and Chief Consumer Officer, hired Duvall.  (*Id.* at 64:6-9; MSJ, Exhibit 2 ("Cureton Dep.") 4:11-16, 32:4-15).  Duvall reported to Mr. Cureton throughout his employment and described their relationship as "good."  (Pl. Dep. 82:4-8).  Mr. Cureton, in turn, reports to Carl Armato, NH's President and CEO.  (MSJ, Exhibit 3 ("Cureton Dec.") ¶ 2).

Duvall testified that his initial responsibility was to evaluate his team and their capabilities.  (Pl. Dep. 69:20 to 70:6).  Duvall spent the first year doing a "thorough evaluation" and characterizes this time period as going "well."  (*Id.* at 81:22-25, 82:14-15).  During the same time period, however, an outside consultant solicited feedback from Duvall's subordinates.  (Cureton Dec. ¶ 3).  Contrary to Duvall's self-assessment, Duvall's subordinates reported that they had "no idea" of Duvall's expectations, that questions did not seem to be encouraged, and that Duvall presented an "academic approach vs. practical solution."  (MSJ, Exhibit 4, Pg. 3).

Duvall testified that the three main components of his department were internal communications, public relations ("PR"), and marketing.  (Pl. Dep. 70:7-16).  Kati Everett, then Vice President of Public Relations and Marketing Partner, independently "owned" internal communications and PR throughout Duvall's employment – as well as provided the day-to-day

support to Duvall's superiors, NH's EVPs (the "Executive Team").[1] (Pl. Dep. 86:20 to 87:10, 88:8 to 89:22; MSJ, Exhibit 5 ("Everett Dep.") 22:10 to 23:16; MSJ, Exhibit 6 ("Everett Dec.") ¶¶ 2, 7). Likewise, from mid-2015 on, Tammy Jones (then Director of Consumer Marketing) testified that she led marketing – the other major area of Duvall's department. (MSJ, Exhibit 7 ("Jones Dep.") 5:1-3, 40:21 to 41:1; Pl. Dep. 94:1-7). As such, Ms. Jones and Ms. Everett handled the lion's share of Duvall's department.

While Mr. Cureton found that Duvall did a good job with what he was asked to do at the outset – such as building a marketing and communications model and framework – the perception among some of Duvall's direct reports was less flattering. (Cureton Dep. 32:16 to 33:7). For example, Ms. Everett observed that Duvall responded to negative feedback from subordinates in a "punitive way," prompting her to artificially inflate her feedback of him to avoid retribution. (Everett Dec. ¶ 5). More troubling still, Ms. Everett developed the belief that Duvall did not respect female colleagues and, on multiple occasions, heard him say that there were "not enough guys in the department." (*Id*. at ¶ 6).

In 2016, Duvall was slated to present to NH's parent and community Boards of Directors, an event attended by over 100 executives and senior leaders. (Cureton Dep. 93:11-22; Cureton Dec. ¶ 4; MSJ, Exhibit 8 ("Armato Dep.") 77:1-14). After taking the stage, Duvall was completely unable to present, ultimately walking off the stage without presenting at all. (*Id*.) As Mr. Armato recalls it, Duvall walked away on the second slide, stating he "couldn't do it anymore." (Armato Dep. 77:1-14). According to Mr. Cureton, the incident "resonated with a number of leaders, you know, throughout the organization ..." (Cureton Dep. 93:19-22). Mr. Armato likewise explained:

---

[1] In fact, Ms. Everett explained that Duvall was so disconnected from communications that he would often ask questions revealing that he did not even read the internal messages Ms. Everett and the team issued. (Everett Dec. ¶ 6).

3

"it was such an unfortunate event for him to really just walk away from the podium in front of so many important people." (Armato Dep. 78:1-3). As a result, Mr. Armato discussed with Mr. Cureton whether someone unable to engage in public speaking had the command to be effective in an SVP role, particularly one devoted to marketing and communications. (*Id*. at 77:1-14).

Following this event, Mr. Cureton observed that Duvall was reluctant to assume important internal speaking opportunities, including before the Board of Directors. (Cureton Dep. 97:4-6; Cureton Dec. ¶ 5). Despite feedback from Mr. Cureton about the significance of key internal speaking engagements, Duvall delegated critical invitations, including opportunities to speak before the Board of Directors, to his subordinates. (Cureton Dep. 90:19 to 91:19; Everett Dec. ¶ 9; MSJ, Exhibit 9 ("Jones Dec.") ¶ 5). As Mr. Cureton explained, no other speaking opportunity is more important for a NH leader than those before the Board or Executive Team. (Cureton Dep. 97:3-9).

