IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| DAVID DUVALL,<br><br>Plaintiff,<br><br>v.<br><br>NOVANT HEALTH, INC.,<br><br>Defendant. | C.A. No. 3:19-cv-00624-DSC |

**DEFENDANT'S TRIAL BRIEF**

COMES NOW Defendant Novant Health, Inc. ("NH"), by and through its counsel, pursuant to Section IV(F) of the Pretrial Order and Case Management Plan, and respectfully submits this Trial Brief.

## I. INTRODUCTION

In this lawsuit, Plaintiff David Duvall asserts two claims relating to his termination from NH. First, Plaintiff claims that his sex (male) and race (Caucasian) were motivating factors in the decision to terminate his employment, alleged violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and the public policy set forth in North Carolina's Equal Employment Practices Act ("NCEEPA"). This is true although Plaintiff previously testified: (1) that he never felt discriminated against during his employment at NH, and (2) that no person at NH discriminated against him in his termination. It is also true that Plaintiff presents no other evidence to show that he was the victim of intentional discrimination – other than through his own ironically discriminatory theory that if white males are replaced by anyone other than other white males, it must be discrimination. (Dkt. 38-1, 168:2-7, 172:11-15).

1

Second, Plaintiff contends that NH terminated his employment to avoid paying him additional severance benefits that he insists would have been due had he remained employed an additional five days. Plaintiff and NH stipulated in the Proposed Pretrial Order that this claim is governed and preempted by the Employee Retirement Income Security Act ("ERISA"). There are several problems with this claim.

Plaintiff is claiming that NH terminated his employment to avoid paying additional severance benefits beyond the twelve months salary continuation NH offered Plaintiff at termination. (Dkt. 38-1, 127:9-21). The immediate issue with Plaintiff's claim is that he is alleging NH acted to deprive him of additional severance benefits under a 2013 severance policy *that was not in effect at the time of his termination in 2018 and that he did not qualify for*. At summary judgment, Plaintiff was unable to identify any record evidence suggesting that he was terminated to avoid paying additional severance benefits under a long-outdated version of NH's severance policy for which Plaintiff did not qualify, and he likewise cannot make this showing at trial.

Given the foregoing, as well as the evidence discussed herein, Plaintiff's lawsuit is subject to judgment as a matter of law in NH's favor.

## II. STIPULATED FACTS FOR TRIAL

Found at Section III of the Parties' Proposed Pretrial Order filed simultaneously herewith.

## III. STATEMENT OF ADDITIONAL MATERIAL FACTS

In addition to the foregoing stipulated facts, the evidence at trial will show the following:

### a. Plaintiff's Early and Significant Delegation to Subordinates

Plaintiff's department was comprised of internal communications, public relations ("PR"), and marketing. (Dkt. 38-1, 70:7-16). From 2015 on, Plaintiff's direct reports, Tammy Jones and

2

Case 3:19-cv-00624-DSC   Document 72   Filed 04/14/21   Page 2 of 20

Kati Everett, handled the lion's share of Plaintiff's department – with Ms. Jones leading marketing and Ms. Everett independently running internal communications and PR and supporting Plaintiff's superiors (NH's "Executive Team"). (Dkt. 38-5, 22:10-23:16; Dkt. 38-6 ¶¶ 2, 7; Dkt. 38-1, 88:8-89:22, 86:20-87:10).

### b. The 2016 Board Presentation

In 2016, Plaintiff was slated to present to NH's parent and community Boards of Directors, an event attended by over 100 executives and senior leaders. (Dkt. 38-2, 93:11-22; Dkt. 38-3 ¶ 4; Dkt. 38-8, 77:1-14). After taking the stage, Plaintiff was completely unable to present, ultimately walking off the stage without presenting at all. (*Id.*) As Carl Armato (NH's President and CEO) recalls it, Plaintiff walked away on the second slide, stating he "couldn't do it anymore." (Dkt. 38-8, 77:1-14). According to Mr. Cureton, the incident "resonated with a number of leaders, you know, throughout the organization ..." (Dkt. 38-2, 93:19-22). Mr. Armato likewise explained: "it was such an unfortunate event for him to really just walk away from the podium in front of so many important people." (Dkt. 38-8, 78:1-3). As a result, Mr. Armato discussed with Mr. Cureton whether someone unable to engage in public speaking had the command to be effective in an SVP role, particularly one devoted to marketing and communications. (*Id.* at 77:1-14).

