# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:19-CV-00624

DAVID DUVALL,                          )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )
                                       )
NOVANT HEALTH, INC.                    )
                                       )
        Defendant.                     )

## PLAINTIFF'S TRIAL BRIEF

Plaintiff, through counsel, respectfully submits this trial brief, describing the evidence supporting of his claims and reviewing the legal issues to be resolved at trial. Plaintiff has been briefed the matter extensively in several prior briefings. [See, ECF 22, 44, 52 and 56]

This matter involves the distortion of a good intention. In 2015, Novant Health signed onto a commitment by numerous health systems nationwide to address health inequities. That goal spurred a commitment to a diversity and inclusion ("D&I") initiative at Novant Health that, by 2018, had turned into avowed, even boastful, "strategic imperative" to rely on racial and gender targets to reshape Novant Health's workforce and leadership to reflect the community it served. As a direct result, Plaintiff and other white

male leaders were dismissed from employment without warning and replaced by women and/or minorities.

A single document best captures the distorting effect of this strategic imperative. The "ninebox" scores of employees identified in discovery shows their ranked potential and performance in 2017, rated as low, medium or high in each category. See Trial Ex. 18. By 2019, every white male employee on that document, no matter how ranked, *had been terminated*; and every *identically ranked* woman and/or minority employees *had been promoted*.

And Plaintiff was terminated six day before his fifth work anniversary to avoid a claim for 18 months' severance that had just been paid to two other dismissed white male executives who had passed the five-year milestone.

Plaintiff brings three claims to trial over his July 30, 2018 dismissal – federal and state "reverse" discrimination claims in violation of Title VII and the public policy set out in N.C.G.S. § 143-422.2, respectively; and an ERISA §510 interference claim under 29 U.S.C. § 1140. Because the severance plan involved continued participation in a health insurance plan, Plaintiff agrees with Defendant that ERISA preempts his corollary state law claim of severance-related wrongful discharge. That ERISA claim is a matter for the Court as only equitable remedies are available under § 502(a)(3).

### A. Background to the Hiring of Plaintiff

Novant Health, Inc. ("Novant") was formed in 1997 by the merger of a health system in Winston-Salem that operated Forsyth Memorial Hospital and other facilities and a health system in Charlotte that operated Presbyterian Hospital and its affiliated clinics. The merged system initially kept separate boards for regulatory reasons but also formed a parent board of directors.

A year after the merger, Novant Health hired accountant-trained Carl Armato from a health system in Louisiana to serve as vice president for finance and operations. Armato preached that Novant Health physicians should be engaged in the business of medicine, what he called the "private physician" operating model, where doctors have a financial stake in their practice group's profitability. That approach was nicknamed the "Armato plan" when Novant adopted it.[1] Novant promoted Armato to positions of increasing responsibility until he was named CEO in August 2012. [*Armato,* pp. 5, 26].

---

[1] Armato is cost conscious and persuaded Novant to change its Supplemental Executive Retirement Plan or "SERP" from a costly "defined benefit" pension with guaranteed annual increases to a "defined contribution" where each executive receives and annual SERP contribution of 15% of their base salary and chooses how to invest it. Plaintiff had to forfeit his entire SERP investment, over $200,000 when terminated.

In January 2013, Armato hired Jesse Cureton into a newly created position of Chief Consumer Officer at the executive vice president level. Cureton had been a Novant board member before retiring from Bank of America in December 2012.

One of his responsibilities was to work on rebranding all Novant Health facilities under a single name/logo, designed by the company Prophet and adopted by the Novant Board. Cureton began a national search for the vacant position of Senior Vice President of Marketing and Communications, integral to marketing the new brand to consumers. A head hunter presented Plaintiff as the candidate whom Cureton would hire. Duvall held Masters degrees in Public Health and Business and had extensive management experience in pharmaceutical and biomedical marketing.

