IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| DAVID DUVALL, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 3:19-cv-624-DSC |
| NOVANT HEALTH, INC., | ) ) |
| Defendant. | ) ) ) |

**MEMORANDUM IN SUPPORT OF DEFENDANT NOVANT HEALTH, INC.'S MOTION FOR SANCTIONS**

COMES NOW Defendant Novant Health, Inc. ("Novant Health"), and files this Memorandum in Support of its Motion for Sanctions against Plaintiff.

## I.   INTRODUCTION

Plaintiff and his counsel displayed a pattern of misconduct throughout the trial that warrants the imposition of sanctions. The misconduct included:

(1) Deliberately referencing improper comparator evidence to support an unfounded "pattern" of discrimination, in direct violation of the Court's orders;

(2) Telling the jury "round one for punitive damages" was that Novant Health had a witness "with a nine-year-old child and a wife" fired to prevent him from testifying for Plaintiff, despite being in receipt of three sworn declarations uniformly confirming the witness was terminated as part of a position elimination and the decision makers did not even know he was testifying (Doc. 119, 54:22-56:15, 59:6-7); and

(3) Repeatedly referencing "diversity bonuses," "targets" and "quotas" when arguing Plaintiff was improperly terminated to further diversity initiatives where the uncontroverted evidence established that *no such bonuses, targets or quotas even existed during Plaintiff's employment*.

Given the underlying circumstances and context, these repeated acts of misconduct were intended to inflame the jury, and they did. The result was an extreme verdict – a baseless

punitive award of $10 million dollars in a case where Plaintiff admitted that the executive who terminated him had no discriminatory animus, he suffered no compensatory damages, and he earned more money after he was terminated than he would have earned had he remained at Novant Health.

The Court has the broad inherent power to issue sanctions where, as here, a party or his counsel engages in such repeated misconduct, particularly in front of a jury. This case presents a textbook example of when sanctions are both warranted and necessary to protect the integrity of the judicial process and to deter similar inappropriate conduct in the future. To achieve those ends, Novant Health respectfully requests that the Court issue such sanctions as it deems appropriate, including dismissing this action and awarding Novant Health the attorneys' fees incurred in bringing this and related motions.

## II. LEGAL STANDARD AND ARGUMENT

### A. The Court's Inherent Power to Issue Sanctions

Controlling Supreme Court and Fourth Circuit precedent makes clear that "[f]ederal courts have the inherent power to manage their own proceedings and to control the conduct of those who appear before them." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 33, 111 S. Ct. 2123, 2126 (1991). "The case law is well established that district courts have the inherent power to sanction parties for certain bad faith conduct, even where there is no particular procedural rule that affirmatively invests the court with the power to sanction." *Strang v. Bd of Trustees, Craven Cmty. Coll.,* 55 F.3d 943, 955 (4th Cir. 1995).

This inherent authority "extends to a full range of litigation abuses." *Chambers,* 501 U.S. at 46. It is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.*

at 43 (citing *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31, 82 S. Ct. 1386, 1389 (1962)). And, it is also broad: appropriate sanctions "may range from dismissal of a lawsuit to an assessment of attorney's fees." *Chambers*, 501 U.S. at 33; *see also Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 833, 114 S. Ct. 2552 (1994) ("Courts traditionally have broad authority through means other than contempt—such as by ... entering default judgment—to penalize a party's failure to comply with the rules of conduct governing the litigation process.").

Conduct that is "tantamount to bad faith" is sanctionable. This determination must be made while examining the context and circumstances of the particular case. *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767, 100 S. Ct. 2455 (1980) (citing *Chambers*, 501 U.S. at 50). As this Court recently recognized, "there are two competing standards in assessing bad faith by counsel: objective and subjective bad faith." *Viper Publ'g, LLC v. Bailey*, No. 3:17-CV-00314-GCM, 2021 WL 5760862, at *1 (W.D.N.C. Dec. 3, 2021); *see also Geiger v. H&H Franchising Sys. Inc.*, No. 317CV00738FDWDSC, 2019 WL 8584638, at *1 (W.D.N.C. May 21, 2019) (citing *Chambers,* 501 U.S. at 47 n.11). The Fourth Circuit has not decided which standard applies. *Viper Publ'g, LLC*, 2021 WL 5760862, at *1. However, as discussed below, under either an objective or subjective standard of bad faith, sanctions are clearly warranted in this case given the misconduct that occurred throughout the trial.

