IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| DAVID DUVALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 3:19-cv-00624-DSC |
| | ) | |
| NOVANT HEALTH, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF AN EQUITABLE AWARD OF BACK PAY AND FRONT PAY

Based on the jury's verdict, Plaintiff has moved the Court for equitable relief in the form of backpay and of front pay in lieu of reinstatement. He respectfully submits this memorandum in support of his motion. Plaintiff first shows the Court the legal support for awarding backpay and then reviews the evidence regarding Defendant's affirmative defense that Plaintiff has failed to mitigate his damages. It includes the quite unique fact of this case – that Plaintiff had found a better paying job but was fired from it for filing this lawsuit. Plaintiff then presents calculations for the amount of backpay, including prejudgment interest.

Plaintiff then reviews the legal basis for awarding front pay in lieu of reinstatement and explains front pay calculations being submitted for the Court to consider. Finally, Plaintiff reviews the tax consequences of a lump sum award.

Plaintiff notes that Judge Graham Mullen outlined all of these guiding principles in his 2019 order in *Tinsley v. City of Charlotte,* No. 3:16-CV-00656-GCM, 2019 WL 1874044 (W.D.N.C. Apr. 26, 2019).

## I.    BACKPAY

With the jury verdict in this case, Plaintiff is presumptively entitled to an award of backpay for the purpose of making him whole.  *Albemarle Paper Company v. Moody*, 422 U.S. 405, 421 (1975); *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 651 (4th Cir. 2002)(citing to *Albemarle*). The Congressional authority to award back pay is found in Section 706(g) of the Civil Rights Act of 1964, 78 Stat. 261, as amended, 42 U.S.C. § 2000e–5(g).  The Supreme Court has interpreted that statute to require "make whole" relief for a prevailing plaintiff.  "The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed." *Albemarle Paper Co.*, 422 U.S. at 418–19, *quoting Wicker v. Hoppock,* 6 Wall. 94, 99, 18 L.Ed. 752 (1867).  Backpay serves "the dual purposes" of Title VII -- "the elimination of employment discrimination and the restoration of persons aggrieved to the situation they would have occupied were it not for the unlawful discrimination." *Brady v. Thurston Motor Lines, Inc.,* 753 F.2d 1269, 1273 (4th Cir. 1985).

Title VII backpay is "a 'make-whole' remedy that resembles compensatory damages in some respects." *Landgraf v. USI Film Products,* 511 U.S. 244, 253 (1994). Restoring lost income and benefits is "the most obvious economic damage in a wrongful discharge case." *Corti v. Storage Tech. Corp.,* 304 F.3d 336, 342–43 (4th Cir.

2

2002).  The backpay period runs from the date of the unlawful employment action until the day of the judgment.  *Patterson v. American Tobacco Company*, 535 F.2d 257, 269 (4th Cir. 1976).  And to make the remedy complete, Title VII backpay awards against employers include all "fringe benefits they would have provided" to the employee in the backpay period.  *Farris v Lynchburg Foundry*, 769 F.2d. 958, 964 (4th Cir. 1985).  Courts calculate the amount of backpay by taking the sum of wages and benefits the former employee would have earned in that backpay period minus any money and benefits earned from other work during that time.    42 U.S.C. § 2000e-5(g).  *Tinsley v. City of Charlotte,* No. 3:16-CV-00656-GCM, 2019 WL 1874044, at *2 (W.D.N.C. Apr. 26, 2019).

Make whole relief also includes pre-judgment interest.  In holding that prejudgment interest was not barred by sovereign immunity in a Title VII case against the U.S. Postal Service, the Supreme Court held:

> Respondent concedes, and apparently all the United States Courts of Appeals that have considered the question agree, that Title VII authorizes prejudgment interest as part of the backpay remedy in suits against private employers. This conclusion surely is correct. The backpay award authorized by § 706(g) of Title VII, as amended, 42 U.S.C. § 2000e–5(g), is a manifestation of Congress' intent to make "persons whole for injuries suffered through past discrimination."   Prejudgment interest, of course, is "an element of complete compensation."

*Loeffler v. Frank,* 486 U.S. 549, 557–58 (1988)(cleaned up).