In addition, Mr. Cureton observed that Duvall was also reluctant to roll up his sleeves and engage his peers around the organization and above on critical efforts. (Cureton Dec. ¶ 8). Both Duvall and Mr. Cureton agree that they had on-going conversations regarding Duvall's effort and performance. (Pl. Dep. 97:11 to 98:7; Cureton Dep. 88:9-15). Mr. Cureton, among other things, testified that he specifically provided feedback to Duvall about his proximity to other leaders and the need to engage them. (Cureton Dep. 94:11-19, 89:12-15, 92:2-19). As Mr. Cureton explained, "the reason that was important was because our leaders were losing confidence in David."[2] (*Id*. at 92:9 to 93:13).

---

[2] Mr. Cureton went on to testify: "And there are a number of reasons … for that, and so it was more around helping David mitigate some of the lost confidence that I was beginning to hear from leaders and David." (Cureton Dep. 93:5-8).

To this end, Tanya Blackmon, a NH EVP, testified that there was a perception among other leaders that "you didn't know where David was." (MSJ, Exhibit 10 ("Blackmon Dep.") at 95:6-12, 105:12-14). She further explained that there was "a general feeling that we didn't see David very much and … he tended to want to meet with you on the phone …" (*Id*. at 95:18-21). Ms. Jones likewise testified that Mr. Cureton shared that Duvall was "absent and not engaged in ways that would give back to him from a leadership perspective" and that he would get the following question from other senior leaders: "Where is David?" (Jones Dep. 53:9-19). Similarly, a former NH EVP testified that while the feedback on Duvall was mixed, some "said hey, well, you know, we don't see David as much." (MSJ, Exhibit 11, 35:11 to 36:4). Underscoring this testimony, Duvall's badge swipes from 2016 through his termination reveal that he averaged less than three recorded days per week in the office. (MSJ, Exhibit 12, ¶ 3).

At the highly-compensated SVP level, NH expects its leaders to be exceptional, not just good enough. (Cureton Dec. ¶ 6). To this end, Mr. Cureton offered the following analogy: NH is looking for senior leaders who are not just playing in the NFL but can get the organization to the Super Bowl. (Cureton Dep. 84:8-23). At this level, Mr. Cureton looks for a leader who is so robust that he or she could be his successor. (*Id*. at 83:17 to 84:7). Over time, and as part of his on-going talent development and strategic and succession planning, Mr. Cureton determined that Duvall simply did not have this potential. (*Id*.) This conclusion is reflected in Duvall's last talent assessment score prior to his termination where he was rated as high performing, but low potential.[3] (Cureton Dec. ¶ 7).

---

[3] Though Duvall testified that he was "highly rated" in the talent assessment (called a "9-box" score) and on the "short-list" of successors to Mr. Cureton, his own assessment is belied by the record. (Pl. Dep. 193:19 to 194:2). In his only other talent assessment score, from 2015, Duvall was rated as medium performance, medium potential. (Cureton Dec. ¶ 7).

In 2018, NH increased its focus on improving patient experience. (Cureton Dep. 89:9 to 90:17; Cureton Dec. ¶ 8). According to Mr. Cureton, the renewed focus on patient experience was an "all hands on deck" initiative. (*Id*.) Mr. Cureton expected Duvall – as opposed to his subordinates – to roll up his sleeves and engage peers and above on how improvement in this area could be made. (*Id*.)

In March 2018, Mr. Cureton completed Duvall's final annual "Leader Performance Check In," which reminded Duvall to "[c]ontinue to provide strategic leadership and stay engaged" under "Opportunities for Growth and Improvement." (MSJ, Exhibit 13 ("Pl. Dep. Ex.") 8, Pg. 12). At the time, Mr. Cureton did not believe that Duvall was providing the engagement level and thought leadership that he expected surrounding patient experience. (Cureton Dep. 101:7 to 103:4). Unfortunately, Mr. Cureton did not observe any increase in Duvall's engagement after this check in. (*Id*.)

In June 2018, Mr. Cureton again spoke to Duvall regarding his need to engage and partner with other leaders surrounding patient experience. (MSJ, Exhibit 14, Pg. 4; Cureton Dep. 89:12 to 90:5; Cureton Dec. ¶¶ 8-9). Despite this feedback, the proverbial last straw occurred when Mr. Cureton learned that Duvall instructed Ms. Everett to attend a Patient Experience Steering Committee meeting with Executive Team leaders in his place, essentially delegating his department's efforts around patient experience to Ms. Everett. (Cureton Dec. ¶ 9). This demonstrated to Mr. Cureton that Duvall "did not get it," nor was he the type of transformational leader that was going to help the organization in its critical effort aimed at improving patient experience. (*Id*.)

Following Duvall's lack of engagement on a critical aspect of NH's business, delegation of this and other significant executive-level responsibilities to his subordinates, and Mr. Cureton's

assessment that Duvall was not the type of enterprise leader that could succeed him, Mr. Cureton decided to terminate Duvall's employment. (MSJ, Exhibit 14, Pg. 3; Cureton Dep. 82:1 to 85:6, 88:3-8, 93:2-94:3, 117:14-22). This decision was informed by Mr. Cureton's desire to go from "good to great" – the expectation for SVPs – and to upgrade talent in the role to someone with a different skill set and professional background who could accelerate patient experience. (Cureton Dep. 80:12 to 81:24, 93:23-94:3).