### c. Mr. Cureton Observes Continued Delegation by Plaintiff and a Loss of Confidence in Plaintiff by the Executive Team

Following the 2016 Board presentation, Mr. Cureton observed that Plaintiff was reluctant to agree to impportant internal speaking opportunities, including before the Board of Directors. (Dkt. 38-2, 97:4-6; Dkt. 38-3 ¶ 5). Despite feedback from Mr. Cureton about the significance of key internal speaking engagements, Plaintiff delegated critical invitations, including opportunities to speak before the Board of Directors, to his subordinates. (Dkt. 38-2, 90:19-91:19; Dkt. 38-6 ¶ 9; Dkt. 38-9 ¶ 5). This fact is confirmed by both Ms. Jones and Ms. Everett. (*Id.*) As Mr.

3

Cureton explained, no other speaking opportunity is more important for a NH leader than those before the Board or Executive Team. (Dkt. 38-2, 97:3-9).

In addition, Mr. Cureton observed that Plaintiff was reluctant to roll up his sleeves and engage his peers around the organization and above on critical efforts. (Dkt. 38-3 ¶ 8). Both Plaintiff and Mr. Cureton agree that they had on-going conversations regarding Plaintiff's effort and performance. (Dkt. 38-1, 97:11-98:7; Dkt. 38-2, 88:9-15). Mr. Cureton, among other things, testified that he specifically provided feedback to Plaintiff about his proximity to other leaders and the need to engage them. (Dkt. 38-2, 94:11-19, 89:12-15, 92:2-19). As Mr. Cureton explained, "the reason that was important was because our leaders were losing confidence in David." (*Id*. at 92:9-93:13). This was an effort "more around helping David mitigate some of the lost confidence that I was beginning to hear from leaders and David." (*Id*. at 93:5-8).

Consistent with Mr. Cureton's perception, another NH EVP testified that there was a perception among other leaders that "you didn't know where David was." (Dkt. 38-10, 95:6-12, 105:12-14). She further explained that there was "a general feeling that we didn't see David very much and ... he tended to want to meet with you on the phone ..." (*Id*. at 95:18-21). Similarly, a former NH EVP testified that while the feedback on Plaintiff was mixed, some "said hey, well, you know, we don't see David as much." (Dkt. 38-11, 35:11 to 36:4). Underscoring this testimony, Plaintiff's badge swipes from 2016 through his termination reveal that he averaged less than three recorded days per week in the office. (Dkt. 38-12 ¶ 3).

### d. Plaintiff, an SVP, is Expected to Be Exceptional, Not Just Good

At the highly-compensated SVP level, NH expects its leaders to be exceptional, not just good enough. (Dkt. 38-3 ¶ 6). Mr. Cureton offered the following analogy: NH is looking for senior leaders who are not just playing in the NFL but can get the organization to the Super Bowl. (Dkt. 38-2, 84:8-23). At this level, Mr. Cureton looks for a leader who is so robust that he or she

4

could be his successor. (*Id*. at 83:17 to 84:7). Over time, and as part of his on-going talent development and strategic and succession planning, Mr. Cureton determined that Plaintiff simply did not have this potential. (*Id*.) This conclusion is reflected in Plaintiff's last talent assessment score where he was rated as high performing, *but low potential*. (Dkt. 38-3 ¶ 7).

### e. Plaintiff's Termination from Employment

In 2018, NH increased its focus on improving patient experience. (Dkt. 38-2, 89:9-90:17; Dkt. 38-3 ¶ 8). According to Mr. Cureton, the renewed focus on patient experience was an "all hands on deck" initiative. (*Id*.) Mr. Cureton expected Plaintiff – as opposed to his subordinates – to roll up his sleeves and engage peers and above on how improvement in this area could be made. (*Id*.)

Plaintiff's annual evaluations, called "Leader Performance Check Ins," are sparsely populated, both for good and negative feedback. Mr. Cureton testified that the annual leader evaluations were less of an avenue to provide feedback than the ongoing conversations he had with senior leaders like Plaintiff. (Dkt. 38-2, 88:12-15). However, in March 2018, Mr. Cureton provided written evaluation feedback to Plaintiff under "Opportunities for Growth and Improvement," reminding Plaintiff to "[c]ontinue to provide strategic leadership and stay engaged." (Dkt. 38-13). At the time, Mr. Cureton did not believe that Plaintiff was providing the engagement level and thought leadership that he expected surrounding patient experience. (Dkt. 38-2, 101:1-103:4). Unfortunately, Mr. Cureton did not observe any increase in Plaintiff's engagement after this check in. (*Id*.)