Novant's job offer included a base salary of $288,000, annual and long-term incentive bonuses, and the annual DC SERP of 15% of base salary. Tr. Ex. 25. It also included a severance plan for Duvall as a Tier II executive -- a promise of a full year's salary and the prior year's bonus if terminated without cause after more than six months of employment, and 18 months of base pay and 1.5 times the prior year's bonus after five-years of employment. Duvall made notes about the terms of severance and the

vesting schedules for the bonus and SERP plans on his offer letter. Tr. Ex. 26. Defendant does not dispute the terms of the 2013 severance plan.

## B. Novant's Marketing Strategy Transformed

Duvall began work on August 5, 2013 and over the next several years would create a nationally recognized model for innovative and effective healthcare marketing, applying quantitative analytics and market segmentation used in other industries but were new to marketing health care. But Duvall first spent time building his team. Over many months, he worked with his staff to assess and reorganizing the structure of its work and hired new staff with specific skills in data analytics and market segmentation. Tr. Ex. 32.

Duvall was very committed to his team's personal development, both as individuals and as a group. He added Tammy Jones, an African American woman, as a marketing director and then championed for her promotion to vice president. Tr. Ex. 44, 45. He enrolled the team in a leadership and development program called One Team. Designed originally to promote physician resiliency and fight burnout, Duvall had gone through the training with other senior leaders and wanted his group to benefit from it. It was so impactful, he extended it for 18 months. His two vice presidents, Jones and Communication Vice President, Kati Everett, praised the training, both for its powerful personal impact

[Everett,68] and the way the team coalesced around it. [Everett 21, 30-31].

Duvall and his team worked closely with Scott Davis from the branding company Prophet on the marketing of the Novant Health brand. They divided Novant Health's customers into six segments and focused on marketing to two of them. Tr. Ex. 29, pp. 30-38. They then used regression analysis to measure the return on marketing investment, quantifying the percentage of new patient encounters generated by the marketing campaigns. Tr. Ex. 29, p. 44. He also pushed for more emotive, distinctive advertising, which led to regional awards and national recognition. Tr. Ex. 36.

By 2016, Duvall and Davis were presenting the marketing of Novant Health at two national healthcare marketing conferences. T. Ex. 29, 31. A marketing professional who heard Duvall speak said it was "quite possibly the best marketing presentation I've ever attended"; that she had shared his "utterly groundbreaking" materials "with anyone who will listen to me about healthcare marketing." Tr. Ex. 30. Duvall also presented Novant's marketing strategy to a gathering at Novant of Ascension Ventures, a consortium of private hospital systems. Tr. Ex. 34

In April 2017, articles by Duvall about Novant Health's mission and marketing strategy were published in the New England Journal of

Medicine's magazine, Catalyst, Tr. Ex. 39, 40, and in Spectrum, Tr. Ex. 38, the magazine of the Society for Healthcare Strategy and Market Development ("SHSMD"), a division of the American Hospital Association. He spoke in May 2017 at the 22nd Annual Healthcare Marketing and Physician Strategies Summit. Tr. Ex. 43. And a different group, the Healthcare Marketing Association, visited and then selected Novant Health as a marketing case study to follow over several years by a national consortium. Tr. Ex. 53. Duvall and a team that included Tammy Jones participated and led sessions at the HMA in Chicago in 2017. His team also initiated campaigns around the new Comprehensive Stroke Center. Yr. Ex. 48

Duvall also sat on numerous Novant committees and led some, including the Growth Strategy Task Force formed in early 2017. Tr. Ex. 37. The most significant, however, was an $8 million venture with Red Ventures that he co-led with Dr. Hank Capps. Tr. Ex. 51, 52. This unique-to-health-care initiative to use U.S. Postal Service relocation data for direct marketing to persons moving into Novant's service areas. The then-president of Novant's Charlotte market, Dr. Andrew Mueller, confirmed that Duvall was his principal contact on that major undertaking.

### C.  Novant Health's Diversity & Inclusion Initiative

During much of Duvall's first two years, Novant did not have a staff person dedicated to promoting diversity and inclusion.  A prior vice president in that role had separated from Novant and her position remained vacant for some time.  But in August 2015, after Novant signed a national hospital system initiative to address healthcare inequities, Carl Armato selected Tanya Blackmon, then president of the Novant hospital in Huntersville, to lead a diversity and inclusion initiative.