### B. Sanctions Are Warranted Where, As Here, a Party Willfully Disobeys a Court Order

A court may exercise its inherent power to sanction when a party or counsel willfully disobeys a court order or when a party acts in bad faith, vexatiously, wantonly, or for oppressive reasons. *Chambers*, 501 U.S. at 44-46; *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 133 S. Ct. 1166, 1175 (2013). Courts across the country have regularly exercised the power to sanction when counsel violates a court order in bad faith, as was the case in this litigation:

- *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 449 F. App'x 923, 926 (Fed. Cir. 2011) (The court imposed a variety of monetary and non-monetary sanctions against the defendant for willful violation of the court's *in limine* order including, among others: (1) imposing on [defendant] the costs and attorney fees incurred by all parties for the first jury selection; (2) severing [defendant] from the other defendants; and (3) awarding the costs and attorney fees incurred by [plaintiff] for trying its case against the severed defendants.");

- *Ferguson v. Valero Energy Corp.*, 454 F. App'x 109, 113 (3d Cir. 2011) (the district court did not abuse its discretion when it sanctioned plaintiffs' counsel after finding that he breached the court's evidentiary orders in bad faith during his opening statement and examination of his first two witnesses);

- *Hardeman v. Monsanto Co.*, 833 F. App'x 92, 93–94 (9th Cir. 2020) (affirming the imposition of sanctions against the plaintiff's attorney for at least three acts during her opening statements in which she (1) spoke to the jury about a later phase of the trial despite a clear understanding among the parties it would be off-limits, (2) violated of the district court's pretrial ruling strictly limiting certain admissible evidence, and (3) violated the court's bifurcation order and pretrial evidentiary ruling limiting other evidence);

- *Fuery v. City of Chicago*, 900 F.3d 450, 454-57 (7th Cir. 2018) (upholding decision to overturn a jury verdict and enter judgment in favor of the non-prevailing party, based on plaintiff's counsel's continuous willful disobedience and bad faith during the trial, including repeated violations of the court's motions *in limine* orders);

- *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1104 (9th Cir. 2005) (imposing sanctions under the court's inherent powers for counsel's deliberate bad faith violations during trial of two pretrial *in limine* orders); and

- *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1108 (9th Cir. 2002) (holding sanctions were warranted when defense counsel introduced testimony in violation of Federal Rule of Evidence 412.4 after two Rule 412 pre-trial motions had been denied).

This Court should reach a similar result in this case. Here, as in the cases cited above, Plaintiff and his counsel also repeatedly violated the Court's *in limine* Order throughout the trial in bad faith. An extensive, chronological discussion of this issue is set forth in Novant Health's Memorandum in Support Its Renewed Motion for Judgment as a Matter of Law. (*See Memorandum in Support of Renewed Motion for Judgment As a Matter of Law*, pp. 3-7). In summary, the Court's *in limine* Order barred presentation of improper "other employee"

evidence at trial, stating that "the probative value of this evidence is substantially outweighed by a danger of unfair prejudice and confusing the issues." (Doc. 84, p. 1). The *in limine* Order on improper comparator evidence was clear—it was not permitted. To the extent any uncertainty remained, the Court reiterated its Order three times at the Pretrial Conference (Doc. 108, 19:13-20, 20:9-22, 21:17-18), on Plaintiff's Motion for Reconsideration (Doc. 88, 88-1, 94, and Text Order 9/7/21), and again at the beginning of trial (Doc. 114, 41:3-8).