In *Maksymchuk v. Frank*, 987 F.2d 1072, 1077 (4th Cir. 1993), the Fourth Circuit remanded a case for failing to consider prejudgment interest, citing decisions in other

circuits that it is an abuse of discretion not to do so and holding that pre-judgment interest is rudimentary to fashioning make whole relief; that "a dollar tomorrow, unless interest is added, does not equal a dollar today." *Id.*

The Fourth Circuit has approved the use of a state's statutory rate for pre-judgment interest. *Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1031 (4th Cir.1993) (*en banc*)(approving use of Virginia's statutory rate); *Hylind v. Xerox Corp.*, 481 F. App'x 819, 822 (4th Cir. 2012)(affirming use of Maryland's statutory rate). And Judge Mullen followed those decisions in applying North Carolina's 8% prejudgment interest from N.C.G.S. § 24-5 on that Title VII backpay award. *Tinsley, supra,* at *2. Pre-judgment interest on lost wages in Title VII cases runs from the date each payment would have been made, less any outside earnings. *Hyde v. Land-of-Sky Reg'l Council*, 572 F.2d 988, 993 (4th Cir. 1978).

### A. Mitigation

The principal limitation on an award backpay is a plaintiff's statutory obligation to mitigate damages. "Although the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982); *Brady v. Thurston Motor Lines, Inc.,* 753 F.2d 1269, 1274 (4th Cir. 1985). That is, a plaintiff must "be reasonably diligent in seeking and accepting new employment substantially equivalent to that from which he was discharged." *Brady,* at 1273, citing to *Ford Motor Co.,* 458

U.S. at 232. The burden of proof, however, is on Novant to show that Duvall failed to "be reasonably diligent" in seeking and accepting other work. *Brady,* 753 F.2d 1269, 1274 (4th Cir. 1985). "An employer ordinarily must come forward with evidence that comparable work is available unless the employer can demonstrate that the plaintiff made no reasonable attempt to find work." *Brown v. Mountainview Cutters, LLC*, 222 F. Supp. 3d 504, 509 (W.D. Va. 2016)(cleaned up).

Defendant has claimed that Plaintiff failed to mitigate his damages. Given that affirmative defense is a potential statutory limitation on an award of backpay, Plaintiff reviews the trial evidence on mitigation, which is unique in three ways.

First, Plaintiff sought and accepted a better paying job in April 2019 at the Henry Ford Health System ("HFHS") in Detroit as the Chief Marketing, Communications & Experience Officer. He made his first contacts in that ultimately successful search in September 2018, less than 60 days after he was fired. That is undisputed evidence of a reasonably diligent effort to seek a comparable job.

Second, he also explored other comparable employment opportunities over the months it took for the HFHS offer to develop. The jury heard the deposition testimony of Shane Grady, an executive recruiter, about his conversation with Plaintiff's former Novant boss, Jesse Cureton, in December 2018. That discussion, where Cureton praised Plaintiff and said he was not fired for performance, was a reference check for a chief of marketing position Plaintiff sought at Johns Hopkins in Maryland. Plaintiff then interviewed for the post but was not selected.

Plaintiff described other opportunities he explored before being offered and accepting the position at Henry Ford in April 2019. His efforts to find opportunities were reasonably diligent and resulted in him finding a better paying position with more responsibilities.

The third and singularly unique fact in this trial is the evidence that Plaintiff was fired by HFHS weeks after that CEO learned that Plaintiff had sued Novant. Plaintiff's Exhibit 98. Defendant offered no evidence of any other reason for his termination, and there is none. See, Pl. Ex. 99, p. 5, ¶ 10 (stating Duvall was terminated "for reasons other than for cause") and *Id.,* p. 5, ¶ 11 and Pl. Ex. 100 (HFHS knew Plaintiff had been terminated from Novant and "any assertion or insinuation" in the media that it did not know "is/are inaccurate.") Plaintiff's Exhibit 100. Thus, Plaintiff's reasonable diligence at mitigation was destroyed as a result of asserting his rights under federal and state law.

Since his termination from HFHS, Plaintiff has not been able to get beyond introductory contacts in looking for comparable employment. Plaintiff testified that post-HFHS discussions with recruiters for chief of marketing positions at Brigham and Women's hospital in Boston, at the Ohio State University/Wexler Medical Center, and Westchester Medical Center Health Network that ended after he disclosed his legal situation.

Where a former employee loses subsequent employment involuntarily, but not for misconduct, the period of entitlement to backpay resumes and the reasonable

diligence standard applies. *See, Brady, supra.* Defendant has the burden of showing this lawsuit has not had the negative impact on Plaintiff's career prospects that it has; Defendant has not presented any evidence of an opportunity foregone since his firing at HFHS and cannot show that Plaintiff had had any realistic chance of finding a comparable position while contesting his termination in this Court.