Duvall's employment was terminated effective July 30, 2018. (Pl. Dep. 125:10 to 126:4). At the time of Duvall's termination, Ms. Everett was promoted to SVP of Communications, a move that Mr. Cureton was contemplating independent of Duvall's separation in recognition of the work Ms. Everett performed independently for years, albeit without the formal title. (Cureton Dep. 85:13-25). Ms. Jones served as an interim marketing SVP while NH conducted a national talent search. (*Id*. at 73:1-5, 77:21 to 78:7). Ms. Jones and Ms. Everett report that following Duvall's departure, the primary change was to their titles and reporting relationships (as they were already performing Duvall's substantive functions). (Jones Dep. 40:21 to 41:1, Everett Dec. ¶ 11). Ten months after Duvall's termination, NH hired Vicky Free as its SVP and Chief Marketing Officer.[4] (Pl. Dep. 203:23 to 204:9, Cureton Dep. 78:14-22).

---

[4] At the time of her hire, Ms. Free had been a Senior Vice President or higher for approximately 13 years, with strong consumer-based experience at Disney, BET and Turner Networks. (Cureton Dec. ¶ 11). Though this consumer-facing, non-health care experience was particularly attractive to NH, Duvall concludes that Ms. Free was not as qualified as he is due to Duvall's public health education and previous healthcare experience. (Cureton Dep. 80:19 to 81:5; Pl. Dep. 205:11 to 206:16). In contrast to Ms. Free, prior to coming to NH, Duvall spent the previous decade operating his own business venture that ultimately "dissolved" following a failure to recover from the 2008 recession. (Pl. Dep. 25:24 to 26:2, 46:24 to 47:12).

**b. *Duvall's Severance Offer***

At the time of Duvall's hire in 2013, NH had an Executive and Leader Severance Pay policy (the "2013 Policy"). (Dkt. 37 (hereinafter "Butner Dec.") ¶ 3). Duvall testified that he never saw a copy of the 2013 Policy during his employment. (Pl. Dep. 79:16-25, 67:16-23). Under the 2013 Policy, Tier II leaders (like Duvall), who met all other eligibility requirements, would receive additional severance if they had five years of service or more. (Butner Dec. ¶ 3). By its explicit terms, the 2013 Policy could be amended, modified, or terminated at any time, for any reason. (*Id.*)

In 2015, NH did just that and amended its Executive and Leader Severance Pay policy (the "2015 Policy"). (*Id.* at ¶ 4). Under the 2015 Policy, Tier II leaders were eligible for a single amount of severance pay regardless of their length of service. (*Id.*)

At the time of his termination, NH offered Duvall severance benefits consistent with the existing 2015 Policy. This resulted in an offer to Duvall of nearly $500,000. (Pl. Dep. 124:1-16, 127:9-25). Duvall refused the offer, oddly claiming that he was entitled to even more severance benefits under the sunset 2013 Policy. (*Id.*) But, because Duvall did not have five years of service, he was not entitled to greater severance benefits under even the inapplicable 2013 Policy. (Pl. Dep. 128:18-24).[5]

**c. *Duvall's Subsequent Job Search and Employment***

Duvall admits that he has not applied for any jobs since his termination from NH. (Pl. Dep. 214:25 to 215:9, 252:6 to 253:2). Instead, he relies on talent recruiters to contact him because, as Duvall testified, one does not "typically" apply for jobs at his "level." (*Id.*) Duvall has since

---

[5] In rejecting the offer, Duvall refused to sign a separation agreement as required and, consequently, has no entitlement to severance under the terms of either policy. (Pl. Dep. 124:1-13, 127:9-25).

withdrawn from consideration for several positions for various reasons, including that one "market was predominantly Hispanic." (Pl. Dep. Ex. 21). Duvall further admitted that he would not consider a job with a base salary under $300,000. (Pl. Dep. 217:3-23).[6]

Duvall ultimately secured alternate employment as an SVP at Henry Ford Health System ("HFHS"). (Pl. Dep. 218:23-25, 228:22 to 229:9). Duvall was terminated from HFHS less than a year after he started. (*Id*. at 219:12-14, 230:11-14). Just as with NH, Duvall claimed that his termination from HFHS was unlawful and threatened legal action. (*Id*. at 13:25 to 16:2).

### d. *Duvall's Claims Against NH*

Duvall admits that he never complained of discrimination during his employment with NH. (Pl. Dep. 136:12-15). Indeed, Duvall did not even think that he was being discriminated against during his employment:

> Q. So while you were employed at Novant, did you ever think that you were being discriminated against in your own mind?
>
> A. No.