In June 2018, Mr. Cureton again spoke to Plaintiff regarding his need to engage and partner with other leaders surrounding patient experience. (Dkt. 38-2, 89:12-90:5; Dkt. 38-3 ¶¶ 8-9). Despite this feedback, the proverbial last straw occurred when Mr. Cureton learned that Plaintiff instructed Ms. Everett to attend a Patient Experience Steering Committee meeting with

5

Executive Team leaders in his place, essentially delegating his department's efforts around patient experience to Ms. Everett. (Dkt. 38-3 ¶ 9). This demonstrated to Mr. Cureton that Plaintiff "did not get it," nor was he the type of transformational leader that was going to help the organization in its critical effort aimed at improving patient experience. (*Id.*) Plaintiff admits he missed this meeting, explaining that he was at a family reunion in Texas. (Dkt. 52, Pg. 8).

Following Plaintiff's lack of engagement on a critical aspect of NH's business, delegation of this and other significant executive-level responsibilities to his subordinates, and Mr. Cureton's assessment that Plaintiff was not the type of enterprise leader that could succeed him, Mr. Cureton decided to terminate Plaintiff's employment. (Dkt. 38-2, 82:1-85:6, 88:3-8, 93:2-94:3, 117:14-22). This decision was informed by Mr. Cureton's desire to go from "good to great" – the expectation for SVPs – and to upgrade talent in the role to someone with a different skill set and professional background who could accelerate patient experience. (Dkt. 38-2, 80:12-81:24, 93:23-94:3). There is no record evidence that anyone other than Mr. Cureton made the termination decision.[1]

Plaintiff's employment was terminated effective July 30, 2018. (Dkt. 38-1, 125:10-126:4). At the time of Plaintiff's termination, Ms. Everett was promoted to SVP of Communications, a move that Mr. Cureton was contemplating independent of Plaintiff's separation in recognition of the work Ms. Everett performed independently for years, albeit without the formal title. (Dkt. 38-2, 85:13-25). Ms. Jones served as an interim marketing SVP

---

[1] Plaintiff has claimed that a jury could conclude Mr. Armato made the termination decision, and not Mr. Cureton, because Mr. Cureton told a recruiter that Mr. Armato had a concern about Plaintiff's command and was potentially aware of his termination before it happened. (Dkt. 52, Pg. 16). Neither of these facts allow a jury to conclude that Mr. Armato was the decision maker, especially in light of testimony to the contrary from both Mr. Cureton and Mr. Armato. Moreover, Plaintiff omits the fact that Mr. Cureton shared Mr. Armato's command concern with the recruiter, *when directly asked what Mr. Armato would say about Plaintiff*. (Dkt. 44-16, 19:16-20:8).

while NH conducted a national talent search. (*Id*. at 73:1-5, 77:21-78:7). Ms. Jones and Ms. Everett report that following Plaintiff's departure, the primary change was to their titles and reporting relationships (as they were already performing Plaintiff's substantive functions). (Dkt. 38-7, 40:21-41:1, Dkt. 38-6 ¶ 11). Ten months after Plaintiff's termination, NH hired Vicky Free as its SVP and Chief Marketing Officer. (Dkt. 38-1, 203:23-204:9, Dkt. 38-2, 78:14-22).

At the time of her hire, Ms. Free had been a Senior Vice President or higher for approximately 13 years, with strong consumer-based experience at Disney, BET and Turner Networks. (Dkt. 38-3 ¶ 11). In contrast to Ms. Free, prior to coming to NH, Plaintiff spent the previous decade operating his own business venture that ultimately "dissolved" following a failure to recover from the 2008 recession. (Dkt. 38-1, 25:24-26:2, 46:24-47:12).

### f. Plaintiff's Severance Offer

At the time of Plaintiff's hire in 2013, NH had an Executive and Leader Severance Pay policy (the "2013 Policy"). (Dkt. 37 ¶ 3). Plaintiff testified that he never saw a copy of the 2013 Policy during his employment. (Dkt. 38-1, 79:16-25, 67:16-23). Under the 2013 Policy, Tier II leaders (like Plaintiff), who met all other eligibility requirements, would receive additional severance if they had five years of service or more.[2] (Dkt. 37 ¶ 3). By its explicit terms, the 2013 Policy could be amended, modified, or terminated at any time, for any reason. (*Id.*)

In 2015, NH amended the severance policy (the "2015 Policy"). (*Id*. at ¶ 4). Under the 2015 Policy, Tier II leaders were eligible for a single amount of severance pay regardless of their length of service. (*Id.*)

---

[2] Plaintiff admits that he did not reach five years of service at the time of his termination in 2018. (Dkt. 38-1, 128:18-24).