Blackmon drafted two versions of a five-year strategic plan to embed diversity and inclusion within Novant Health by 2020.  Trial Exhibits 5, 6. Phase One of each included a "listening tour" in which Blackmon would meet with Novant employees and leaders, then she would gather data on Novant Health's level of diversity and inclusion to compare against other "best practice" organizations, and then engage with Novant Health's Board and leadership team over the results.  Phase Two was an active period where various strategies would be implemented to promote D&I and metrics would be developed and employed to assess progress.  Finally, Phase Three was a period where the impact of the D&I initiative would be assessed and shortfalls would be addressed.

In May 2016, in a show of commitment to the initiative, Armato publicized his promotion of Blackmon and two other women, the Chief

Human Resources officer and the Chief of Nursing, to Executive Vice President positions and made them members of the Executive team. Tr. Ex. 1.

On November 22, 2016, Blackmon presented to the Board a lengthy power point setting out the business case for committing to diversity and inclusion. Tr. Ex. 2. It included a single-page summary of her listening tour findings and a two-page schematic of a now slightly shortened plan to embed diversity by 2019 - promoting D&I and developing metrics in 2017, utilizing a D&I "lens" in decision-making in 2018, and then assessing progress and making adjustments in 2019. Tr. Ex. 3. The Board embraced Blackmon's proposal and approved a long-term-incentive (LTI) plan for 2017 to 2019 that benefited the senior leadership financially for improving diversity and inclusion, measured by the responses to an employee survey. Tr. Ex. 7.

In implementation, the D&I plan followed closely Blackmon's timetable presented to the Board. She submitted workforce data to Diversity, Inc., to compare Novant's levels of D&I with that of other organizations. By April 2017, Novant received a disappointing scorecard. Tr. Ex. 8. While Novant treated women employees comparatively well in all but compensation, it was below the median by most diversity measures and was at the bottom in accountability. *Id.* Defendant did not publicize the unflattering results, but

instead issued a press release that Diversity MBA had rated it the fourth best place to work for women and diverse managers nationally. Trial Ex. 9.

Blackmon spent most of 2017 promoting the D&I initiative, conducting trainings and workshops for employees on the value of D&I and building Business Resource Groups or BRGs – organizing events to support various identity groups. A program called LIFT provided leadership training for women. In August, she praised Duvall and his team for providing her the promotional materials for her D&I activities. Trial Ex. 11.

A bit like the ninebox exhibit, one training roster would later show the impact of the D&I initiative. Over several days in late April and early May 2017, a group called the White Men's Caucus, including five of Armato's director reports, attended a training on how white men could be diversity "partners." Tr. Ex. 10. But by 2019, most attendees, including all but one of Armato's direct reports, were no longer employed and had been replaced by minorities and/or women.

That outcome reflected the increasingly direct effort in 2018 to meet diversity targets and reshape the demographics of Novant Health's leadership. [Brunstetter, p. 24, l. 18 to p.26, l. 21]

On February 1, 2018, a newly formed Diversity and Inclusion Executive Council (DIEC) held its first meeting and discussed how to strengthen the "strategic direction" of D&I, including the development of metrics to measure

progress since 2015.  Trial Ex. 12.  Duvall attended.  The minutes noted the disappointing results of the Diversity, Inc. report card, the need to address the shortfalls and the decision to delay another report card application to Diversity, Inc. until at least 2019.  The DIEC discussed self-scoring Novant Health based upon the Bersin diversity model instead. Trial Ex. 13.[2]

Later that month, the first of Armato's white male direct reports was let go without warning and replaced by a woman.  David Garrett, the SVP and Chief Information Officer had been recognized for his work in providing doctors and patients access to electronic medical records called EPIC. Garrett had earned Novant a level 7 HIMSS designation, the highest rating for electronic medical record access, and a Davies award for its functionality. After Armato hired Angela Yochem over Garret as EVP for Digital, and Garrett was then terminated and replaced as SVP by Leti Nettles, a female who lacked a master's degree required for an SVP position.