Despite the Court's clear orders and Plaintiff's counsel's admitted understanding of the same (*See* Doc. 114, 6:5-7:23; 11:4-19, 27:4-29:15), Plaintiff introduced improper "other employee" evidence during trial on multiple occasions. (*See* Doc. 115, 233:3-13, Doc. 116, 198:21-199:5; Doc. 119, 57:3-11). During questioning by his own counsel, Plaintiff explicitly testified about each of the six other employees the Court had unequivocally barred, providing their specific job titles:

> **And then, you know, I was aware that several senior male executives had been let go from the company in the months prior to me being let go. And then in the weeks and months following my termination, more and more were being let go. And that's when you know, a very clear pattern started to emerge when you have, you know, your chief legal officer, your chief experience officer, your chief medical officer, your chief IT officer, your president of the Charlotte market, yourself.**

(Doc. 116, 198:21-199:5).

Despite the Court's limiting instruction to the jury to disregard the improper comparator evidence (Doc. 117, 23:7-17) that Plaintiff himself offered during his direct examination, the damage was clearly done. Having heard the disallowed other employee evidence, the jury could not easily forget it, given its highly prejudicial nature. This disallowed evidence surely tainted the jury's view of the case throughout trial, just as the Court predicted at the outset of the case.

5

(*See* Doc. 108, 20:9-22). Novant Health's counsel pointed out the deeply prejudicial nature of the disallowed other employee evidence on several occasions, including on the first day of trial:

> **If he comes in affirmatively and starts telling the jury you'll hear evidence that they fired all the white guys that attended this meeting, then we are stuck as a defendant either being prejudiced by that or going in and opening the door, and we will have trials on all of these people, the circumstances, why they left, what this person's sexual impropriety was, why this guy went and took another CEO job at another health care system, and that's why he was fired because he was applying on Novant's computers and they found out.**

(Doc. 114, 32:10-19; *see also* Doc. 116, 212:15-217:6).

Plaintiff's conduct in testifying about the disallowed "other employee" evidence in violation of the oft-repeated *in limine* Order meets both the objective and subjective standard of bad faith. It is "permissible to infer bad faith" from a violation of an order "plus the surrounding circumstances." *Miller v. City of Los Angeles,* 661 F.3d 1024, 1029 (9th Cir. 2011). The surrounding circumstances here make clear that Plaintiff and his counsel were acting in bad faith. They include: (1) Plaintiff's counsel's repeated, unsuccessful requests that the Court reverse its *in Limine* Order prior to and during trial, which shows both the importance of this evidence and that Plaintiff and his counsel understood the Court's order; (2) Plaintiff's direct and explicit testimony on the positions of the other employees, which the Court had repeatedly barred, showing this was not a close or narrow violation; (3) repeated, subsequent violations of the *in Limine* Order, including the repeated nature of the violations during the trial and ongoing references by Plaintiff and his counsel to a pattern of unlawful terminations; and (4) the timing of the violations during the trial, including during closing argument, well after the Court had provided the jury with a curative instruction. (Doc. 119, 20:5-6; 27:20-28:6, 57:3-11; 106:9-12; 107:23-25). After Plaintiff directly violated the *in limine* and subsequent Orders, he immediately went on to discuss other separations under Cureton. (Doc. 116, 199:6-12).

6

Plaintiff cannot claim to have been unaware of the scope of the *in limine* Order or to have made an honest error by referencing these "other employee" terminations. Plaintiff attended the entire trial. At the beginning of trial, Plaintiff's counsel confirmed several times that he understood the scope of the *in limine* Order. (*See* Doc. 114, 6:5-7:23; 11:4-19, 27:4-29:15). Plaintiff listened to all of the arguments regarding the "other employee" evidence at trial and actively participated throughout the trial. <u>Plaintiff knew he was not supposed to discuss these barred other employees, but he did so anyway.</u> (*See* Doc. 116, 198:21-199:5). This constitutes bad faith. No limiting instruction could undo the damage of this improper testimony. The magnitude of the verdict reveals that the jury did not disregard this evidence as instructed. Such blatant disregard for the Court's *in limine* Orders compels the issuance of appropriate sanctions.