The mitigation evidence shows that Plaintiff sought and accepted a *better* job, but then was fired, and lost viability as a candidate for comparable employment, due to asserting his rights against Defendant under Title VII and state law. And the jury has found that Defendant discriminated against Duvall in terminating him. As the court held in *Tinsley,*

> Defendant cannot now fault Plaintiff for an inability to find comparable work when it was Defendant's discriminatory conduct that prevent(s) Plaintiff from obtaining such work . . .(.)"

*Tinsley,* 2019 WL 1874044, at *1. Because Plaintiff has been reasonably diligent in seeking other work, and because his contesting Defendant's unlawful conduct has created the barrier to comparable employment, Novant cannot meet its burden of proving a failure to mitigate nor escape its make-whole obligations. Thus, the Court should award full backpay.

## II.    BACKPAY CALCULATIONS

Plaintiff testified to the creation and content of Exhibit 76 at trial – a spread sheet detailing the components of his lost wages and benefits from Novant from the date of separation to mid-September, 2021, reduced by the earnings and severance

7

payments from HFHS. That document's calculations went only through the time they were prepared for trial. Plaintiff submits with this memorandum an updated and revised version of the spread sheet, showing the calculations through February 28, 2022. Exhibit A. Plaintiff provides a line-by-line explanation of the wages and benefits in the spread sheet, including the reduction of those losses by the earnings, benefits and severance paid by HFHS.

### A.  Base Pay – Line 4

Line 4 of the spread sheet shows the calculation of Plaintiff's base salary at Novant Health from July 30, 2018 to the present.

The base salary of $402,676 for 2018, in block B4, comes from page 5 of Plaintiff's Exhibit 75. That exhibit contains Plaintiff's salary history at Novant Health from 2014 to 2018. Defendant provided the document in discovery and Carl Armato, the CEO, identified it at trial as a common format for salary information and testified about its contents.

The base salary calculations listed in Line 4 for the years 2019 – 2022 (D4 to H4)[1] are based on an assumed annual increase of 7% over the 2018 salary. The 7% assumption is supported in the record. It is lower than the greater than 8% annual increase in base salary that Plaintiff received during his tenure at Novant. His base salary increased from $288,000 in August 2013 (Ex. 24) to $402,000 in November

---

[1] G4 contains the prorated 2022 backpay through February. H4 is the full annual salary.

2017 (Ex. 75, p. 5), an increase of 39.6% over four years and four months.  The 7% assumption is also lower than the nearly 9% annual increase in base pay of the CEO, Carl Armato, during that same period. His base salary rose from $1,044,780 in 2013 (Ex. 115) to $1,503,933 in 2018 (Ex. 113), an increase of 44%.  Tanya Blackmon, the EVP for Diversity and Inclusion also had pay raises of more than 9%, increasing from $270,087 in 2016 (Ex. 111) to $369,816 in 2019 (Ex. 114), or 37% in four years.

B.    **Annual Incentive Pay or AIP - Line 5**

The amount of Annual Incentive Pay ("AIP"), the annual performance bonus, is shown on Line 5 of the chart.  An AIP plan is prepared annually for each eligible executive and sets out the year's performance goals, both for the system and for the individual executive.  It assigns weight to each goal for calculating the performance bonus.  See Plaintiff's Exhibits 34, 56, 82-84.  Plaintiff also introduced through Mr. Armato the underlying AIP plan document setting the parameters for the AIP bonuses  Pl. Ex. 86.  And Pl. Ex. 75 contains the calculations of Plaintiff's AIP bonus payment for each year from 2014 to 2017.

Plaintiff's AIP bonus for 2017, for $183,745, is found on p. 4 of Pl. Ex. 75.  It like other incentives, was paid early in the next year, 2018, and thus is listed in box B5 at a 2018 payment.  To calculate the AIP 2019-22, Plaintiff applied the same 7% annual increase.  See D5 through G5.