(Pl. Dep. 141:13-16).

Following his termination, Duvall, through out-of-state legal counsel, contacted NH in an effort to re-negotiate the severance offer discussed above. (*Id*. at 132:2 to 133:1, 134:22 to 135:15). When NH refused Duvall's demand for more severance benefits, and over four months after Duvall's termination, Duvall (through his current counsel) sent NH a letter claiming for the first

---

[6] In February 2019, Duvall became a contender for a position at Johns Hopkins Medicine. (Pl. Dep. Ex. 21). Consistent with Duvall's expressed aversion in this suit to workplace diversity, the recruiter involved testified that Duvall became concerned when he learned that Johns Hopkins was interested in a diverse slate of candidates. (MSJ, Exhibit 16, 43:18 to 44:15). Duvall reportedly said something to the effect of: "being a middle-aged white guy is probably not going to play in my favor." (*Id*.)

time that he had been discriminated against <u>on the basis of age</u>. (Pl. Dep. Ex. 14). As Duvall admitted:

> **Q.  Prior to hiring Mr. Largess, had you ever claimed discrimination of any kind against Novant?**
>
> **A.  No.**

(Pl. Dep. 136:19-21). In the letter, Duvall claimed that "there is a remarkable pattern of age discrimination at Novant …" (Pl. Dep. Ex. 14).

Nearly six months after his termination, Duvall filed an administrative charge with the EEOC. (Pl. Dep. Ex. 15). On the charge, Duvall checked the box for "age" discrimination, stating: "I was one of 10 white executives over the age of 50 whom Novant separated from employment in 2018, two years into an initiative to promote diversity." (*Id*.) In addition to age, Duvall added that he believed he was the victim of "reverse discrimination" in the "particulars" section of the charge. (*Id*.) Two months later, and now some eight months after his termination, Duvall amended his EEOC charge to add both "race" and "sex." (Pl. Dep. Ex. 16).

Duvall filed this lawsuit in November 2019. The suit abandons his initial claim of age discrimination and instead pursues his latent race and sex discrimination claims. This is true even despite Duvall <u>admitting</u>, as of his deposition in June 2020, that no one at NH discriminated against him with respect to his termination:

> **Q.  Do you believe any individual discriminated against you in your termination from NH?**
>
> **A.  No.  Not individually.**

(*Id*. at 176:6-8). Instead, just as he did with his prior age claim, Duvall's "reverse discrimination" claim is premised on an alleged "pattern" that has nothing to do with his own termination. (*Id*. at 176:6-25; 169:11-13).

Regarding his claimed "pattern" – and despite his repeated admissions of the lack of individual discrimination at NH – Duvall takes the rather inconceivable position that any termination of a white man followed by the hiring of anyone other than a white man must be discriminatory on its face:

> **Q.** **…So what you're saying is regardless of the qualifications of the people, whether they are black or female, you believe [if] they got jobs previously held by white men, that it must be evidence of discrimination; isn't that right?**
>
> **A.** **Yes.**
>
> …
>
> **Q.** **However, if there's a pattern of people of different races or genders entering the workforce and taking jobs previously held by white males, that is a pattern of discrimination in your mind; correct?**
>
> **A.** **Yes.**

(*Id*. at 168:2-7, 172:11-15).

Plaintiff now asks the Court to endorse his anachronistic theory and find, as a matter of law, that any time a minority or woman is hired into a position previously held by a white man, it must be discrimination regardless of the person's qualifications.

### III. LEGAL ARGUMENT

#### a. *Summary Judgment is Appropriate on Duvall's "Reverse Discrimination" Claim*

In his first and third claims, Duvall alleges that he was terminated because of his race and sex in violation of Title VII and the public policy of NCEEPA, respectively. Duvall's "reverse discrimination" claim fails entirely under Title VII. Consequently, because NCEEPA claims are evaluated under the same framework, summary judgment is likewise warranted on Duvall's state

11

law wrongful discharge claim. *Jones v. Lowe's Companies, Inc.*, 402 F. Supp. 3d 266, 284 (W.D.N.C. 2019).

### i. *Title VII Framework*

In Title VII discrimination cases, "the plaintiff bears 'the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination.'" *DeJarnette v. Corning Inc.*, 133 F.3d 293, 297 (4th Cir. 1998) (quotation omitted). Where, as here, there is absolutely no direct evidence of discrimination, Duvall must proceed under the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v Green*. 411 U.S. 792 (1973). Under this framework, Duvall bears both the initial burden of establishing a *prima facie* case, as well as the ultimate burden of proving intentional discrimination. *Id.* at 802-04; *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010).