7

At the time of his termination, NH offered Plaintiff severance benefits consistent with the existing 2015 Policy.[3] Plaintiff refused the offer, claiming that he was entitled to even more severance benefits under the sunset 2013 Policy. (*Id.*) But, because Plaintiff did not have five years of service, he was not entitled to greater severance benefits under even the inapplicable 2013 Policy. (Dkt. 38-1, 128:18-24). Further, in rejecting the offer, Plaintiff refused to sign a separation agreement as required and, consequently, has no entitlement to severance under the terms of either policy. (Dkt. 37).

### g. Plaintiff's Subsequent Job Search and Higher Paying Employment

Following Plaintiff's termination in July 2018, Plaintiff admitted that he did not subsequently even apply for employment. (Dkt. 40 at Pg. 8). Instead, he relied solely on talent recruiters to find him because, in Plaintiff's view, one does not "typically" apply for jobs at his "level." (*Id.*) Despite this remarkably passive approach, Plaintiff was contacted by recruiting firms from September of 2018 through the first quarter of 2019. (Dkt. 38-1, Pg. 54). At the time, Plaintiff would not consider a job with a base salary under $300,000.[4] (Dkt. 40, Pg. 9).

Plaintiff admits that between January and April of 2019, he voluntarily withdrew from multiple executive marketing positions:

- In January 2019, Plaintiff interviewed with a recruiter for the Chief Marketing and Communications Officer role at M Health Fairview at the University of Minnesota. (Dkt. 38-13, Pg. 20). Thereafter, Plaintiff spoke with an unidentified industry contact, who opined that a new leader could come in given the "tenuous political relationship" there. (*See* Exhibit A). As a result, Plaintiff decided not to pursue the job opportunity, testifying: "I just chose to not continue to pursue it." (*Id.*)

- During the first quarter of 2019, Plaintiff interviewed several times for the Chief Communications and Marketing Officer role at the University of Michigan

---

[3] This resulted in an offer to Plaintiff of nearly $500,000. (Dkt. 38-1, 124:1-16, 127:9-25).

[4] Notably, Plaintiff was hired at NH with a starting base salary of $288,000, the highest annual salary he had earned in his life up to that point. (Dkt. 38-1, Pg. 13).

8

(Michigan Medicine). (Dkt. 38-1, Pg. 54). Plaintiff withdrew, allegedly at the recruiter's recommendation, because the base salary was below $300,000. (*See* Exhibit A). Plaintiff also testified that, despite the title, the role did not encompass marketing and was thus half the scope of his NH role (an interesting claim considering he admittedly ceded all of communications/PR activities to his subordinate at NH). (*Id.*)

- In April 2019, Plaintiff interviewed for a Chief Marketing Officer role at the University of Miami Health System. (Dkt. 38-13, Pg. 20). Though the position offered a base salary in the "[l]ow 4s" (meaning $400,000), Plaintiff withdrew because he thought the geography of south Florida was "unappealing," "the market was predominately Hispanic and Plaintiff doesn't speak Spanish," and $400,000 was low in Plaintiff's estimate based on the cost of living.[5] (Exhibit A; Dkt. 38-13, Pg. 20).

Plaintiff ultimately secured employment at HFHS, beginning June 10, 2019 as its SVP of Public Relations, Marketing, Communications & Chief Experience Officer. (Dkt. 38-1, Pg. 56-7, 59). Plaintiff admits that this was not an equivalent position to NH, *it was better*. Plaintiff was paid more than he was at NH and considered the job a "promotion" because: (1) he reported directly to the CEO, and (2) had expanded responsibilities for a larger healthcare system. (Dkt. 38-1, Pg. 59-60). Though Plaintiff was terminated from this position on January 6, 2020, he received, among other compensation, base salary through December 2020. (*See* Exhibit A).

Following Plaintiff's termination from HFHS, he resumed waiting for recruiters to locate and present opportunities, which Plaintiff considers "actively looking." (Dkt. 38-1, Pg. 61). Yet again, through this process, Plaintiff was presented and withdrew from consideration for a VP of Marketing and Communications role with Cape Fear Valley Health System in 2020. (*See* Exhibit B). He did so without even learning the compensation offered because it was only "a billion dollar system" with a smaller scope of responsibility than he had at NH. (*Id.*)

### h. **Plaintiff's Claims Against NH, Testimony, and Theory of Discrimination**

---

[5] This offer appears to have exceeded Plaintiff's final base salary with NH, which was $402,676.