Importantly for the ERISA claim, Garrett was a Tier II executive and had a 2011 severance agreement with the same five-year incentive offered to Duvall.  Garrett received 18 months of severance.  Tr. Ex. 97.

_____

[2] Duvall cooperatively provided Blackmon a model used for measuring D&I in an academic hospital setting that she did not use.  Trial Ex.14.

In May 2018, the DIEC met a second time. Tr .Ex. 15. Blackmon's team presented the metrics promised at the February DIEC meeting – charts showing the demographic shift in Novant Health's workforce and leadership from 2015 to 2017, by race/ethnicity and gender. Tr. Ex. 16. At the May meeting, which Duvall attended, the DIEC discussed whether Novant's Health's leadership reflected the workforce. Blackmon promised the development of a diversity dashboard by the next DIEC meeting, one that each department could use in assessing the demographics of its team.

In June, a second of Armato's direct reports, the Chief Medical Officer, Dr. Thomas Zweng, was fired without warning. He would be replaced by Dr. Eric Eskioglu. Zweng also had a Tier II severance agreement from 2009 with the same incentive increase after five years of employment. Tr. Ex. 101. Zweng received 18 months of severance. Trial Ex. 102.

Then, on July 30, six days before his fifth work anniversary, Plaintiff was terminated without warning and, with Armato's required prior approval, Duvall's vice president for communications, Kati Everett, was promoted to SVP of Communications. Cureton included her promotion in an announcement about Duvall's separation that Everett had prepared before the termination and that Cureton issued after telling Duvall the news. Tr. Ex. 71. Tammy Jones assumed the marketing duties during a search for a marketing SVP.

Cureton had never documented a single concern about Duvall's work. He told him at the termination that Duvall had accomplished everything asked of him, but there was a story behind the decision that he could not convey. Cureton left the room and Karen Powers from HR presented him with a 12-month severance agreement. Tr. Ex. 72.

Cureton, Everett and Powers from human resources then selected three black women finalists for Marketing SVP. The person selected, Vicky Free, had the same academic training as Plaintiff at the Kellogg School of Management. She did not begin until May 2019, after more leadership changes had taken place.

In late October, Armato announced the termination of the Chief Legal Officer and former Novant board chair, Peter Brunstetter, and named three minorities as his chief legal officer, chief medical officer and president of the Medical Group.

Brunstetter, had served as board chair of Winston-Salem hospital system during the 1997 Novant merger and as chair of the parent board. [Brunstetter, p. 12-14]. After serving in the state legislature from 2006 to 2013, including the role of appropriations committee co-chair [*Id.* pp. 8-10], he returned to Novant in December 2013 in a role he proposed to Armato — Executive Vice President and Chief Legal Officer. [*Id.* pp. 11, 16].

Brunstetter described sitting next to Armato at an executive team meeting before his termination and after the October 8, 2018 termination of John Phipps, the president of the Medical Group. They finished an agenda item about embedding diversity at senior levels and Armato "kind of clapped his hands together", shook his head, and said, "I know exactly what I am going to do."[*Id.*, p. 48, 50]. On October 23, he fired Brunstetter and then filled those three vacancies.

In firing him, Armato told Brunstetter that he was concernedabout his level of engagement, that he needed someone able to manage a $10 Billion company; and that it would be "unfair to ask you to come along" on the journey Novant was undertaken. Brunstetter, p. 45. In fact, Brunsetter's engagement score was higher than Armato's, Tr. Ex. 64; and he had overseen a $22 Billion state budget in the Legislature and, post-termination, served as COO of the $12 Billion UNC system. [Brunstetter, pp. 9, 62-63]

On October 25, 2018, two days after firing and replacing Brunstetter, Armato attended the year's third DIEC meeting, and his first. The minutes reflect a defiant discussion of Novant Health's right to use internal diversity "targets" to meet its "strategic imperatives" to reshape the leadership and workforce of Novant Health to reflect the community. Tr. Ex. 19. Those minutes read:

> We, Novant Health, are not interested in meeting quotas; quotas are mandated by someone outside of your organization. We want to reach our targets, targets are set by the organization, which is within our strategic imperatives and making sure our workforce reflects the community we serve.