### C. <u>Sanctions Are Appropriate for Counsel's Repeated Misrepresentations to the Jury</u>

Sanctions are likewise warranted when counsel knowingly makes misrepresentations of fact to the jury. *See e.g. Fink v. Gomez,* 239 F.3d 989, 994 (9th Cir. 2001); *In re Crescent City Ests., LLC*, 588 F.3d 822, 831 (4th Cir. 2009) (the court's inherent power "permit awards of attorneys' fees against attorneys whose actions compromise standards of professional integrity and competence"); *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 991 F.3d 361, 368–69 (2d Cir. 2021) (a single misrepresentation is sufficient to justify an award of sanctions under the court's inherent power … "a court need not wait until a party commits multiple misrepresentations before it may put a stop to the party's chicanery.")

The Fourth Circuit's opinion in *Six v. Generations Fed. Credit Union,* 891 F.3d 508, 511 (4th Cir. 2018) is illustrative. In that case, the Fourth Circuit affirmed the Middle District of North Carolina's imposition of sanctions on three attorneys and their law firms under its inherent authority and 28 U.S.C. § 1927. The court held that the attorneys' conduct – which included one

attorneys' clear, affirmative misrepresentation to the Court under oath and several instances of conduct that the Court described as *"a mosaic of half-truths, inconsistencies, mischaracterizations, exaggerations, omissions, evasions, and failures to correct known misimpressions"* – showed a *"lack of candor to the court and disrespect for the judicial process"* that warranted sanctions. *Id.* (emphasis added).

In so holding, the Fourth Circuit emphasized the federal court's inherent authority to sanction and noted that "[a]ttorneys are obligated to act with candor in presenting claims for judicial resolution." *Id.* at 519 (*citing McCoy v. Ct. of Appeals of Wisconsin., Dist. 1*, 486 U.S. 429, 440, 108 S. Ct. 1895 (1988)). "In particular, '[a] lawyer shall not knowingly ... make a false statement ... or fail to correct a false statement" of material fact to the tribunal, nor shall a lawyer "offer evidence that the lawyer knows to be false.'" *Id.* (*citing* N.C. R. Prof'l Conduct 3.3 and M.D.N.C. Local R. of Practice & P. 83.10e(b) (adopting North Carolina State Bar's Rules of Professional Conduct, including the requirement of candor toward the tribunal).[1]

As discussed below, Plaintiff's counsel made multiple misrepresentations to the jury on critical facts throughout the trial. Any one of these misrepresentations independently warrants sanctions. All of them together show that sanctions are not just warranted but are also necessary to protect the integrity of the judicial process and deter similarly inappropriate behavior in the future.

---

[1] Similarly, Local Civil Rule 83.1 of the Western District of North Carolina states: "By making an appearance, such attorney agrees to abide by the Local Rules, the North Carolina Rules of Professional Conduct, and to submit themselves to this Court for the enforcement of such rules."

8

1. <u>Plaintiff's Counsel's False Accusations that Novant Health Fired a Witness to Prevent Him From Testifying</u>

    a. *Plaintiff's Counsel's Initial Unfounded Conspiracy Theory*

Plaintiff's counsel told the jury that Novant Health had Matthias Krebs, a witness with "a nine-year-old child and a wife," fired just because he was going to testify favorably for Plaintiff, despite knowing this was false. (*See* Doc. 119, 54:22-56:15).

Plaintiff first identified Krebs as a witness in April 2021. Krebs was a Novant Health employee living in Denver, Colorado. Plaintiff issued him a trial subpoena which Novant Health moved to quash because it was not properly served. (Doc. 92 and Doc. 92-5). Plaintiff's counsel filed a Response to Defendant's Motion to Quash Subpoenas ("Response") in which he outlined an unfounded conspiracy theory that Novant Health's in-house counsel, Mindy Staley, and/or lead counsel, Benjamin Holland, orchestrated Krebs' termination to keep him outside of the subpoena power of the Court to prevent him from testifying in favor of Plaintiff at trial. (Doc. 95).