### C.    Long Term Incentive or LTI – Line 6

The LTI formula and calculations and are also contained in pp. 1-4 of Plaintiff's Exhibit 75.   Like the AIP, this bonus is calculated by a formula tied to the measured achievement of weighted goals, but over a longer, three-year cycle.  Like the AIP, Plaintiff received his 2017 LTI payment of $64,694 in early 2018.  See B6.   That amount is taken from page 4 of exhibit 75.   The amount in D6, for 2019, is calculated using the 66.08% score for achievement of goals for the 2016 – 2018 LTI cycle, contained in Exhibit B to this brief, Defendant's Trial Exhibit 18.   The amount in E6 for 2020 is calculated using the 90.59 % achievement of goals for the 2017 – 2019 cycle shown in the attached Exhibit C, Defendant's original trial exhibit 32 that it then withdrew.[2]  The amounts listed in F6 for 2021 and G6 for 2022 are based on an achievement score of 73.75%, the average of the achievement scores provided for 2017 to 2019.   For each LTI calculation in line 6, the base salary from the first year of the three-year cycle is used, as done in Plaintiff's Exhibit 75.

### D.    Defined Contribution SERP or DC SERP – Line 7

A Supplemental Executive Retirement Plan or SERP is a tax-deferred compensation vehicle that Novant provided to Plaintiff and other highly paid executives.  Mr. Armato testified to the decision to switch from a defined benefit or DB SERP to a defined contribution or DC SERP.   Novant paid 15% of base pay

---

[2] The authenticity of these documents is not contested.

into an executive DC SERP for each employee. Plaintiff's DC SERP amounts for 2014 to 2018 are shown on pp. 1-4 of Exhibit 75. Like the AIP and LTI bonuses, the 2017 DC SERP was paid in early 2018. The figure of $58,642 listed in B7 is taken from page 4 of Exhibit 75. The amounts then listed in boxes D7 to G7 are 15% of the base pay listed for those respective years in boxes D4 to G4. In his severance agreement with Plaintiff, HFHS agreed to pay out his SERP from there, Pl. Ex. 99, p. 6, ¶ 12 (d), so it was included in the 2020 HFHS W-2. and then offset the backpay owed Plaintiff.

### E. 457(f) Contribution – Line 8

Plaintiff testified that Novant provided this additional vehicle for retirement savings for executives and Plaintiff received $7500 each year towards this plan. That amount is listed each year from 2018 to 2021, and is prorated for 2022 at $1,275.

### F. Health Insurance – Line 9

Plaintiff had to pay for COBRA coverage after his separation from Novant, Defendant's Trial Exhibit 10, attached as Exhibit D, at a cost to him of $20,620 per year or $1,718.33 a month. He received health insurance coverage at Henry Ford when he began there in June 2019; and Henry Ford paid for health insurance as part of their severance/settlement, Pl. Ex. 99, ¶ 12(b), so the cost of insurance is excluded from the spread sheet from June 2019 to January 2021. It is then included from February 2021 to the present at $1,718.33 a month.

### G. Executive Discretionary Fund – Line 10

Novant provided Plaintiff with $10,000 to use for personal and professional needs as he saw fit. HFHS did not provide this benefit so it is listed as a lost benefit each year.

### H.   Automobile Allowance – Line 11

Novant provided $12,000 toward the cost of an automobile. HFHS did not provide this benefit, so it is listed as a lost benefit each year. HFHS offered Plaintiff a discount on the purchase of a car instead of a vehicle allowance. See the reference to the "Ford Motor Company Employee A Plan" on page 3 of Exhibit 97.[3]

### I.   401(a) Plan – Line 12

Novant contributed 4.3% of Plaintiff's salary into a 401(a) plan. A 401(a) plan is the non-profit equivalent to the 401(k) plan commonly used by private employers. Henry Ford used a 403(b) plan as its retirement vehicle, Plaintiff's Ex. 97, p. 3, but its contributions were excluded from severance payments and thus forfeited.

### J.   Total Income at Novant – Line 13

Line 13 provides the sum from lines 4 – 12 in each of the columns B and D-G. It reflects the total amount that Plaintiff would have earned at Novant in each of these years:

2018 -- $762,502   B13

---

[3] This link will show the Court the Ford Employee discount plan.
https://www.ford.com/support/how-tos/owner-resources/sales-support/what-are-the-available-ford-employee-vehicle-purchase-plans/

2019 -- $818,261   D13
2020   $894,449   E13
2021   $953,286   F13
2022   $526,888   G13 (through February 2022)

## K.  Net Novant Earnings for 2018 -- C-13 through C-15

Column C lists Plaintiff's actual earnings from Novant for 2018.

C13: $617,207 is taken from Plaintiff's W-2 for 2018, Exhibit 116.