Under this model, Duvall must first make out a *prima facie* case. *McDonnell Douglas*, 411 U.S. at 802. To establish a *prima facie* case under Title VII, Duvall must show: (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) he suffered this adverse action despite performing his job in accordance with the employer's legitimate expectations. *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011) (citation omitted). In addition, Duvall must make out a fourth prong designed to show circumstances giving rise to an inference of discrimination. *Pepper v. Precision Valve Corp.*, 526 Fed. Appx. 335, 336 (4th Cir. 2013) (unpublished) (citing *Adams*, 640 F.3d at 558); *Griggs v. Casual Corner Grp., Inc.*, No. 3:02CV277, 2005 WL 1983888, at *7 (W.D.N.C. Aug. 10, 2005).

If Duvall establishes a *prima facie* case by a preponderance of the evidence, the burden shifts to NH to articulate a legitimate, non-discriminatory reason for its employment action. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).

If NH articulates a legitimate, non-discriminatory reason, "the presumption of unlawful discrimination created by the *prima facie* case 'drops out of the picture,'" and the burden shifts back to Duvall to show that the proffered reason is pretextual and that the challenged employment decision was a function of intentional discrimination. *Id.* (quotation omitted). At this stage, Duvall's burden "merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination" and the sole remaining issue is discrimination *vel non*. *Burdine*, 450 U.S. at 256; *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005).

### ii. *Duvall Cannot Establish a Prima Facie Case*

Summary judgment is appropriate because Duvall cannot establish *prima facie* elements three or four, meriting dismissal of his claims as a matter of law.[7]

### 1. *Duvall Was Not Meeting NH's Legitimate Performance Expectations for an SVP*

As to element three, Duvall cannot show that he was meeting NH's legitimate performance expectations at the time of his termination. As Mr. Cureton explained, the expectation for an SVP reporting to him is that they are exceptional, not just adequate, and he is looking for someone so robust that they could ultimately succeed him. Mr. Cureton concluded that Duvall was not the type of exceptional leader that could be his successor.

---

[7] NH acknowledges that Duvall can show that he suffered an adverse action (termination) and that he is a Caucasian man. On the latter point, it is worth noting that while an open question in the Fourth Circuit, "[s]ome circuit courts have held that for a plaintiff to prove a claim of reverse discrimination, he must also show 'background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Cutshall v. Potter*, 347 F. Supp. 2d 228, 233 (W.D.N.C. 2004), *aff'd*, 146 F. App'x 702 (4th Cir. 2005) (quoting *Parker v. Baltimore & Ohio R. Co.*, 652 F.2d 1012, 1017 (D.C.Cir. 1981)). Duvall does not meet the ordinary burden in a Title VII case, let alone any heightened evidentiary showing.

For example, Mr. Cureton observed that Duvall was reluctant to engage his peers across the organization and the Executive Team on critical efforts, including patient experience. In the month before Duvall's termination, Mr. Cureton discovered that Duvall seemingly delegated his department's efforts around patient experience – a top priority – to his subordinate instead of providing the direct engagement level Mr. Cureton expected. Prior to this time, Duvall also delegated critical internal speaking opportunities to subordinates, following a widely viewed incident where Duvall was completely unable to present to NH's parent and community Boards of Directors. In fact, as the record evidence demonstrates, Duvall delegated large swaths of his responsibilities to his subordinates with little to no oversight on his part. This fact is further underscored by the record evidence that: (1) very little changed for Ms. Everett or Ms. Jones following Duvall's termination and (2) the unassailable fact that there was no need to replace Duvall for some ten months following his termination.

Meanwhile, the record evidence establishes without question that the Executive Team – Duvall's superiors – had little confidence in Duvall as a leader. From wondering where he was, to Ms. Everett handling all duties relating to the Executive Team, to Duvall's inability to present to NH leadership, the loss of confidence in Duvall by the senior leaders is clear. Given the foregoing, Duvall simply cannot show that he was meeting NH's legitimate performance expectations as an SVP at the time of his termination.

### 2. *Duvall Cannot Raise an Inference of Discrimination*

Even if Duvall could show that he was meeting NH's performance expectations, he cannot demonstrate circumstances giving rise to an inference of discrimination, as required. In fact, Duvall's deposition admissions foreclose any such showing. During his deposition, Duvall testified that he never felt discriminated against during his employment:

> **Q.** So while you were employed at Novant, did you ever think that you were being discriminated against in your own mind?
>
> **A.** No.

(Pl. Dep. at 141:13-16). Duvall further testified that he does not believe any person discriminated against him, <u>including with respect to his termination</u>:

> **Q.** Do you believe any individual discriminated against you in your termination from NH?
>
> **A.** No. Not individually.

(*Id*. at 176:6-8). These admissions, standing alone, are fatal to a showing that Duvall was terminated under any circumstances giving rise to an inference of discrimination and, frankly, this lawsuit. In fact, they compel the opposite conclusion. *See Danial v. Morgan State Univ.*, 426 F. Supp. 3d 135, 147 (D. Md. 2019), *reconsideration denied*, No. CV CCB-17-959, 2020 WL 4016174 (D. Md. July 16, 2020) (**considering fourth *prima facie* element and finding plaintiff plainly could not proceed with race discrimination claim where he admitted in his deposition that he did not believe he was discriminated against**).