9

Case 3:19-cv-00624-DSC    Document 72    Filed 04/14/21    Page 9 of 20

Plaintiff testified that he did not think he was being discriminated against during his employment:

> **Q. So while you were employed at Novant, did you ever think that you were being discriminated against in your own mind?**
>
> **A. No.**

(Dkt. 38-1, 141:13-16). Indeed, it was not until after his termination, and after NH refused Plaintiff's demand for additional severance, that Plaintiff first claimed discrimination – at that time claiming age discrimination. (Pl. Dep. 136:19-21). This lawsuit abandons Plaintiff's initial claim of age discrimination and instead claims race and sex discrimination. This is true even despite Plaintiff <u>admitting</u> that no one at NH discriminated against him with respect to his termination:

> **Q. Do you believe any individual discriminated against you in your termination from NH?**
>
> **A. No. Not individually.**

(Dkt. 38-1, 176:6-8). Despite his repeated admissions of the lack of individual discrimination at NH, Plaintiff takes the rather inconceivable position that any termination of a white man followed by the hiring of anyone other than a white man must be discriminatory on its face:

> **Q. ...So what you're saying is regardless of the qualifications of the people, whether they are black or female, you believe [if] they got jobs previously held by white men, that it must be evidence of discrimination; isn't that right?**
>
> **A. Yes.**
>
> ...
>
> **Q. However, if there's a pattern of people of different races or genders entering the workforce and taking jobs previously held by white males, that is a pattern of discrimination in your mind; correct?**
>
> **A. Yes.**

(*Id*. at 168:2-7, 172:11-15).

10

### III. LEGAL ARGUMENT

#### a. Judgment as a Matter of Law is Warranted on Plaintiff's Severance Claims

##### *i. Plaintiff Cannot Present Evidence at Trial of "Specific Intent" Under ERISA as Required*

Plaintiff claims a violation of 29 U.S.C. § 1140 ("Section 510") of ERISA, which prohibits "discharge …. for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan …" The *McDonnell Douglas* burden-shifting framework applies to claims for discriminatory discharge brought under § 510 of ERISA. *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 239 (4th Cir. 1991). Therefore, Plaintiff must first establish a *prima facie* case, including a showing that he was discharged "'under circumstances that give rise to an inference of discrimination.'" *Blair*, 235 F. Supp. 2d at 473 (quotation omitted); (Dkt. 52, Pg. 22). In addition, Plaintiff must meet his ultimate burden to prove that he was discharged for the purpose of interfering with plan benefits. Under ERISA § 510, this requires a showing of "<u>specific intent</u>" to interfere with attainment of plan benefits. *Id*. at 239.

Plaintiff cannot present circumstances raising an inference of discrimination sufficient to establish a *prima facie* case, let alone meet his burden to prove that NH terminated his employment with the specific intent to interfere with his attainment of severance benefits. <u>Plaintiff's summary judgment briefing makes this abundantly clear</u>.

There is not a shred of evidence in this case that NH fired Plaintiff to avoid paying additional severance under the sunset 2013 policy. At the time of Plaintiff's termination in 2018, it had been out-of-date and inapplicable for nearly three years, having been amended and replaced by the 2015 policy under which Plaintiff was offered severance benefits. (Dkt. 37). While Plaintiff will likely argue that he was unaware the policy changed, Plaintiff's awareness is

irrelevant for ERISA 510 purposes, which focuses on employer intent (and not the Claimant's knowledge). Indeed, if Plaintiff's awareness of the policy controlled (and it does not), Plaintiff testified that he never saw either the 2013 or 2015 Policies during his employment.

As to employer intent, Mr. Cureton testified that at the time he made the decision to terminate Plaintiff, he was not aware of the amount or terms of any severance benefits Plaintiff may have been entitled to. Dkt. 38-3 ¶ 3. Instead, NH presented ample evidence of the actual legitimate, non-discriminatory cause of Plaintiff's termination. *See supra*. At summary judgment, Plaintiff was unable to point to any evidence in the record linking his termination to a motivation to avoid severance payments under an outdated policy, let alone specific intent. The same will be true at trial.