[*Id.*, p. 2]. At the end of the minutes were discussions about concerns about whether white men should look elsewhere for work.

Brunsetter explained why he thought these diversity targets had become so urgent. [Brunstetter 27-28]. Armato is results oriented and other goals had proven difficult. Expansion by merger and acquisition had failed several times and the goal to increase patient safety scores required compilation of data over several years. Making diversity progress by meeting targets was easiest to achieve. [*Id.* p. 28]

In December 2018, Cureton spoke with two head hunters vetting Duvall for a position at Johns Hopkins that his separation was *not* based on his performance; Tr. Ex.84. 85; instead, Duvall had been let go as part of a larger change in the leadership team, seeking a "new point of view" (the very purpose of the D&I plan). He described the other changed positions and said he would rehire Duvall. Defendant's post-hoc effort to identify performance concerns, discussed below, completely contradicted Cureton's statements to these two recruiters.

The diversity initiative pressed on into 2019. The Board's governance committee received a new diversity metrics report in February 2019, Tr. Ex.

20, that restated the imperative of developing a leadership team that reflected the community, *id.,* pp. 5-7, and unveiled the diversity "dashboard" for tracking metrics. [*Id.,* pp.8-9].

The February report set new diversity targets for African-Americans in leadership and for Hispanics and Asians in the workforce and in leadership. The Board then approved a long-term incentive plan where 50% of LTI bonus over the next three-year cycle would depend on meeting those Hispanic and Asian hiring targets. Tr. Ex. 21

Within weeks, the white male president of the Charlotte market, Dr. Andrew Mueller, was terminated abruptly by Eric Eskioglu and replaced by an Asian executive, Saad Ehtisham.  Eskioglu told Mueller that Novant Health had abolished his position, was moving away from using physicians as administrators, and he was fired for looking for a job elsewhere.

Mueller's role as president of the Charlotte market had mirrored his counterpart in Winston-Salem, Dr. Stephen Motew. [Mueller, 17]. Both were physician-administrators, a combination that Armato supported. [Armato, pp. 28-30].  Armato contradicted Eskioglu that he physician administrator model had ended or that Mueller should be fired for looking elsewhere for work.

That same month, Blackmon attended a summit for a new BRG called Engaging White Men.  Tr. Ex. 23.  Her presentation generated an

anonymous hotline complaint that she had announced that white men would not be selected as leaders going forward.  Tr. Ex. 24

In May 2019, Ms. Free replaced Duvall as the new Senior Vice President for Marketing

And, in September 2019, Blackmon presented a new "Employer of Choice" report with trends in diversity metrics from 2016 to 2019.  It showed a 5.6% decline in white leadership (Vice President and higher), increases in leadership representation in all other racial or ethnic groups, and a remarkable 21.1% jump in the number of women in leadership.  [*Id.*]

## D.    Defendant's Justifications for Plaintiff's Discharge

Denying that the avowed racial and gender targeting had anything to do with Plaintiff's termination, ignoring Armato's pre-termination role in approving the two new SVP roles to replace Duvall, avoiding the fact that Cureton had not documented a single concern in five years and had told the recruiters that Duvall had done everything asked of him and was not fired due to performance,  Defendant claims that Cureton acted alone and fired Duvall for performance.

### 1.    Public Speaking.

Defendant's claim that Plaintiff's stopping a speech in April 2016 had led him to avoid speaking *internally* and that he delegated that duty to others.  But there is no record of any such concerns.  Plaintiff finished that

April speech and spoke to the Board later that year about new patient "personas" in EPIC, Novant's electronic medical records system. He gave the keynote address to the Novant Health Foundation staff retreat in 2017 and spoke to and moderated the Marketing and Communications staff retreat of more than 100 people in 2017. The only goal speaking Cureton ever identified was to appear nationally, which Plaintiff did often, as noted above.

Defendant's only example of avoidance is an email in April 2018 that the next HMA session in Chicago conflicted with the May 2018 Board meeting. Tr. Ex. 68. Duvall's participation at HMA was a specific annual incentive plan goal approved for 2017. Tr. Ex. 55. Plaintiff ended up speaking at the HMA and Tammy Jones attended but did not present at the Board meeting.