Plaintiff's counsel said he planned to file a motion for sanctions against Novant Health's counsel for this alleged conduct though he admitted he had not yet done any research to support it. (*Id.* at pp. 1, 2, and 5). Plaintiff attached a declaration from Krebs to his Response. (Doc. 95-4). Tellingly, Krebs' declaration did not state that he believed that he was terminated because of Plaintiff's subpoena or his proposed testimony. (*Id.* ¶ 18). Similarly, when he was called as a witness at trial, Krebs did not testify that he thought he was terminated to keep him from testifying. (Doc. 115, 223:18-224:23). Krebs' declaration, which was publicly filed with the Court, also included a statement that Plaintiff was "fired during a period when many white men were being let go and replaced by more diverse employees in a very short time" even though the Court had barred – on at least three separate previous occasions – Plaintiff's alleged "other

9

employee" evidence seeking to establish an unsupported "pattern" of discrimination against white males. (Doc. 95-4, ¶ 18).

### b. Plaintiff's Counsel's Receipt of Evidentiary Proof Confirming His Accusations Were False

Novant Health's counsel, Margaret Santen, notified Plaintiff's counsel that the allegations in the Response lacked any evidentiary basis, were made without any reasonable inquiry beforehand, and violated Rule 11 of the Federal Rules of Civil Procedure. (*See* Exhibit A – Emails Between Largess and Santen, pp. 2-4). Santen specifically noted that neither Holland nor Staley knew that Krebs had even been terminated until they received Plaintiff's Response. Moreover, Santen noted that the relevant decision makers for Krebs' termination were unaware of Plaintiff's subpoena, any discussion between Krebs and Holland, or the content of Krebs' anticipated testimony at the time of his termination. *Id.* Santen promised to provide sworn declarations to support all of these facts as necessary. *Id.* Plaintiff's counsel responded within minutes writing "Please, don't be ridiculous. You will be getting a motion for sanctions this week." (Exhibit A, p. 2).

Santen subsequently provided Plaintiff's counsel with sworn declarations from the three Novant Health managers who were involved in Krebs' termination. (Exhibit A, p. 1). All three independently confirmed that they: (1) decided to terminate Krebs and eliminate his position after several months of discussing the same in advance without ever talking to Holland, Staley, or anyone in Novant Health's legal department; and (2) did not know about Plaintiff's lawsuit or Krebs' subpoena at the time Krebs was terminated. (*See* Exhibit B – Declaration of Andrea Hauser; Exhibit C – Declaration of Kate Forbes; and Exhibit D – Declaration of Leticia Smith).

In the correspondence accompanying these declarations, Santen warned Plaintiff's counsel that any motion for sanctions he may file would be completely frivolous and would

result in a sanctions motion from Novant Health. (Exhibit A, p. 1). Plaintiff's counsel responded quickly, "[a]ctually, I am not proceeding. After reviewing the case law, I don't think the court would enter any sanction at this time." (*Id.*). In response, Santen also warned Plaintiff's counsel that any future reference to this baseless conspiracy theory about Krebs' termination in any court filing or during trial would result in Novant Health filing for sanctions.

When Krebs showed up to testify at trial, Novant Health's counsel immediately informed the Court of the concern that Plaintiff's counsel would improperly raise the false story about Krebs' termination. (*See* Doc. 115, 126:5-129:22). Novant Health's counsel noted that "[w]hether [Krebs] was terminated the day after he spoke to me doesn't have any relevance to either one of those issues. On top of it … [i]t clearly would prejudice Novant to have that kind of allegation tossed out there without us, again, going into it and disproving the issue." (Doc. 115, 129:12-17). The Court overruled Novant Health's broader objection, but barred "any claims that Mr. Holland or counsel for Novant acted to have the man fired." (Doc. 115, 129:18-22).

    c. *Plaintiff's Counsel's Deliberate Misrepresentations to the Jury*

Despite having received three uncontroverted declarations that Krebs was not terminated because he was going to testify for Plaintiff but rather was let go as part of a position elimination that had been planned for some time, Plaintiff's counsel told the jury during closing:

> **And maybe *the most shocking part of this case and maybe one round for punitive damages in this case is you learned Matthias tells the story about David was the best boss* out of 21 he had. He's in his 50s. Of 21 people he worked with, David was hands down the best boss...[s]o Matthias meets with counsel when we list him as a witness. And he tells them what he told you on the stand. David was a fantastic boss. And he tells about his misgivings about Ms. Free, and the next day he gets fired. Oh, my God. Oh, my God. A man with a nine-year-old child and a wife. Because he was willing to come here and speak honestly about his experience with David."**

11

(Doc. 119, 54:22-56:15) (emphasis added). And he later reiterated this false statement: **"And then they fire Matthias when he's willing to come testify. *Unbelievably harsh.*"** (Doc. 119, 59:6-7) (emphasis added).