C14:  $210,455 is taken from Exhibit 74, which shows that Plaintiff forfeited

that amount from a Novant retirement account when terminated.

C15: The figure $406,762 is the difference between Plaintiff's W-2 earnings and

the retirement fund forfeiture, and thus reflects his net earnings at Novant in 2018.

## L.  Lost Novant Earnings from 2018 to Present -- Column I

In column I, cells I15 through I19, Plaintiff lists the Novant Health earnings

lost since his termination, to be offset in Column J by his HFHS earnings.

I15:  $355,740 is the net loss for 2018; the difference between B13, the

$762,502 that Plaintiff would have earned at Novant in 2018 if he had not been fired,

and C15, $406,762, his actual net earnings after forfeiture of the retirement funds.

I16, $818,261 is the total projected lost salary for 2019, from D13
I17, $894,449 is the total projected lost salary for 2020, from E13
I18, $953,286 is the total projected lost salary for 2021, from F13
I19, $526,888 is the total projected lost salary through Feb. 2022, from G13

I20 contains the sum of those four years of figures, **$3,548,624**

**M.        Offsetting Earnings from Henry Ford Health System**

Column J contains Plaintiff's offsetting earning from Henry Ford; his wage from June 2019 until January 6, 2020 and then the severance that paid through February 13, 2021.   Pl. Ex. 99, p. 6, ¶ 12 (a) – (d).  The HFHS W-2s for 2019 and 2020 and a check stub showing his HFHS earnings for 2021 were submitted in Pl. Ex. 103.  The amounts Plaintiff received are listed as follows:

J-16    (2019) $551,127
J-17    (2020) $700,567
J-18    (2021) $  72,983

J-20 then shows the sum of those three years of earnings, **$1,324,677**

**N.  Net Loss of Earnings and Benefits – Column K -- $2,223,947**

Column K shows the difference between Plaintiff's lost earnings at Novant (in Column I) and the earnings made at Henry Ford (in Column J).

K-15  $355,740 for 2018   [(I-15) $355,740  – (J-15) $0]
K-16  $267,134 for 2019   [(I-16) $818,261  – (J-16) $551,127]
K-17  $193,882 for 2020   [(I-17)  $894,449  – (J-17) $700,567]
K-18  $880,303 for 2021   [(I-18)  $953,286  – (J-18) $72,983]
K-19  $526,888 for 2022   [(I-19)  $526,888 --  (J-19) $0]

K-20 lists the sum of the offset losses from 2018 to the present, $2,223,947. That figure is measure of lost earning and benefits, offset by earnings, before applying any prejudgment interest.

**O. Prejudgment Interest**

The proper calculation of prejudgment interest turns on separating interest on installment wage payments, which runs from the date each payment would have been

due, *see Hyde, supra,* from interest on lump sum payments like incentive pay, for which interest runs from the date that lump sum was due.

On the installment payments, Plaintiff uses the total amount of payments for a specific period and applies statutory interest from the midpoint of that payment period, effectively capturing the accruing interest for the entire period of the installment payments.

The following items are treated as installment payments:

Line 4, base pay
Line 9, health insurance
Line 11, Vehicle Allowance
Line 12, 401(a)

These remaining items are treated as lump payments, using March 1 of each year as the payment date.

Line 5, AIP
Line 6, LTI
Line 7, DC SERP
Line 8, 457(f)
Line 10, Executive Perk

The resulting calculations of pre-judgement interest are as follows:

**1. 2018**

Plaintiff's backpay for 2018 is $355,740 (K-15).   Of that amount, $210,445 was the lump forfeiture of the 457(f) funds (C-14), leaving $145,295.  Thus, Plaintiff proposes the following interest calculation of 8% interest.

a.  Interest on the lump sum forfeiture of $210,450 from August 1, 2018 to March 1, 2022, or 43 months or 3.58333 years, calculated as follows:

$210,450 x 8% x 3.5833 years = **$60,327.56**

b. Interest on the balance of $145,295 from October 15, 2018 (the midpoint of August 1 to December 31 2018) to March 1, 2022, or 40.5 months or 3.375 years is calculated as:

$145,295 x 8% x 3.375 years = **$39,229.65**

**Total Prejudgment Interest for 2018 Backpay -- $99,557.21**

**2. 2019**

Plaintiff's backpay for 2019 is $267,134 (K-16). Plaintiff received $551,127 in severance payments from HFHS in 2019 (J-16) covering all of his projected installment salary payments at Novant Health, mainly base pay of $430,863. So, this back pay amount is treated as a lump sum that was owed to him by March 1, 2019.