### iii. *NH Terminated Duvall for a Legitimate, Non-Discriminatory Reason*

Even assuming, *arguendo*, Duvall could establish a *prima facie* case, NH clearly articulates a legitimate explanation for Duvall's termination. Mr. Cureton made the decision to terminate Duvall's employment based on an aggregation of considerations, including Duvall's delegation of significant responsibilities to his subordinates, the conclusion that he was not exceptional or a successor to Mr. Cureton, and the opportunity to elevate talent in the role to more closely align with the organization's increased focus on patient experience. This fully satisfies NH's burden of production at this stage.

#### iv. *Duvall Cannot Show Intentional Discrimination*

Duvall cannot meet his ultimate burden to show that he was the victim of intentional race or gender based discrimination. While ***admittedly*** not the victim of any individualized discrimination, Duvall attempts to support his claim based on an alleged "pattern" of terminations of other white employees and his own assessment of his performance. (Pl. Dep. 176:6-25, 169:11 to 171:7). These arguments do not allow Duvall to advance beyond a *prima facie* case, let alone survive summary judgment.

As to Duvall's claimed "pattern," Duvall hand-selected seven other white employees from three different levels of the organization, whom he claims show that white men were replaced with female and/or minority candidates. (Dkt. Entry 22-12, Pg. 4-10). The initial problem with this "other employee" evidence is that: (1) none were terminated by the same decision maker as Duvall; (2) none were terminated under the same or similar circumstances as Duvall; (3) none had the same job function, title, or responsibilities as Duvall; and (4) some were not even replaced by a female or non-white candidate. (Dkt. 35, MSJ, Exhibit 17).

Even putting all of that aside, Duvall's "pattern" evidence fails for a much simpler reason. When one views the aggregate numbers – and not just the selective anecdotes Duvall offers – there is no pattern of displacing white male SVPs like Duvall. (Dkt. 36, MSJ, Exhibit 18, Exhibit A). The percentage of white men at the SVP level in 2015 is **<u>virtually identical</u>** to the percentage of white men at the SVP level at the end of 2019, following what Duvall characterizes as a "diversity push." *Id.* While Duvall would obviously like to ignore this uncontroverted fact, it completely undercuts Duvall's conspiratorial theory.

Aside from his debunked "pattern" evidence, Duvall relies on the "extreme discordance" between his glowing assessment of his own performance and the reasons for his termination. (Pl.

16

Dep. 176:18-22). However, it is the opinion of the decision maker that matters. *Evans*, 80 F.3d at 961. Duvall's appraisal of his own efforts is irrelevant as a matter of well-established law. *DeJarnette*, 133 F.3d at 299; *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000); *Montgomery v. Anson Cty. Bd. of Educ.*, No. 3:16CV309-GCM, 2018 WL 1385409, at *3 (W.D.N.C. Mar. 19, 2018) ("Nor is a plaintiff's positive self-assessment sufficient evidence to defeat summary judgment.").[8]

Finally, in addition to the resounding lack of evidence of discrimination in this case, there is an additional factor that creates a strong inference against an ultimate showing of intentional discrimination. Mr. Cureton made the decision to hire Duvall and Mr. Cureton made the decision to fire him. (Cureton Dep. 32:4-15, 82:18-21).

In the Fourth Circuit, the fact that an employee is hired and fired by the same person can create a strong inference that the employer's stated reason for acting against the employee is not pretextual. *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991). While the inference typically arises when the decisions are made within a relatively short time span, courts apply this inference even when multiple years separate a hiring and firing. *See Valluzzi v. Azar*, 8:18-CV-03602-PX, 2020 WL 128457, at *6 (D. Md. Jan. 10, 2020).

As a result, unable to make any showing necessary to proceed to trial, the Court should grant NH summary judgment under Title VII and corollary state law.

_____

[8] Stripped of these arguments, Duvall is left with his own subjective belief that he was discriminated against for his traditional majority status. Not only is this counter to his deposition admissions, but it is also insufficient to survive summary judgment. *Montgomery*, 2018 WL 1385409, at *3 (granting summary judgment in employment discrimination case, explaining: "Where the only 'evidence' [plaintiff] has proffered is her own subjective and speculative belief that she was discriminated against, summary judgment in favor of the Defendant is appropriate.").

**b. *Summary Judgment is Also Appropriate on Duvall's Severance-Related Claims***

In addition to his "reverse discrimination" claim, Duvall alleges that he was terminated just before his fifth work anniversary in order "to prevent him from attaining the severance benefit available to those with five years of service." (Dkt. Entry 1 ¶ 45). Duvall seeks to pursue this claim under ERISA, 29 U.S.C. § 1140 ("Section 510"), or if ERISA is inapplicable, as a state law wrongful discharge claim. (*Id*. ¶¶ 41-47, 55-64). As set forth below, Duvall's claim is governed by ERISA, which preempts his state law counterpart, and complete summary judgment in NH's favor is appropriate.