To date, Plaintiff has only been able to offer two arguments in support of this claim. Both are wholly deficient. First, likely to avoid Mr. Cureton's foregoing testimony, Plaintiff argues that "a jury could find that Armato was the decision maker." (Dkt. 52, Pg. 16). No reasonable jury could conclude that. *See supra*, FN 1. It also would not change the result. There is no record evidence that Mr. Armato (or any other person at NH) acted to deprive Plaintiff of severance benefits under an outdated plan. Tellingly, the only evidence Plaintiff offers on this point is the fact that "Armato's career at Novant has turned his attention to finance, including changing the pension plan to save money." (Dkt. 52, Pg. 16).

Second, Plaintiff claims that the reasons NH offered for his termination were false. (Dkt. 52, Pg. 22). This argument is largely premised on a job reference conversation Mr. Cureton had with a recruiter at Plaintiff's request and for his benefit. As discussed at length in NH's summary judgment opposition brief, the information Mr. Cureton gave is consistent with the stated reasons for Plaintiff's termination and does not show falsity. (Dkt. 51, Pg. 3-7). In any event, even if it did, Plaintiff still has not shown that *the true reason* for his termination was to avoid paying

12

benefits under an outdated policy. Where, as here, there is a complete lack of evidence on a claim for which Plaintiff bears the burden at trial, judgment as a matter of law under ERISA is required. (*See* Dkt. 40, Pg. 22).

### b. Judgment as a Matter of Law is Warranted on Plaintiff's "Reverse Discrimination" Claim

Like the ERISA claim, no reasonable jury to find in favor of Plaintiff on his claim of wrongful discharge in violation of Title VII or the policy contained in NCEEPA, each of which is evaluated under the same framework. *Jones v. Lowe's Companies, Inc.*, 402 F. Supp. 3d 266, 284 (W.D.N.C. 2019).

Plaintiff is proceeding under a "mixed motive" proof scheme, a framework utilized in cases where an employee alleges that an employer had both legitimate and illegitimate reasons for making a job decision. 42 U.S.C. § 2000e–2(m); *Desert Palace Inc. v. Costa*, 539 U.S. 90, 93, 101 (2003). Under this framework, Plaintiff must first prove by a preponderance of the evidence that his sex and race were motivating factors in the decision to terminate his employment. 42 U.S.C. § 2000e–2(m); *Desert Palace*, 539 U.S. at 94, 99. If Plaintiff meets this burden, Novant Health may then present an affirmative defense by demonstrating that it would have taken the same action absent the impermissible motivating factor. *Id*. at 94-95. If Novant Health makes this showing, Plaintiff is entitled only to declaratory relief, certain types of injunctive relief, and attorneys' fees. *Id*. at 94. Notably, even when a litigant proceeds under a mixed motive theory, "'[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'" *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286 (4th Cir. 2004), *overruled on other grounds*, *University of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000).

13

### *i. Plaintiff Cannot Demonstrate by a Preponderance of Evidence that Sex or Race Were Motivating Factors for his Termination*

There is no triable issue on Plaintiff's initial showing, i.e., that he was the victim of intentional discrimination motivated by his sex or his race. Plaintiff failed to meet this burden at summary judgment and necessarily cannot present sufficient evidence of it at trial.

Plaintiff admitted during his deposition that he was not the victim of individualized discrimination:

> **Q. Do you believe any individual discriminated against you in your termination from NH?**
>
> **A. No. Not individually.**

(Dkt. 38-1, 176:6-8). This admission is fatal. *See Danial v. Morgan State Univ.*, 426 F. Supp. 3d 135, 147 (D. Md. 2019), *reconsideration denied*, No. CV CCB-17-959, 2020 WL 4016174 (D. Md. July 16, 2020) (finding plaintiff plainly could not proceed with race discrimination claim where he admitted in his deposition that he did not believe he was discriminated against).

Admittedly not the victim of any individualized discrimination, Plaintiff attempts to support his claim in two ways: (1) through the terminations of six other white male employees; and (2) through an attack on NH's diversity, inclusion, and health equity efforts. Both avenues are similar in that: (1) they are premised on complete speculation wholly lacking in evidence; (2) they do not show any connection to race or sex discrimination; and (3) they are in no way related to Plaintiff's own termination – the central issue in this case.

NH discussed Plaintiff's hand-selected "other employee evidence" at length in its Motions in *Limine*. In short: (1) none were terminated by the same decision maker as Plaintiff; (2) none were terminated under the same or similar circumstances as Plaintiff; and (3) none were otherwise similarly situated to Plaintiff. (Dkt. 35). Interestingly, some were not even replaced by a female or non-white candidate, begging the question as to why Plaintiff selected them at all. In

14

addition, this evidence has zero link to race or sex discrimination. It is completely inadmissible at trial and necessarily cannot support Plaintiff's case.