### 2. Peer Engagement and Delegation of Duties

Defendant claims, but again never documented, that Plaintiff had failed to engage with his peers. Plaintiff's team engagement score for 2018 was 4.58 Tr. Ex. 59, 60, much higher than Cureton's score of 4.03, which was well below the system average of 4.32. Tr. Ex. 54. And Cureton could not identify any peer who complained about Duvall's lack of engagement. In fact, Cureton had written in a review in January 2017 that

Plaintiff's interaction with "stakeholders" (his peers) was the thing he did best.

That April, Duval had distributed a new ad campaign around the life-flight helicopter, Tr. Ex. 66, worked with Prophet on a presentation for a possible merger, Tr. Ex. 67 and co-led the launch of Red Ventures. The claim that Plaintiff was fired for failing to attend a single June 25, 2018 meeting of a patient experience committee was astonishing given his engagement in other matter. But as Plaintiff's calendar shows that he had previously scheduled vacation on Friday, June 22 and Monday June 25. Thus, Plaintiff asked Ms. Everett to attend in his stead.

## Issues for Trial

## I. Title VII Prohibits Race and Gender Discrimination

Plaintiff alleges that he was terminated and replaced by two females, one a racial minority, because of his race and gender - in furtherance of Defendant's diversity initiative. Title VII protects white employees from discrimination based on their race, *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 278-80 (1976), and protects men from discrimination based on their sex. *Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.,* 462 U.S. 669, 685 (1983). And voluntary affirmative action plans like Novant Health's are actionable if they "unnecessarily trammel" the rights of white employees.

*Smith v. Va. Commonwealth Univ.*, 84 F.3d 672, 676 (4th Cir. 1996). And Terminating a white male employee to achieve a hiring target for minorities or women is unlawful under *United Steelworkers v. Weber*, 443 U.S. 193, 208 (1979); as is setting numeric targets "intended to maintain racial balance". *Lilly v. Beckley*, 797 F.2d 191, 194–95 (4th Cir. 1986).

Defendants do not contest these legal principles, but argue instead that Cureton fired Duvall over wholly undocumented performance concerns and not because of the declared race and gender-imperative to change the face of leadership to mirror the community.

### A.    The Mixed-Motive Proof Scheme Applies.

There are two ways to prove race and/or gender discrimination under Title VII, the "mixed-motive" approach codified in the 1991 amendments to Title VII, or the *McDonnell-Douglas* circumstantial evidence test. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) The Fourth Circuit has not yet ruled on whether a Title VII reverse discrimination Plaintiff must produce additional evidence to establish a *prima facie* case under *McDonnell Douglas*. *Lucas v. Dole,* 835 F.2d 532, 534 (4th Cir. 1987); *Weeks v. Union Camp Corp.,* 215 F.3d 1323, 2000 WL 727771, at *6 n.13 (4th Cir. 2000). But the evidence or pretext is powerful here.

Further, the mixed-motive approach, codified in response to the

decision in *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989), is statutory

and has straight-forward application. The first of the two applicable

statutes read

> Except as otherwise provided in this subchapter, an unlawful
> employment practice is established when the complaining party
> demonstrates that race, color, religion, sex, or national origin was **a
> motivating factor** for any employment practice, even though other
> factors also motivated the practice.

42 U.S.C.A. § 2000e-2(m)(emphasis added). In 2003, the Supreme Court

held in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), that sufficient

circumstantial proof can support of a mixed-motive approach. Citing to

the language of the statute, it held:

> Section 2000e–2(m) unambiguously states that a plaintiff need only
> "demonstrat[e]" that an employer used a forbidden consideration
> with respect to 'any employment practice. On its face, the statute does
> not mention, much less require, that a plaintiff make a heightened
> showing through direct evidence.

*Id.*, at 98–99.