This misrepresentation, and the context in which it was made, cannot be condoned by this Court. The statement, which counsel knew was false, was made for the sole purpose of inflaming the jury to award punitive damages without regard to the actual evidence, which the jury did.

Moreover, in stating that the false statement regarding Krebs' termination was **"round one for punitive damages,"** Plaintiff's counsel misrepresented the law on punitive damages. Even if Novant Health had terminated Krebs to prevent him from testifying, which it did not, that could not be a basis for punitive damages *for Plaintiff's claims*. Title VII authorizes punitive damages only when a plaintiff shows the employer "engaged in unlawful intentional discrimination with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). That is, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law[.]" *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536, 119 S. Ct. 2118 (1999). An action directed at Krebs, as a matter of law, cannot support punitive damages for alleged discrimination against Duvall.

Using a false statement to urge the jury to award punitive damages is sanctionable. The appropriate sanction is to set aside the punitive damages award.

2. <u>Plaintiffs' Counsel's Repeated Misrepresentations Regarding Non-Existent Diversity Bonuses</u>

Throughout the trial, Plaintiff's counsel made repeated misrepresentations to the jury regarding "diversity bonuses" and "targets" that he claimed led to Plaintiff's termination. In fact, the evidence was uncontroverted that no "diversity bonuses" or "targets" existed during

Plaintiff's employment at Novant Health. The following comparison contrasts Plaintiff's counsel's misrepresentations with the evidence at trial:

| DIVERSITY "TARGETS" | |
|---|---|
| **Plaintiff's Counsel's Misrepresentations** | **What the Evidence Actually Shows** |
| **Plaintiff's Counsel's repeated references to "targets to reduce white male leadership and increase females and minorities"**<br><br>**"And the targets were to reduce the amount of white male leadership and to increase the amount of female leadership and minority leadership, more diverse people in leadership positions." (Doc. 114, 50:6-9)**<br><br>"So two women took his role during this time when they're trying to meet these targets." (Doc. 114, 53:2-3)<br><br>"And in that intervening five years -- they aren't in denial about it -- we didn't set any targets. Well, it sure looks like it in the records…" (Doc. 119, 105:23-25)<br><br>**"[W]e have this direct evidence of this program and the goals and the targets. We have the testimony of people that is fired as a part of this change in leadership." (Doc. 119, 106:21-24)** | **Tanya Blackmon's Actual Testimony**<br><br>"We never had any targets to hit a certain number of people in the organization. That was never our goal." (Doc. 114, 86:10-12)<br><br>**Q. To your knowledge, has Novant Health ever had a policy of favoring white -- or nonwhite and female employees over white males?**<br>**A. No** (Doc. 115, 25:23-26:1)<br><br>**Q. Does Novant Health have any targets for decreasing white men in its workforce?**<br>**A. We do not.**<br>**Q. Has Novant Health ever had any targets for decreasing white men in its workforce?**<br>**A. We do not.** I've been with Novant Health for over 20 years, and we have not had any targets related to that.<br>(Doc. 115, 26:25-26:6)<br><br>**Q. So even after Mr. Duvall's termination, Novant Health still didn't have targets for increasing black and African-American employees in the workforce?**<br>**A. That is correct.**<br>**Q. Even though it was recommended to you by your consultants?**<br>**A. Yes.**<br>(Doc. 115, 34:25-35:3)<br><br>**Q. Okay. If we look at the next page at 136, do we see some diversity and inclusion goals for 2019 to 2021?**<br>**A. Yes.** |