Interest in the lump sum of $267,134 from March 1, 2019 to March 1, 2022, or three years is calculated as:

$267,134 x 8% x 3.0 years = **$64,112.16**

**Total Prejudgment Interest for 2019 Backpay -- $64,112.16**

**3. 2020**

Plaintiff's backpay calculation for 2020 is $193,882. Given that Plaintiff received $700,567 in severance from HFHS in 2020 (J-17), that more than covered his projected base salary at Novant Health of $461,024. So, this back pay amount is also treated as a lump sum payment owed as of March 1, 2020.

16

Interest in the lump sum of $194,304 from March 1, 2020 to March 1, 2022, or two years is calculated as:

$193,882 x 8% x 2.0 years = **$31,021.12**

**Total Prejudgment Interest for 2020 Backpay -- $31,021.12**

**4. 2021**

Plaintiff's backpay calculation for 2021 is $880,303. Given that Plaintiff received $72,983 in severance from HFHS against a projected base pay at Novant of $493,295, a significant portion of this 2021backpay is treated as installment wages owed, with the balance treated as a lump sum of bonus payments. Subtracting the HFHS severance from the projected base pay leaves $420,312 in unpaid salary. Adding to the remaining owed base pay the health insurance ($18,043), 401(a) contribution ($21,212) and the vehicle plan ($10,000), the installment portion of the backpay comes to $469,567. Subtracting that sum from the total backpay owed leaves $419,736 in lump sum payments. Thus, the two interest calculations are as follows:

    a. Interest in the lump sum owed of $419,736 from March 1, 2021 to March 1, 2022, or one year is calculated as: $419,736 x 8% x 1.0 years = **$33,578.88**

    **b.** Interest on the installment balance of $469,567 from July 1, 2021 (the midpoint of 2021) to March 1, 2022, or 9 months or .75 years is calculated as: $469,567 x 8% x 0.75 years = **$28,174.02**

**Total Prejudgment Interest for 2021 Backpay -- $61,752.90**

### 5. 2022

Plaintiff's backpay calculation for January and February 2022 is $526,888, based on Plaintiff receiving his 2021 payments of AIP, LTI, DC SERP and 457(f) contributions by March 1. HFHS paid no severance in this period. This payment is also be split in its treatment. Of that total backpay sum, $426,122 (G5 – G8) is the payments of the API and LTI bonuses and the DC SERP and 457 contributions. The balance of $100,766 is treated installment backpay.

The interest is very modest, as the lump sum of $426,122 does not bear any interest until it is owed on March 1 2022. Of the installment payment remainder, the midpoint of the two months is only one month. A month is .08333 years

$100,766 x 8% x 0.08333 years = **$671.77**

**Total Prejudgment Interest for 2022 Backpay -- $671.77**

Adding the interest calculations from 2018 to 2022,

- **total prejudgment interest** = **$257,115.**

- **total backpay with prejudgment interest = $2,481.062**

## III.    REINSTATEMENT/FRONT PAY

The Court must next decide whether reinstatement or front pay is the appropriate forward-looking remedy in this case. Reinstatement and front pay are an additional, necessary way for a court, acting in equity, to fashion make-whole relief, this time addressing losses that will be realized after entry of the judgment. See *Duke v.*

*Uniroyal*, 928 F.2d 1413, 1423–24 (4th Cir. 1991); *Hunter v. Town of Mocksville*, 201

F.Supp.3d 750, 756-57 (M.D.N.C. 2016)

In the Fourth Circuit, reinstatement is the preferred remedy over front pay,

*Uniroyal*, 928 F.2d at 1424, as it eliminates some of the uncertainties involved in a

front pay award.  But it is not the best remedy where the litigation has irreparably

damaged the relationship between the parties. *Tinsley*, supra, at *3-5.  Here, that is

clearly the case.