**i. *ERISA Governs Duvall's Severance Claim and Preempts His State Law Cause of Action***

Both parties agree that Duvall's severance-related claim is governed by ERISA. (Dkt. Entry 1 ¶ 42). "The hallmark of an ERISA plan is that it 'requires an ongoing administrative program to meet the employer's obligation.'" *Yarber v. Capital Bank*, 944 F. Supp. 2d 437, 443 (E.D.N.C. 2013) (citing *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987)). However, the ongoing administrative program need only be minimal to constitute an ERISA plan. *Mullaly v. Ins. Servs. Office, Inc.*, 395 F. Supp. 2d 290, 294 (M.D.N.C. 2005).

To evaluate whether severance pay provisions are ERISA-governed plans, courts typically examine the following: (1) the amount of managerial discretion granted in paying the benefits and whether a case-by-case review of employees is needed; (2) whether payments are triggered by a single, unique event in the course of business or on a recurring basis; (3) whether the employer must make a one-time, lump-sum payment or continuous, periodic payments; and (4) whether the employer undertook any long-term obligations with respect to the payments. *Id*. at 294-295. While all of these factors support a finding that NH's 2013 Policy and 2015 Policy (the "Policies") are

subject to ERISA, courts have found that satisfaction of factors one and two is sufficient for ERISA coverage. *Mullaly*, 395 F. Supp. at 296. Both factors are easily satisfied here.

As to individualized review and discretion (factor one), the Policies provide that employees in Tiers I-V of NH's Executive and Leadership Compensation Program, who do not have an individual severance agreement and who are employed in a full-time capacity for at least six months, are eligible for severance in one of five instances unless "such occurrence is part of a uniform or broad-based compensation and/or Tier participation reduction approach under which all similarly situated Employees are treated in a similar manner." (Butner Dec. ¶¶ 3-4). Notwithstanding these five reasons for separation, the Policies also list seven instances in which an employee would not otherwise be entitled to severance. *Id*. This requires substantial case-by-case review and managerial discretion and leans heavily in favor of the Policies being considered ERISA plans. *See Mullaly*, 395 F. Supp. 2d at 295 (explaining that "courts across the country have held the discretion of determining the cause of termination to be a factor heavily favoring an ERISA plan").

As to factor two, the Policies are not triggered by a singular unique event (like the plant closing contemplated by *Fort Halifax*), but instead are triggered by different reasons for separation on an on-going basis as qualifying leaders are separated. "[T]he existence of other employee contracts offering similar benefits would require [the employer] to maintain some administrative scheme to consider employee eligibility on multiple occasions as the employment of each potential claimant was terminated." *Yarber*, 944 F. Supp. 2d at 444-445 (citation omitted). Therefore, factor two also demonstrates the existence of an ERISA plan. *Mullaly*, 395 F. Supp. 2d at 296 (finding factor two favored the finding of an ERISA plan where "Defendant's obligations are

recurring as employees are terminated, which necessarily requires some ongoing administration.”).
For these reasons, and others[9], the Policies are ERISA-covered plans.

ERISA broadly preempts “any and all” state laws that relate to employee benefits plans.
29 U.S.C. § 1144(a); *Blair*, 158 F. Supp. 2d at 657-58. “[W]hen a plaintiff is alleging that they
were fired so that the employer would no longer have to provide them with benefits, and attempts
to use a state law cause of action to seek relief, that claim will be preempted, because ‘[t]he sole
remedy for being fired by an employer on account of benefits must be under ERISA....’” *Long v.
Bos. Sci. Corp.*, 665 F. Supp. 2d 541, 549 (D.S.C. 2008) (quotation omitted); *See also Kahalas v.
Claims Administration Corp.*, CIV. A. DKC 92-2253, 1995 WL 795666, at *3 (D. Md. Mar. 16,
1995) (applying ERISA preemption to state law wrongful discharge claim). Whereas here, a state
law claim is preempted by ERISA, summary judgment and dismissal with prejudice is appropriate.
*Colburn v. Hickory Springs Mfg. Co.*, No. 5:19-CV-139-FL, 2020 WL 1490703, at *13 (E.D.N.C.
Mar. 24, 2020).