Admissibility aside, Plaintiff's "other employee" evidence fails for a much simpler reason. When one views the aggregate numbers – and not just the selective anecdotes Plaintiff offers – there is no pattern of displacing white male SVPs like Plaintiff. (Dkt. 36, Exhibit B). The percentage of white men at the SVP level in 2015 is **<u>virtually identical</u>** to the percentage of white men at the SVP level at the end of 2019, following what Plaintiff characterizes as a push to remove white men from leadership roles. (*Id.*)

Aside from his debunked and inadmissible "other employee" evidence, Plaintiff attempts to build a conspiracy theory through a selective and highly narrated recounting of NH's diversity, inclusion, and health equity efforts. NH discussed its diversity, inclusion, and health equity efforts extensively in response to Plaintiff's Partial Motion for Summary Judgment. (*See* Dkt. 51, Pg. 14-19). As Mr. Armato explained, NH's diversity and inclusion efforts are primarily aimed at achieving health equity, i.e., "to obtain the highest level of health for all people." (Dkt. 51-6, 117:4-6; Dkt. 51-5, 58:4-6). In other words, NH aspires to reflect the communities it serves in order to deliver a remarkable patient experience every time, to everyone. (Dkt. 51-6, 110:2-7, 14-25-111:2).

Despite expansive discovery, Plaintiff has never marshalled any evidence that NH's diversity, inclusion, or health equity efforts had any connection to his termination, absent sheer conjecture. *Montgomery*, 2018 WL 1385409, at *3 (dismissal is appropriate "[w]here the only 'evidence' [plaintiff] has proffered is her own … speculative belief that []he was discriminated against"). He also never identified evidence showing that these efforts were discriminatory in any respect other than through conclusory statements by counsel.

To the contrary, Plaintiff admitted that diversity at NH meant:

15

> A variety of people of different backgrounds **but more importantly of different thoughts and perspectives and values.** So we had this concept of what's above the ground that you can see and what's below the ground that you can't see. And that was a principal teaching. Educational backgrounds, socio-economic backgrounds, religious backgrounds, social determina[nts]of health, **all those were things that we were trying to become more aware of beyond race and gender.**

(Dkt. 23-1, 106:2-14) (emphasis added). With respect to the NH's workforce, the record testimony underscored that NH is always going to hire the best candidate for the job:

> What we're doing is really looking at the best talent and making sure our talent -- we have the talent for our organization to be successful, and that's -- and success for us is meeting the needs of our patients, engaging our team members, and creating an environment where all of our team members and patients can thrive and where Novant Health not only survives as an organization in health care but thrives.

(Dkt. 51-5, 127:5-12). To do so, NH ensures that its recruitment efforts are broad so that it is able to consider the most competitive and diverse talent pool available. (*Id*. at 60:8-15, 123:14-18, 57:11-18). As Ms. Blackmon explained, it is "about spreading our net far and wide so that we can -- we can acquire all the talent that's out there. In our business of health care or any other business, you can't afford to leave any talent on the table if you're wanting to have a thriving organization." (*Id*. at 123:14-18). She went on to explain:

> We start looking at how do we spread our net far and wide so that we can source the best talent that's out there. As I was mentioning with my college football team, they had to really expand their reach if they wanted to be competitive in football. It's the same with Novant Health. If we want to meet the needs of our patients, if we want to continue to grow Novant Health and be successful, we have to expand our reach.

(*Id*. at 57:11-18). By spreading its net far and wide and selecting the best talent, NH is able to move closer to reflecting the communities it serves. (*Id*. at 60:5-15). NH's wide net is inclusive of all candidates, including white men. (Dkt. 51-6, 110:2-7).

16

There is nothing sinister about the foregoing (or even relevant to this case), as the foregoing shows. Realizing as much, Plaintiff leans heavily on what he calls a "targets." However, the only existing numeric goal with respect to workforce representation is NH's long-term goal for the three-year cycle of 2019 to 2021 to close the gap in certain demographic aspects of its workforce versus the communities NH serves. The 2019 to 2021 goal was effective *after* Plaintiff's termination and has nothing to do with replacing white men in senior leadership positions.[6] (Dkt. 36 ¶ 4). During Plaintiff's employment, there were no numeric targets or related compensation goals concerning workforce demographics or the diversity of NH's employees. Likewise, Mr. Cureton testified that he was not aware of numeric diversity targets and was (and is) not operating within them. (Dkt. 51-2, 123:12 to 124:2, 125:11-14, 128:7-18).