Here there is a mix of direct and circumstantial evidence: The oft

repeated, avowed strategic imperative to reshape the demographics of the

leadership to reflect that of the community; the declared "right" to use race

and gender targets to achieve that strategic imperative; the creation of

metrics to measure progress toward those targets; the financial incentives to

use race in decision making; the pattern of terminations evident in the nine-

box exhibit, where at every level of potential – low, medium or high – the white male employees were fired while the identically rated women and minorities were promoted; and the number of Cureton's white male direct reports falling from seven to one over the course of the D&I initiative. All strong evidence of unlawful motive.

There is classic circumstantial evidence –the complete absence of any documentation of the claimed performance concerns, so that a jury could disbelieve that claim, particularly given Cureton's statement against interest to the head hunters that Duvall's performance was not the reason he was fired.

### B. The Burden of Proof Shifts

Upon a finding by the jury under 42 U.S.C.A. § 2000e-2(m) that race and/or gender was a motivating factor in Duvall's termination, then the burden of proof, not just production, shifts to Novant under 42 U.S.C.A. § 2000e-5(g)(2)(B), to show that it would have taken the same action and fired Duvall absent the discriminatory motive. It can avoid liability for damages and avoid reinstatement of Duvall, but not certain court sanctions. *See Diamond v. ColonialLife & Acc. Ins. Co.*, 416 F.3d 310, 317 (4th Cir. 2005).

### C. Cureton's Statements to Ward Group

Cureton's statements to Ward Group that Duvall was not fired for her performance come into focus when the burden shifts to Defendant. The Court should find the statements to be an admission against interest by Defendant Novant under Federal Rule of Evidence 801(d)(2)(D). Cureton spoke to Ward Group in his capacity as an agent of Novant, an Executive Vice President, about a matter within that agency — the hiring and employment of Duvall under his supervision and his termination as part of a change in leadership. *See*, *Sutton v. Roth, L.L.C.*, 361 F. App'x 543, 547–48 (4th Cir. 2010). Novant cannot disavow these statements.

At a minimum, the jury can find, as can the court on the ERISA claim, that Cureton statements to Ward Group contradict both his deposition testimony and the Defendant's discovery responses, calling his clearly undocumented assertions about performance problems even more into question.

## II. State Law Follows These Same Principles

Plaintiff also claims that his termination violated the public policy set out in the North Carolina Equal Employment Practices Act or N.C.G.S. § 143-222.2. The state courts look to "federal decisions for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases." *N. Carolina Dep't of Correction v. Gibson,* 308 N.C.

131, 136, 301 S.E.2d 78, 82 (1983).  Thus, the Title VII proof scheme applies to the state law claim and the jury will not need a separate instruction on that claim.

## A. Title VII Cap on Damages

Plaintiff seeks actual and punitive damages but not non-pecuniary damages on his discrimination claim.  The absence of a hard cap on punitive damages under state law may become an issue in the case if the jury were to award substantial punitive damages.  Under 42 U.S.C. § 1981a(b)(3)(D), the amount of non-economic and punitive damages is capped at $300,000.  Under N.C.G.S. § 1D-25, however, the amount of punitive damages is capped at three times the damages awarded in total compensation, or $250,000, whichever is greater.

Plaintiff has prepared a chart/exhibit to explain economic loss in excess of $1 million.  If the jury awards economic damages in that range and also awards punitive damages, the state law cap may supersede the Title VII cap.  But application of any cap will be a matter for the Court and not the jury.

## III.  The Section 510 ERISA Claim

Plaintiff also alleges that he was terminated six days before his fifth work anniversary to interfere with him making any claim to the 18 months

of severance offered him after five years when hired.  It had just paid same that Tier II benefit to two other executives.   This claim is brought under 29 U.S.C.  § 1140 or § 510 of ERISA.

Two statutory provisions support his claim.  First,

It shall be unlawful for any person to discharge ... a participant or beneficiary ...for the purpose of interfering with the attainment of any right to which such participant **may become** entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140. *See Blair v. Young Phillips Corp.,* 235 F. Supp. 2d 465, 472 (M.D.N.C.2002)   The Fourth Circuit had held that a vested participant in a plan can sue under  § 510 for being denied the opportunity to accrue more benefits.  *Conkwright v. Westinghouse Elec. Corp.,* 933 F.2d 231, 238 (4th Cir. 1991)

Further, Defendant claims that is changed the severance plan in 2015 without notice to anyone.  There is a statutory obligation to disclose any material change in a covered benefit plan within a specified time.