**Q. Okay. And, again, were these goals that followed Mr. Duvall's employment?
A. They were after, after David left.
Q. Okay. So at the time these goals were implemented, Mr. Duvall was not an employee at Novant Health?
A. Correct.**
Q. Okay. If we can look at the first one, diversity and inclusion representation. You talked a little bit about it yesterday. Increasing Hispanic and Latino percentages and Asian populations. Do you see that?
A. Yes.
Q. Is there any mention in here about increasing African-American percentages?
A. No.
Q. Was that a goal?
A. It was not.
Q. Was it a secret goal?
A. No.
Q. Is there any mention in here about increasing female percentages?
A. No.
Q. Was it a goal?
A. No, it was not.
Q. Was it a secret goal?
A. It was not.
(Doc. 115, 37:6-38:8)

**Q. In other words, during Mr. Duvall's employment which ended in 2018, were there any goals whatsoever tied to increases in any demographic representation?
A. No, there were not.**
(Doc. 115, 79:3-6)

*See also Deposition of Carl Armato* (Doc. 116, 85:4-86:14) ("**there were no targets, no quotas, no goals, no anything set inside of Novant Health until 2019** when we decided that as the Hispanic community and the Asian community were growing as patients that we were serving, that we had to find a way to reflect our

| | communities. And so, therefore, that's when we put some targets, was in 2019, not any time during this.") |
|---|---|

| DIVERSITY BONUSES ||
|---|---|
| **Plaintiff's Counsel's Misrepresentations** | **What the Evidence Actually Shows** |
| **Plaintiff's Opening Statement:**<br><br>"So in '17 they change patient satisfaction to team member engagement, and the bonus then becomes based on how you're doing under this measure of diversity. And guess what? It goes from zero to three. Zero in '16 to three in '17. And it means for some of the executives hundreds of thousands of dollars in bonuses. **So there's this kind of perverse financial incentive built in to meeting those diversity goals that if we can meet the numbers, we get more money. And that is what leads to David losing his job.**" (Doc. 114, 53:23-54:7)<br><br>**"And that's what this case is about. The intersection of these two things: The marketing program that he constructed, this diversity inclusion program that Ms. Blackmon constructed, the financial incentive that got built in and became a focus and gave everyone meet your targets and you'll make money. And David lost his job."** (Doc. 114, 57:8-13)<br><br>**Plaintiff's Closing Argument**:<br><br>"The third goal was diversity, and that was the place where we could get results. In 2018 was about getting results in the diversity program **and the leadership benefiting from it financially**." (Doc. 119, 54:10-13) | **Tanya Blackmon's Actual Testimony:**<br><br>Q. To your knowledge, has Novant Health -- well, during Mr. Duvall's employment ever had any bonus whatsoever tied to increasing diversity?<br>A. No.<br>(Doc. 115, 26:2-5)<br><br>Q. "Has Novant Health ever given bonuses for decreasing white males in the workforce?<br>A. Absolutely not.<br>Q. What about bonuses for increasing African-Americans in the workforce?<br>A. No.<br>Q. Has Novant Health ever given bonuses for increasing African Americans in the workforce?<br>A. No.<br>Q. Has Novant Health ever given bonuses for increasing women in the workforce?<br>A. No.<br>Q. Mr. Largess talked about hundreds of thousands of dollars in bonuses for decreasing -- or increasing diversity in his opening statement. Are you aware of any bonuses for increasing diversity that executives got that were hundreds of thousands of dollars?<br>A. No.<br>Q. So if I said executives got $100,000 -- hundreds of thousands of dollars in bonuses for increasing diversity, would that be a true or false statement?<br>A. That would be a false statement."<br>(Doc. 115, 31:25-32:21)<br><br>Q. At any point during Mr. Duvall's |