To date, has Defendant never broached reinstatement.   Indeed, Defendant's

animosity toward Duvall is palpable. They falsified his performance documents in

discovery and terminated an employee, Matthias Krebs, the day after he indicated that

he would testify in favor of Duvall at the trial.  And its counsel has announced its

intention to accuse Plaintiff and his counsel of unethical conduct in the course of the

litigation and trial.  The relationship between the parties is "irreparably damaged." *Id.*

## A. FRONT PAY

Since reinstatement is not viable, the Court must consider front pay as the

alternative equitable measure to assure forward-looking, make-whole relief . *Uniroyal*,

928 F.2d at 1424.   Front pay awards involve uncertainties, as no one can predict the

future. *Id.* at 1423.  On the other hand, the Court cannot blink reality at Plaintiff's

predicament.  A high-level marketing and communications executive who lost one

position already for asserting his rights has very limited prospects for returning to his

prior status.  The Court has to balance the realities of Plaintiff's prospects against the

chance of creating an unwarranted windfall and must use a "tempered" approach in weighing the equities. *Hunter*, 201 F.Supp.3d at 757-58 (citing *Uniroyal*, 928 F.2d at 1424). Plaintiff bears the burden of proving the information supporting front pay. *Id.* at 758.

As recognized in *Tinsley*, the *Hunter* decision in the Middle District identified ten factors to consider in determining an award of front pay that is appropriate: (1) the plaintiff's age; (2) the length of time the plaintiff was employed by the defendant employer; (3) the likelihood the plaintiff's employment would have continued absent the discrimination; (4) the length of time it will take the plaintiff, using reasonable effort, to secure comparable employment; (5) the plaintiff's work life expectancy; (6) the length of time other employees typically held the position lost; (7) the plaintiff's status as an at-will employee; (8) the plaintiff's ability to work, including the ability to work for the defendant employer; (9) the plaintiff's subjective intention to remain in the position; (10) the plaintiff's efforts to mitigate damages. *See, Tinsley*, at *5, citing to *Hunter*, 201 F.Supp.3d at 758-59.

1. **Plaintiff's Age**: Plaintiff was born on August 18, 1965, and is 56.

2. **Length of Employment**: Plaintiff worked for Defendant just days shy of five years.

3. **The Likelihood of Continued Employment Absent Discrimination:** Plaintiff fully anticipated a long career with Defendant, as other executives at and above his level have had long tenures with the company. Jesse Cureton, who hired

Plaintiff, continues to work with Defendant nearly four years after the termination;

Jim Tobalski, whom Plaintiff replaced, had worked for Novant for 12 years; Kati

Everett, who replaced Plaintiff as SVP for Communications and Public Relations, has

been with Novant for over 20 years; Tammy Jones, whom Plaintiff hired as a

marketing director and then promoted to Vice President, and who now serves as SVP

for Marketing, has been with Novant since 2015.   Tonya Blackmon, the EVP for

Diversity and Inclusion since 2016, held various positions with Novant since 1992

before taking on this current role; and Carl Armato, the CEO, has been with Novant

since the 1990s.  It is not a culture of rapid turnover.

4.      **Length of Time to Secure Comparable Employment.**  This factor is

the single most important.   Duvall's decision to assert his federal and state rights has

had a powerfully negative impact on his finding a comparable position, and the

unexpected post-trial publicity about the case has placed his career prospects in

further jeopardy.

As noted, HFHS terminated Plaintiff just weeks after news of his lawsuit broke.

Pl. Ex. 98.   HFHS's draconian reaction to an Plaintiff suing his prior employer for

discrimination, particularly a claim involving the culturally sensitive issue of so-called

"reverse" discrimination, is compelling proof of the problem he faces.  This major

hospital system showed him the door and following his termination, Plaintiff's

discussions with executive recruiters looking to fill comparable positions at three

other hospital systems went silent when Plaintiff disclosed the circumstances

surrounding his termination from HFHS upon filing the ongoing, publicly reported lawsuit against Novant Health. That the verdict drew such media attention only further hurt Plaintiff's prospects, as he now identified by many as the person who took on diversity and inclusion.

The problem is that the Chief Marketing & Communications Officer is the promoting face of any organization's brand -- to the community, to the executive leadership, to the board of directors, to the donor population, and to team members he would lead. A candidate who has been the plaintiff in a controversial lawsuit against a prior employer, wrongly perceived as a challenge to the very idea of diversity and inclusion programs that most employers now try to embrace, can only be perceived by potential employers as a huge risk of controversy and litigation, and not a viable candidate for that community and institution-facing role. No CMO doors have opened as a result of this verdict. So, at age 56, Plaintiff faces tremendous uncertainty in his chosen career. Thus, front pay is warranted.

5.    **Plaintiff's Work Life Expectancy.** Plaintiff planned to work until at least age 67 when he would first be eligible for full social security benefits. See, https://www.ssa.gov/pubs/EN-05-10035.pdf.