---

[9] Factor three likewise supports an ERISA finding. The Policies provide for continuous, reoccurring payments for between six and twenty-four months “on a regular pay period basis,” as well as group welfare benefits during the same period. (Butner Dec. ¶¶ 3-4). In addition, the Policies require qualifying leaders to sign a separation agreement as an explicit term of severance eligibility, which includes a covenant against competition. *Id*. This creates the need to monitor compliance over an extended, on-going period of time and the potential for a new administrative program to do so. *See Blair v. Young Phillips Corp.*, 158 F. Supp. 2d 654, 662 (M.D.N.C. 2001) (finding severance agreement constituted an ERISA plan where employer had discretion to determine severance eligibility and non-compete covenant required ongoing administration and potential to establish new administrative program). It, along with the non-disparagement and non-disclosure provisions also contained in the separation agreements, also require on-going monitoring by NH, all further supporting the conclusion that the Policies are governed by ERISA. (Butner Dec. ¶¶ 3-4).

### ii. *Duvall Cannot Point to Record Evidence to Avoid Dismissal of His ERISA Claim*

The *McDonnell Douglas* burden-shifting framework applies to claims for discriminatory discharge brought under § 510 of ERISA. *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 239 (4th Cir. 1991). To establish a *prima facie* case, Duvall must show: "(1) that he is a member of the protected class, i.e., a participant in an employee benefit plan; (2) that he was qualified for the job; and (3) that he was discharged 'under circumstances that give rise to an inference of discrimination.'" *Blair*, 235 F. Supp. 2d at 473 (quotation omitted). It is not enough for Duvall to establish a *prima facie* case. Duvall must also meet his ultimate burden to prove that he was discharged for the purpose of interfering with plan benefits. *Conkwright*, 933 F.2d at 238. Importantly, "to take advantage of § 510, one must prove a specific intent" to interfere with an employee's rights. *Id.* at 239.

In this case, Duvall cannot present circumstances raising an inference of discrimination sufficient to establish a *prima facie* case, let alone discharge his burden to prove that NH terminated Duvall's employment with the specific intent to interfere with his entitlement to severance benefits. Duvall argues that he was terminated just short of his fifth work anniversary in 2018 in order to deprive him of additional severance benefits under NH's 2013 Policy for Tier II leaders with five or more years of service. The immediate problem with this claim is that NH amended its severance policy in 2015. Under the amendment, there is no distinction for Tier II leaders before, at, or after five years of service. (Butner Dec. ¶ 4). Thus, Duvall is left with the nonsensical argument that NH terminated his employment to avoid paying additional severance benefits under an outdated version of its severance policy.

This claim is also belied by record evidence. Mr. Cureton testified that at the time he made the decision to terminate Duvall (and even today), he is not aware of the amount or terms of any

severance benefits Duvall may have been entitled to. (Cureton Dec. ¶ 10). Instead, Mr. Cureton made the decision to terminate Duvall's employment following his discovery in June 2018 that Duvall delegated his department's patient experience partnership to a subordinate. (Cureton Dec. ¶ 9). Upon this record, Duvall cannot tie Mr. Cureton's decision to terminate his employment to any consideration of severance benefits, even under an outdated policy as Duvall alleges. This falls woefully short of a *prima facie* showing and even farther away from the "specific intent" required under § 510. *Goode v. Am. Veterans, Inc.*, 874 F. Supp. 2d 430, 454 (D. Md. 2012) (granting summary judgment on § 510 claim where plaintiff failed to supply any connection between her discharge and an attempt to prevent her from attaining ERISA-protected benefits, explaining "[n]o reasonable jury could find unlawful intent."). Therefore, dismissal of Plaintiff's ERISA claim (and preempted state law claim) is warranted.

## IV.    CONCLUSION

Failing to meet his burden on each and every claim presented, Duvall cannot proceed to trial under any applicable standard. Consequently, NH respectfully requests full summary judgment.

Dated this the 21st day of September, 2020.

Respectfully submitted,

/s/Benjamin R. Holland
Benjamin R. Holland, NC #28580
Elizabeth R. Gift, NC #44331
S. Abigail Littrell, NC #49354
*Attorneys for Defendant*
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
201 South College Street, Suite 2300
Charlotte, NC 28244
Telephone: 704.342.2588
Facsimile: 704.342.4379
E-mail: ben.holland@ogletree.com
elizabeth.gift@ogletree.com
abby.littrell@ogletree.com

## CERTIFICATE OF SERVICE

I, Elizabeth R. Gift, hereby certify that I have this day electronically filed the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will send notification of the filing to the following person:

> S. Luke Largess
> *Attorney for Plaintiff*
> Tin, Fulton, Walker & Owen, PLLC
> 301 East Park Avenue
> Charlotte, NC 28203
> Telephone: 704.338.1220
> Facsimile: 704.338.1312
> Email: llargess@tinfulton.com

Dated this the 21st day of September, 2020.

> /s/Elizabeth R. Gift
> N.C. Bar No. 44331
> *Attorney for Defendant*
> OGLETREE, DEAKINS, NASH,
> SMOAK & STEWART, P.C.
> 201 South College Street, Suite 2300
> Charlotte, NC 28244
> Telephone: 704.342.2588
> Facsimile: 704.342.4379
> E-mail: elizabeth.gift@ogletree.com