As a result, unable to make any showing necessary to proceed to trial, NH seeks judgment as a matter of law under Title VII and corollary state law.

### ii. *NH Can Make Out its Affirmative Defense*

Even assuming Plaintiff could prove by a preponderance of the evidence that his termination was motivated by sex or race (which he cannot), NH can show that it would have terminated Plaintiff's employment regardless of those considerations.

The record evidence is clear that the expectation for an SVP reporting to Mr. Cureton is that they are exceptional, not just adequate or even good. As Mr. Cureton explained, he is looking for someone so robust that they could ultimately succeed him. Mr. Cureton concluded that Plaintiff was not the type of exceptional leader that could be his successor. For example, Mr. Cureton observed that Plaintiff was reluctant to engage his peers across the organization and the Executive Team on critical efforts, including patient experience. In the month before Plaintiff's

---

[6] This is particularly true for Plaintiff who was ultimately replaced by an African American female, as this long-term incentive does not concern workforce demographics for female or African-American employees.

17

termination, Mr. Cureton discovered that Plaintiff seemingly delegated his department's efforts around patient experience – a top priority – to his subordinate instead of providing the direct engagement level Mr. Cureton expected. Prior to this time, Plaintiff also delegated critical internal speaking opportunities to subordinates, following a widely viewed incident where he was completely unable to present to NH's Boards of Directors.

In fact, as the record evidence demonstrates, Plaintiff delegated large swaths of his responsibilities to his subordinates with little to no oversight on his part. This fact is further underscored by the record evidence that: (1) very little changed for Ms. Everett or Ms. Jones following Plaintiff's termination and (2) the unassailable fact that there was no need to replace Plaintiff for some ten months following his termination.

Meanwhile, the record evidence establishes without question that the Executive Team – Plaintiff's superiors – had very little confidence in Plaintiff as a leader. From wondering where he was, to Ms. Everett handling all duties relating to the Executive Team, to Plaintiff's inability to present to NH leadership, the loss of confidence in Plaintiff by the senior leaders within the organization is clear.

Against this backdrop, NH can clearly show a legitimate explanation for Plaintiff's termination that would have (and was) decided upon without consideration of his sex or race. Mr. Cureton made the decision to terminate Plaintiff's employment based on an aggregation of considerations, including Plaintiff's delegation of significant responsibilities to his subordinates, the conclusion that he was not exceptional or a successor to Mr. Cureton, and the opportunity to elevate talent in the role to more closely align with the organization's increased focus on patient experience (a top priority Plaintiff largely delegated to his subordinate). This fully satisfies NH's affirmative defense showing. Therefore, at best, Plaintiff recovery in this case is substantially limited.

## IV. CONCLUSION

Failing to meet his burden on each and every claim presented, Plaintiff's claims fail as a matter of law. For the reasons stated above and such other evidence and argument that will be presented at trial, NH will seek directed verdict at trial.

Dated this the 14th day of April, 2021.

Respectfully submitted,

/s/Benjamin R. Holland
Benjamin R. Holland, NC #28580
Elizabeth R. Gift, NC #44331
S. Abigail Littrell, NC #49354
*Attorneys for Defendant*
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
201 South College Street, Suite 2300
Charlotte, NC 28244
Telephone: 704.342.2588
Facsimile: 704.342.4379
E-mail: ben.holland@ogletree.com
elizabeth.gift@ogletree.com
abby.littrell@ogletree.com

## CERTIFICATE OF SERVICE

I, Elizabeth R. Gift, hereby certify that I have this day electronically filed the foregoing **DEFENDANT'S TRIAL BRIEF** with the Clerk of Court using the CM/ECF system, which will send notification of the filing to the following person:

S. Luke Largess
*Attorney for Plaintiff*
Tin, Fulton, Walker & Owen, PLLC
301 East Park Avenue
Charlotte, NC 28203
Telephone: 704.338.1220
Facsimile: 704.338.1312
Email: llargess@tinfulton.com

Dated this the 14th day of April, 2021.

/s/Elizabeth R. Gift
N.C. Bar No. 44331
*Attorney for Defendant*
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
201 South College Street, Suite 2300
Charlotte, NC 28244
Telephone: 704.342.2588
Facsimile: 704.342.4379
E-mail: elizabeth.gift@ogletree.com