[A] summary description of such modification or change shall be furnished not later than 210 days after the end of the plan year in which the change is adopted

29 U.S.C.A. § 1024(b)(1). Those reporting requirements apply to severance plans. *See, Blau v. Del Monte Corp.,* 748 F.2d 1348, 1352 (9th Cir. 1984)(holding that the reportingrequirements of ERISA apply to severance

plans and citing to *Donovan v. Dillingham*, 688 F.2d 1367, 1372 (11th Cir.1982); and *Dependahl v. Falstaff Brewing Corp.,* 491 F.Supp. 1188, 1195 (E.D.Mo.1980), *aff'd* 653 F.2d 1208 (8th Cir.), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981)).

Defendant does not dispute that the 2013 severance plan provided that five-year incentive benefit. Defendant has produced an amended severance plan from 2015 that does not contain the five-year incentive and claims the 2015 plan supplanted the 2013 plan. But it failed to notify Plaintiff of that change, as required by 29 U.S.C.A. § 1024(b)(1)

When an employer fails to follow its reporting obligations under 29 U.S.C.A. § 1024(b)(1), an employee can sue for reformation of the undisclosed current plan to the more generous benefit previously offered. *See, Aiken v. Policy Mgmt. Sys. Corp.*, 13 F.3d 138 (4th Cir. 1993) (employee allowed to challenge undisclosed change in retirement benefit). The failure to disclose modifications can also constitute a breach of fiduciary duty imposed by ERISA and justify reformation to the prior benefit on that basis. *Rodriguez v. MEBA Pension Tr.*, 872 F.2d 69 (4th Cir. 1989).

Thus, if Plaintiff had been fired *after* his fifth anniversary, he could have sued under *Conkwright* or over Defendant's failure to disclose the

material change in the severance plan and sought judicial reformation to provide him the 18 months offered upon hire. Firing him just prior to his fifth anniversary foreclosed that claim because his right to the 18 months benefit under the 2013 plan had not yet vested. The termination claim fits squarely within 29 U.S.C. § 1140. It is interference with a right to which a "participant may become entitled".

Like in discrimination cases, direct evidence of "specific intent" to interfere with attaining a benefit can be difficult to prove, so the courts use the *McDonnell Douglas* framework for § 510 claims. A plaintiff may prove his case by showing (1) that he is a member of the protected class, *i.e.,* a participant in an employee benefit plan; (2) that he was qualified for the job; and (3) that he was discharged "under circumstances that give rise to an inference of discrimination." *Blair v. Young Phillips Corp.*, 235 F. Supp. 2d 465, 473 (M.D.N.C. 2002)(internal citations omitted).

This court sits in equity on this claim under §502(a)(3). It can find pretext and reject Defendant's claim that performance problems justified the termination. There is no other rational explanation for the timing except that Novant had just paid two other executives the 18 months of Tier II severance promised to Plaintiff after five years of work. This evidence would allow this Court to find that he was fired on July 30, 2018

with the unlawful intent to interfere with his making a claim for the 18 months of severance after working five years.

The equitable remedy for that violation is the reformation of the severance plan or a surcharge to provide Plaintiff the benefit he was denied.

Respectfully submitted this 19th day of April, 2021.

**/s/ S. Luke Largess**
S. Luke Largess
NC Bar No. 17486
TIN, FULTON, WALKER & OWEN, PLLC
301 East Park Avenue
Charlotte, NC 28203
Tel.: 704-338-1220
Fax: 704-338-1312
luke.largess@tinfulton.com

## CERTIFICATE OF SERVICE

I certify that I have served the foregoing Document upon Defendant through the ECF system

This is the 19th day of April, 2021.

**/s/ S. Luke Largess**
S. Luke Largess

*Attorney for the Plaintiff*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing document consists of fewer than 6000 words, including the caption and signature blocks.

This is the 21st day of September, 2020.

**/s/ S. Luke Largess**

S. Luke Largess

*Attorney for the Plaintiff*