15

| | |
|---|---|
| | employment, were bonuses given to Novant Health employees for increasing black or African-American representation at any level of the organization, leadership or not?<br>A. They were not.<br>Q. Have there ever been any bonuses given at Novant Health for increasing black or African-American representation?<br>A. No, there have not been.<br>Q. Are there now?<br>A. No, there are not.<br>Q. Have there ever been any bonuses given at any level of Novant Health for increasing female representation in the workforce?<br>A. No, there have not.<br>Q. Are there now?<br>A. No.<br>(Doc. 115, 35:8-23)<br><br>*See also* (Doc. 115, 41:14-42:3) (confirming no percentage of bonus was tied to increasing diversity); and (Doc. 117, 160:2-5, 174:13-15) (confirming Cureton did not get a financial bonus for terminating Duvall or for hiring Jones). |

Plaintiff offered no evidence to counter the testimony of Blackmon and Armato regarding the absence of diversity bonuses, targets, and quotas. Thus no evidence supported Plaintiff counsel's false and inflammatory contentions in the opening statement and closing argument.

Furthermore, Plaintiff's counsel's contentions also contradicted *his own client's* repeated endorsement of Novant Health's D&I program. Plaintiff sat on Novant Health's D&I executive committee, Novant Health's highest-ranking committee on this subject, and Plaintiff admitted that Novant Health's D&I program was "properly done" during his employment. (Doc. 115, 14:6-15:22; Doc. 117, 84:16-21). Plaintiff's counsel's false statements regarding diversity bonuses, targets, and quotas are sanctionable.

## III. CONCLUSION

Plaintiff's presentation at trial entailed multiple intentional violations of the Court's *in limine* orders and repeat misrepresentations of the evidence. Such conduct was improperly intended to inflame the jury, and it succeeded. Novant Health respectfully asks the Court to redress this misconduct by an order of sanctions, including dismissal of this action with prejudice, an award of attorneys' fees to Novant Health for bringing this motion, and/or such other relief the court deems just and proper.

(*Signature block appears on the next page.*)

Dated this 1st day of February, 2022.

    s/ Benjamin R. Holland
    Benjamin R. Holland
    N.C. Bar No. 28580
    ben.holland@ogletree.com
    Margaret Santen
    N.C. Bar No. 52947
    maggie.santen@ogletree.com
    Elizabeth R. Gift
    N.C. Bar No. 44331
    elizabeth.gift@ogletree.com
    S. Abigail Littrell
    N.C. Bar No. 49354
    abby.littrell@ogletree.com

    OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
    201 South College Street, Suite 2300
    Charlotte, North Carolina 28244
    Telephone: 704.342.2588
    Facsimile: 704.342.4379

    *and*

    Charles E. Johnson
    N.C. Bar No. 9890
    cejohnson@robinsonbradshaw.com
    Stephen M. Cox
    N.C. Bar No. 23057
    scox@robinsonbradshaw.com
    Angelique R. Vincent-Hamacher
    N.C. Bar No. 29547
    avincent@robinsonbradshaw.com

    ROBINSON, BRADSHAW & HINSON, P.A.
    101 North Tryon Street, Suite 1900
    Charlotte, North Carolina 28246
    Telephone: 704.377.2536
    Facsimile: 704.373.3996

    ***Attorneys for Defendant Novant Health, Inc.***

# CERTIFICATE OF SERVICE

I, Benjamin R. Holland, hereby certify that I have this day electronically filed the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANT NOVANT HEALTH, INC.'S MOTION FOR SANCTIONS** with the Clerk of Court using the CM/ECF system, which will send notification of the filing to the following person:

S. Luke Largess
*Attorney for Plaintiff*
Tin, Fulton, Walker & Owen, PLLC
301 East Park Avenue
Charlotte, NC 28203
Telephone: 704.338.1220
Facsimile: 704.338.1312
Email: llargess@tinfulton.com

Dated this 1st day of February, 2022.

                                                    s/ Benjamin R. Holland
                                                    Benjamin R. Holland, N.C. Bar No. 28580
                                                    *Attorney for Defendant*
                                                    OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
                                                    201 South College Street, Suite 2300
                                                    Charlotte, NC  28244
                                                    Telephone:  704-342-2588
                                                    Facsimile:  704-342-4379
                                                    Email:  ben.holland@ogletree.com