6.    **Length of Time Employees Typically Hold the Position Lost.** As noted in the previous paragraph 3, Novant Health does not have a culture of rapid turnover at the SVP level in Marketing and Communications.

7.     **Plaintiff's Status As An At-Will Employee.**  Plaintiff was an at-will employee, not employed on a contract.   But most persons outside of the public sector work in that at-will capacity.   For that reason, Defendant presented Plaintiff a severance plan with a five-year incentive, to induce him (and other executives) to remain at Novant Health for more than five years.

8.     **Plaintiff's Ability to Work.**  Plaintiff is not disabled in any manner and is able to work, and was able to work for Defendant.

9.     **Plaintiff's Subjective Intention to Remain in Position.**  Plaintiff and his wife built a home in Charlotte after a few years with Novant Health, fully intending to remain in Charlotte, at Novant Health, until and after his retirement.

10.     **Plaintiff's Efforts to Mitigate Damages.**  Please see the discussion of mitigation set out *supra* at pp. 4-7, and in ¶ 4 of this section.   The mitigation evidence in this case shows the highly unusual fact that Plaintiff found a better paying job but was terminated from it weeks after this litigation went public.  The opportunities he explored after HFHS all went ice cold as soon as he disclosed his quick departure from HFHS and this lawsuit to recruiters.  And he has now been out of work for two years.  The burden of proof on mitigation of damages is on Defendant and it did not begin to show that Plaintiff has any reasonable, short-term prospects for reemployment in a comparable Marketing and Communications position as a result of asserting his federal and state rights.

### B. Front Pay Calculations

Plaintiff has compiled a table, Exhibit E, showing front pay calculations for up to 10.5 years, to age 67, for the Court's consideration. The calculations use many of the same assumptions as the backpay spread sheet – a 7% annual increase in base pay and AIP; a 73.75% achievement rate for LTI, and 15% of base pay for the DC SERP. Plaintiff has also discounted the total figure to its present value using Excel's "Net Present Value" formula and the 10-year Treasury rate as of January 31, 2022 of 1.8%.

### C. Federal Tax Adjustment

Finally, *Tinsley* recognized that tax adjustments may be necessary to compensate for the higher tax rate applied to a lump sum compared to receiving that same amount over time as annual income. *Tinsley, supra,* *7. In Exhibit F, using tax tables from the IRS, Plaintiff shows the Court the difference in effective tax rates of the 2021 back pay award and the 2022 back and front pay awards, if they had bee received in a single year, and the tax rate for a hypothetical lump sum of $10 million. The difference is nearly 6%. Plaintiff asks the Court to determine the amount of back pay and front pay and then allow Plaintiff to present a calculation of the amount needed to adjust for the tax effect of the lump sum.

## CONCLUSION

Plaintiff offers two concluding observations.

First, Defendant cannot complain about the position Plaintiff finds himself in, from national speaker to *persona non grata* in his chosen field with a wholly uncertain professional future -- its unlawful conduct put him there. See *Tinsley*, *1.

Second, Defendant cannot complain about the amount of pay set out in these calculations, as it merely reflects the salaries that Novant pays its executives. In 2019, Novant paid 25 executives more than the $818,216 listed in block D13 of the backpay chart as Duvall's lost earnings for that year. Pl. Ex. 114. Fourteen of those employees received more than $1 Million dollars. And that pattern was not new. See, also, Pl. Ex. 111-113. Defendant created the levels of salary seen in these charts. It is at Novant's compensation levels that Plaintiff seeks what the law provides, "to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed." *Albemarle Paper Co.*, 422 U.S. at 418–19.

Plaintiff respectfully moves the Court to award backpay with prejudgment interest totaling $2,481,062 and front pay discounted to a present value of $12,983,705; and to allow Plaintiff to present a tax equalization figure.

Respectfully submitted, this 1st day of February, 2022.

/s/ **S. Luke Largess**
NC Bar No. 17486
*Attorney for Plaintiff*
Tin, Fulton, Walker & Owen, PLLC
301 East Park Avenue
Charlotte, NC 28203
Telephone: 704.338.1220
Email:llargess@tinfulton.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document contains fewer than 6,000 word.

This is the 1st day of February, 2022.

/s/S. Luke Largess
N.C. Bar No. 17486
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record:

This is the 1st day of February, 2022.

/s/S. Luke Largess
N.C. Bar No. 17486
*Attorney for Plaintiff*