IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

DAVID DUVALL,                          )
                                       )
        Plaintiff,                     )
                                       )
    v.                                 )        C.A. No. 3:19-cv-00624-DSC
                                       )
NOVANT HEALTH, INC.,                   )
                                       )
        Defendant.                     )
                                       )
_____      )

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION
## TO SET ASIDE PUNITIVE DAMAGES

Plaintiff, through counsel, respectfully submits this Response to Defendant's

Motion to Set Aside the award of punitive damages [ECF 127] and memorandum in

support.  [ECF 128]

Defendant challenges its derivative liability for punitive damages and the

amount.   Defendant's briefing on derivative liability attacks the jury's finding that

Cureton discriminated, an improper expansion of its Rule 50(b) argument, illogically

based on a co-worker harassment case. *Ward v. AutoZoners,* 958 F.3d 254 (4th Cir.

2020).

Defendant's due process arguments as to the amount of punitive damages are

premature.  The Court has yet to determine back and front pay.  Its proportionality

arguments cannot be considered until the Court determines back and front pay.  And

Defendant's claim that punitive damages cannot be awarded absent compensatory damages is simply wrong. *Corti v. Storage Tech. Corp.*, 304 F.3d 336 (4th Cir. 2002), allows a jury to award punitive damages as long as the trial court awards backpay.

Plaintiff begins with a review of derivative or agency liability for punitive damages, how it applies here, and then turns to the due process issues.

## I.      Punitive Damages and the 1991 Amendments to Title VII.

The 1991 amendments to Title VII created a provision for punitive damages. 42 U.S.C. § 1981a(a)(1) and (b).   The circuit courts then divided over what evidence was required to obtain punitive damages.  Several circuits required "egregious" conduct, including the Fourth Circuit. *See Lowery v. Cir. City Stores, Inc.,* 158 F.3d 742, 766 (4th Cir. 1998), *cert. granted, judgment vacated,* 527 U.S. 1031 (1999).   The courts also divided on how to establish employer liability based on the discriminatory conduct of its employees.

The Supreme Court took up both issues in *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526 (1999)

### A. *Kolstad* Established a "Reckless Disregard" Standard for Liability

In *Kolstad,* the plaintiff proved that she was denied a promotion because of her sex.  The trial court rejected her claim for punitive damages, finding a lack of egregious conduct.  A panel of the D.C. Circuit reversed, and then a divided *en banc* court reversed the panel, holding that egregious conduct was required. The Supreme Court granted *certiorari.*

To establish the standard for awarding punitive damages under the new statute, the Court began with the language of 42 U.S.C. § 1981a(b)(1).

> The employer must act with "malice or with reckless indifference to the [plaintiff's] federally protected rights." § 1981a(b)(1) (emphasis added). The terms "malice" or "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.

527 U.S. at 535. The Court looked to *Smith v. Wade,* 461 U.S. 30 (1983), which established the standard for punitive damages in 42 U.S.C. §1983 cases, to define what "malice" and "reckless indifference" meant.

> . . . its intent standard, at a minimum, required recklessness in its subjective form. The Court referred to a "subjective consciousness" of a risk of injury or illegality and a " 'criminal indifference to civil obligations.' ". . . The Court thus compared the recklessness standard to the requirement that defendants act with " 'knowledge of falsity or reckless disregard for the truth' " before punitive awards are available in defamation actions. . . . Applying this standard in the context of § 1981a, an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages.

*Id.,* at 536 (internal citations omitted). The Court explained there may be situations where an employer is not liable for punitive damages despite a verdict of intentional discrimination by one of its employees where the law is not clear.

> [T]here will be circumstances where intentional discrimination does not give rise to punitive damages liability under this standard. In some instances, the employer may simply be unaware of the relevant federal prohibition. There will be cases, moreover, in which the employer discriminates with the distinct belief that its discrimination is lawful.

*Id.* at 536-37.

Notably, Defendant does not raise these *Kolstad* defenses to punitive damages liability. It does not claim that Novant Health and Cureton were unaware that terminating someone based on race and gender would be unlawful. Nor does it claim Duvall could be fired on account of his race and gender lawfully to further the goals of the D&I program. Instead, it denies that Duvall's termination was motivated by race and gender, insists the decision was unrelated to his D&I initiative, and contests the verdict. Disputing the verdict is not a defense to the employer's punitive damages liability, which derives from the verdict of discrimination by the employee. A challenge to that verdict must be made under Rule 50(b). Defendant misses this quite basic point, as shown below.

### B. *Kolstad* Applied Agency Principles Establish Employer Liability

After establishing the standard for "malice" and "reckless indifference," *Kolstad* turned to the second disputed issue – how to establish employer liability for punitive damages for the discriminatory acts of its employees. It decided to rely on common law principles set out in the Restatement (Second) of Agency.

> The Restatement of Agency places strict limits on the extent to which an agent's misconduct may be imputed to the principal for purposes of awarding punitive damages:
>
>> "Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if:
>> "(a) the principal authorized the doing and the manner of the act, or
>> "(b) the agent was unfit and the principal was reckless in employing him, or

> "(c) the agent was employed in a managerial capacity and was
> acting in the scope of employment, or
> "(d) the principal or a managerial agent of the principal ratified or
> approved the act."
> Restatement (Second) of Agency, § 217 C

*Id.* at 542-43.

That third basis for agency liability, managerial liability under part (c), is the basis for liability here. There is no dispute that Cureton, an Executive Vice President, was one of Defendant's "managers" and acted within that scope in terminating Duvall. That prong of common law agency liability under *Kolstad* readily applies.

But the Court then softened the strict application of agency liability for punitive damages by adding a good-faith defense.

> Recognizing Title VII as an effort to promote prevention as well as
> remediation, and observing the very principles underlying the
> Restatements' strict limits on vicarious liability for punitive damages, we
> agree that, in the punitive damages context, an employer may not be
> vicariously liable for the discriminatory employment decisions of
> managerial agents where these decisions are contrary to the employer's
> "good-faith efforts to comply with Title VII."

*Id.* p. 545. Defendant's arguments that it acted in good-faith are discussed in more detail, *supra.*

## C. *Lowery* Controls Defendant's Liability for Punitive Damages After *Kolstad.*

As noted, the Fourth Circuit had applied the egregious conduct standard for punitive damages liability. *Lowery,* 158 F.3d at 766. Those two Black female employees won a jury verdict on the denial of promotions by their respective managers based on

race.  The Fourth Circuit had affirmed underlying liability but rejected punitive

damages, 158 F.3d at 768, and they sought *certiorari.*

On remand, the Fourth Circuit applied *Kolstad* to uphold the punitive damages

award based on discrimination by each plaintiff's manager.  *Lowery v. Circuit City Stores,*

*Inc.,* 206 F.3d 431 (4th Cir. 2000).   In an analysis that controls what this Court must

undertake to assess the challenge to derivative liability here, *Lowery* set out the four

issues that must be addressed:

> We must first ask whether . . . . the decision maker (acted) in the face of
> a perceived risk that (his) decision would violate federal law.  . . . . If the
> answer is yes . . . . we should next ask whether a reasonable juror could
> find the decision maker served the employer in a managerial capacity.  If
> the answer is yes, we must ask whether a reasonable juror could find that
> the decision maker acted within the scope of her employment in making
> the challenged decision. . . . . Finally, if the answer . . . is yes, we must ask
> whether a reasonable juror could *only* conclude that Circuit City engaged
> in good-faith efforts to comply with (federal law).

*Id.* at 443(emphasis added).

The Fourth Circuit then applied those four factors to the evidence for each

plaintiff.  It found that Lowery's manager was aware of federal law prohibiting

discrimination, served defendant as a manager, and acted within the scope of that

management role in denying promotion.  *Id.* 443-44.  It then reviewed the evidence of

the employer's anti-discrimination policies and training programs against the plaintiffs'

evidence of discriminatory practices.  It weighed that conflicting evidence in the light

most favorable to the plaintiffs, including all reasonable inferences.  *Id.,* at 445-46.  It

then concluded, "we are not persuaded that a reasonable juror could only conclude

that Circuit City engaged in good-faith efforts to comply" with federal law. *Id.* at 446. Having answered the four questions affirmatively, derivative liability applied.

It then conducted the same inquiry as to plaintiff Peterson and her manager, and reached the same conclusion. *Id.,* at 447.

Defendant asserts here that Cureton was the sole decision-maker in Plaintiff's termination. While Plaintiff disputes that assertion, believing the evidence shows Armato's involvement as well, Cureton clearly was directly involved and this Court can rely upon that fact to consider the four *Kolstad/Lowery* questions. Defendant recognizes the framework but uses much of the brief to challenge the underlying verdict. That is not a *Kostad/Lowery* argument.

The issue of punitive damages liability derives from the jury verdict that Cureton, acting for Novant, terminated Plaintiff on account of his race and gender, and would not have made the same decision in their absence. Defendant separately challenges that verdict under Rule 50(b). It cannot use a *Kolstad* challenge to agency liability for punitive damages to expand its Rule 50(b) briefing.

## II. *Ward v. Autozoners* Has No Bearing

Quoting from *Ward v. AutoZoners,* 958 F.3d 254, 256 (4th Cir. 2020), Defendant acknowledges the first *Kolstad/Lowery* question.

> This requires a showing that "the evidence [is] sufficient for a reasonable jury to find that the 'employer's decision maker'—that is, the managerial employee—'discriminated in the face of a perceived risk that the decision would violate federal law.'"

[ECF 128, p. 5]. But it turns the perception of "risk" or awareness of the law issue upside down, denying that Cureton discriminated.

Defendant knows that Cureton – like anyone with his experience in corporate management--was aware that firing someone based on his race or gender would violate federal law. Ms. Blackmon, the D&I leader for Novant, agreed that an employer cannot fire someone based on race or gender to create space for more diversity. ECF 115, Vol. II, p. 53, ll. 15-25. Unable to avoid the obvious answer to this first issue, Defendant contorts the holding in *Ward,* a co-worker harassment case, to challenge the discrimination verdict.

In *Ward,* the trial court had let stand compensatory and punitive damages awarded by a jury based upon the failure of managers to stop grossly offensive physical and verbal sexual harassment of one store clerk by another. The Fourth Circuit held that while the negligence of the managers in addressing the situation supported compensatory damages, it did not support agency liability for punitive damages.

> *Kolstad* and *Lowery* provide no support for punitive damages liability
> when the employee who carries out the intentional discrimination is not
> a manager and the alleged managers did not carry out the intentional
> discrimination.

958 F.3d at 267.

The misconduct of a line employee and the inadequate response of managers in *Ward* have no bearing on agency liability for punitive damages in this case. Here, the

manager committed the intentional discrimination.  Yet Defendant insists that *Ward*

controls and claims Plaintiff has failed to meet his burden under *Ward* to show

Cureton's specific intent to discriminate.  That is a challenge to the first two Issues on

the verdict sheet.

Defendant begins its assault: Plaintiff admitted he did not feel discriminated

against during his employment, Cureton never showed racial animus toward him, and

Plaintiff never complained about discrimination during his employment.  [ECF 128 p.

6].  These challenges to the underlying verdict are strawmen.  Plaintiff never alleged a

hostile work environment or that Cureton acted from racial animus.  He claimed, and

the jury found, that he was fired on account of his race and gender to improve

diversity during the D&I push.

Defendant challenges the "putative" evidence of a pattern of discrimination,

with arguments presented entirely in a light favorable to it, targeted at the jury verdict.

> The evidence is undisputed that Cureton did not terminate Plaintiff to
> make room for diverse candidates, nor did he have any personal or
> financial incentive to do so. (Doc. 117, 159:19-160:5). Likewise, Carl
> Armato, Novant Health's CEO, did not direct Cureton (or anyone else)
> to eliminate white males from his team. (Doc. 116, 102:3-11).

*Id.*, p. 7.   It claims that *Ward* compels setting aside the punitive damages award based

on the challenge to the verdict.

> Where, as here, no evidence of intentional discrimination by the decision
> maker exists, the Fourth Circuit has held that punitive damages awards
> must be overturned. See *Ward*, 958 F.3d 254.

*Id.* p. 8.  It claims that "District courts throughout this circuit have regularly relied on *Ward* in disallowing punitive damages when this strict burden of proof is not met." *Id.*, p. 9[1]  The "strict burden of proof" has been met by the discrimination verdict.

Defendant continues to harangue against the verdict, writing that Plaintiff cannot "bootstrap" Armato's press comments or "cherry-pick" from the D&I documents to show intentional discrimination by Cureton.  And then, underlined for effect: "<u>This is particularly true because there is no direct evidentiary link between the</u> <u>D&I Program and Plaintiff's termination</u>." *Id.*, p. 9.

Defendant clearly does not accept the verdict.  But a motion to set aside punitive damages under *Kolstad's* rubric is not cover for this improper Rule 50(b) challenge.

## III.    Defense of the D&I Initiative

Defendant then challenges the evidence that Duvall was fired to further the D&I initiative.  *Id.* at p. 10.

> Moreover, the evidence is uncontroverted that Novant Health's D&I Program was lawfully implemented and did not entail terminating employees of one race or gender to make room for another. (Doc. 115, 12:20-24). . . .
> . . . a D&I Program **without directives to terminate white men** to make room for diverse candidates and proof Plaintiff was improperly terminated pursuant to the program, cannot support an award of punitive damages.

---

[1] Defendant cites *Equal Employ. Opportunity Comm'n v. Joe's Old Fashioned Bar-B-Que, Inc.,* No. 5:18-CV-00180, 2020 WL 3128599 (W.D.N.C. June 12, 2020) to support dismissal of punitive damages, but that is also a co-worker harassment case.  Those managers fired the perpetrator so the case was dismissed at summary judgement.  That case has no bearing.

*Id.* (emphasis added)  Defendant challenges the verdict and claims without legal citation that absent an explicit directive to terminate employees, its D&I program cannot be scrutinized.  There is no direct evidence requirement.   The jury rejected the justifications for termination that Defendant offered and found Cureton terminated Duvall to further diversity during the D&I push.

The adamant defense of the D&I initiative melds into the fourth *Kolstad* issue, their defense of good faith efforts to comply with federal law.  Identifying positive aspects of the D&I initiative, as Defendant devotes pages to doing, does not resolve the good faith inquiry. Under *Lowery,* 206 F.3rd 445-47, the Court must weigh, in the light most favorable to Plaintiff, the conflicting evidence that Duvall was fired on account of his race and gender to further the expressed D&I and DIEC goal of remaking the workforce to look like the community, against Defendant's claims of entirely good-faith efforts to follow the law.  The Court then must decide whether a reasonable juror could conclude that Novant acted "only" in a good faith effort to comply with federal law and that Cureton acted contrary to those efforts.

Jurors found that Cureton acted in furtherance of Defendant's D&I policy, not against it.  Defendant did not put on any evidence of other efforts to comply with federal law, such as an EEO non-discrimination policy that employers routinely rely upon post-*Kolstad* to show good faith.  *Cf. Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 548 (4th Cir. 2003) (evidence of "extensively implemented organization-

wide Equal Employment Opportunity Policy.") The only "good faith" documents presented at trial – all introduced by Plaintiff --- were in the D&I plan. Certainly, parts of that program were transparent and positive. Plaintiff and his team supported them.

But Blackmon admitted that other parts of the initiative were not shared with employees – the executive team's review of metrics, Pl. Ex. 15, 19, the bonuses paid to executives based to AIP and LTI diversity and inclusion goals, Pl. Ex. 75, 6; the declaration at the October 2018 DIEC meeting that self-determined targets to remake the workforce until it mirrored the community were not quotas; and the employee concerns discussed at that meeting -- about whether White males should look elsewhere for opportunities, whether such emphasis on women was okay, and whether employees' qualifications for jobs still mattered. Pl. Ex. 18, p. 2. That is not evidence of exclusively "good-faith." Cureton's discriminatory termination of Duvall was *not* contrary to the D&I policy -- it furthered it.

Given the verdict that Cureton fired Duvall because of his race and gender to increase diversity during the D&I push in 2018, a reasonable juror could *not* find that Defendant acted *only* to comply in good-faith with the law.

## IV.  Award of Punitive Damages in *Lowry* Is Not Distinguishable

Defendant then tries, as it must, to distinguish this case from *Lowery*. [ECF 128, pp. 11-13] It focuses on the race-based animus in that record compared to here. But that is a distinction without a difference.

In both cases, jurors found an intentional act of discrimination on account of race and, here, gender, by a manager who was aware of the law against discrimination. The managerial decisions were taken within the scope of employment and the evidence of the employer's good faith efforts to comply with the law was so mixed that it was *not* a case a "reasonable juror could *only* conclude that (Novant) engaged in good-faith efforts to comply with federal law."[2] *Lowery* applies four-square. Defendant is liable for punitive damages.

## V.    Defendant's Due Process Claims

Defendant next declares the amount of the punitive damage award a violation of due process.   It makes four arguments, that -- its race and gender discrimination was not reprehensible; the award is invalid absent an award of compensatory damages; the award is disproportionate to other cases in a chart it compiled; and, Plaintiff's counsel inflamed the jury.

Plaintiff addresses these arguments in a slightly different order.

## A. Punitive Damages Can Be Awarded Without Compensatory Damages

Defendant argues that punitive damages cannot be awarded absent an award of compensatory damages.  That is not true.  Since 2002, the Fourth Circuit has held that compensatory damages are not required for a jury to award punitive damages in

---

[2] Defendant could also be liable for punitive damages as the principal, given that the Board approved and followed the progress of the D&I initiative.  But that determination is not necessary given the evidence of managerial derivative liability.

a Title VII case, as long as the trial court awards backpay.  *Corti v. Storage Tech. Corp.,* 304 F.3d 336, 341-43 (4th Cir. 2002).

*Corti* found that loss of income due to discrimination is an "actionable harm," and that a prevailing plaintiff in a Title VII case is presumptively entitled to back pay under  42 U.S.C. § 2000e–5(g).  It called back pay in a Title VII case "a 'make-whole' remedy that resembles compensatory damages in some respects." *Id.*, at 342, *quoting Landgraf v. USI Film Products,* 511 U.S. 244, 253, (1994); *see also Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418–22, (1975).   Judge Niemeyer concurred separately to write, "Indeed, backpay awards are compensatory in nature and are, in fact, "the most obvious economic damages in a wrongful discharge case." *Id.,* at 344.  The court then concluded, in a line directly applicable to Defendant's arguments here:

> Because back pay awards serve a similar purpose as compensatory
> damage awards, the "familiar tort mantra" that punitive damages may
> not be assessed in the absence of compensatory damages will not aid
> (Defendant) in this case.

304 F.3d at 342.  That mantra will not aid Defendant in this case.

It is a surprise that Defendant argues the need for compensatory damages without addressing *Corti.*  The case was presented and argued at trial, and the Court allowed jurors to consider punitive damages while it took the backpay issue based upon it.  That it argues against controlling law in this circuit without at least acknowledging it is puzzling.

## B.  The Court Needs to Determine Back and Front Pay.

Not waiting for the Court to set back and front pay, Defendant argues proportionality, declaring Plaintiff's claim for backpay is valueless.  It has not made any effort to date to measure Plaintiff's actual lost earnings and benefits from his termination on July 30, 2018 to present, claiming that Plaintiff's position with HFHS paid more than he earned at Novant and it is his fault he lost the job, so he has no economic damages.

Plaintiff explained the applicable law in his petition and presented a detailed calculation of his lost earnings and benefits that comes to $2,223,947 before interest and $2,481,062, with 8% state interest from August 2018 through March 2, 2022.   If the Court awards full backpay with interest, the ratio to the punitive damage award would be about 4:1.

Plaintiff has also submitted calculations for front pay. A year of front pay added to backpay would result in a 3:1 ratio.  Three years of front pay with backpay would create a ratio under 2:1.[3]  Full backpay and front pay to age 67 would exceed the punitive damages award, which would obviate any due process concerns.

---

[3]  In *Taylor v. Republic Services, Inc.,* 968 F. Supp. 2d 768, 803 (E.D. Va. 2013), a case on the list, the court awarded the plaintiff, 42 years old at time of termination, five years of front pay.  It did not award punitive damages as the case involved harassment by a co-worker, and the HR manager's diffident response did not support agency liability.

Defendant also presents a chart of regional punitive damages awards to argue the jury's award is excessive compared to other local cases. But the range of punitive damages in the chart includes a ratio of 10:1 in a case this Court helped manage – *Driskell V. Summit Contracting Group, Inc.*, 3:16-cv-819-FDW-DC; and the chart shows a ratio of 9:1 in a Spartanburg case.

This Court needs to determine back and front pay before it considers any proportionality arguments.

## C. Reprehensibility

Remarkably, Defendant argues that its use of race and gender in terminating Duvall was not reprehensible because plaintiff only lost wages, and that loss is insufficient to support punitive damages. It so argues, knowing backpay is "a 'make-whole' remedy that resembles compensatory damages in some respects." *Landgraf,* 511 U.S. at 253

It cites to *BMW of North America v. Gore,* 517 U.S. 559 (1996) to argue that lost wages from discrimination will not support punitive damages. There, a jury awarded $2,000,000 in punitive damages after a car dealer failed to disclose the car had been repainted. That Defendant compares terminating someone based on their race gender to repainting a car seems inappropriate, but it gets worse.

Defendant falsely describes the Fourth Circuit as holding in an unpublished decision that a punitive damage award based on lost wages is "especially suspect."

[ECF 128, p. 17, *citing Jordan v. Shaw Indus., Inc.,* 131 F.3d 134 (4th Cir. 1997)(unpublished)].  In fact, that quoted phrase described the Supreme Court's reaction to punitive damages for the repainted car in *BMW.  See id.,* at *5.  *Jordan* involved fraud claims and a unanimous panel approved of punitive damages awards ranging from 488:1 to 101:1  *Id.*   Judge Luttig wrote for the panel that "far more disparate punitive damages award ratios have been countenanced even in the wake of *BMW.*"  *Id.*

As for the Fourth Circuit measuring the reprehensibility of race and gender discrimination, in *Lowery,* the analogous case where jurors found a manager had discriminated based on race, the Fourth Circuit upheld punitive damages ratios of 18:1 for Lowery and 11:1 for Peterson.  206 F.3d at 436.

### D. Inflaming the Jury

Defendant then argues that the "most obvious explanation" for the "excessive" award of punitive damages was the misconduct of Plaintiff's counsel.   Defendant claims the punitive damage verdict, whichcame after five days of evidence and a sixth day of closing argument, stems from these inflammatory acts.

1.  a. The testimony of Matthias Krebs, allowed by the Court, that he saw a pattern of white men being "let go without reason".  ECF 115, p.233

    b.  The testimony of Plaintiff to the positions of white men terminated in 2018 that led him to believe he was fired to achieve diversity; ECF 116, pp. 198-99; followed by a limiting instruction by the Court, ECF 117, p. 23.

      c.  Plaintiff's closing argument recounting *admitted* evidence from Plaintiff, the CEO Armato, the recruiter Shane Grady and former general counsel, Pete Brunstetter.

2.  "Repeated misrepresentations about diversity bonuses and targets"

3.  The "false" statement in closing that Krebs had been fired the day after telling Novant's counsel he would testify in favor of Plaintiff at trial.

4.  The "completely unnecessary reference" to George Floyd in questioning Cureton about Adidas luring Duvall's replacement from Novant.

[ECF 128, p. 19] Defendant offers scant legal support for its due process argument about the inflammatory effect of this evidence. With the exception of Plaintiff's brief testimony about the positions of persons removed, corrected with a limiting instruction, all of it was admitted without contemporaneous objection. The fact counsel argued about *admitted* evidence during closing did not violate due process. As for that one curative instruction, Defendant claims it was ineffective, but does not present any case law to overcome the "almost invariable assumption of the law that jurors follow their instructions". *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)

Defendant claims the reference to George Floyd inflamed the jury in a "reverse" discrimination case. Cureton testified that Adidas lured Plaintiff's replacement away from Novant, suggesting it showed her superior reputation and talent. So, counsel asked Cureton if he was aware of the publicly reported controversy at Adidas over its dearth of black employees that arose after George Floyd's death, after which the replacement got the offer from Adidas. Defendant did not object to the question, and Plaintiff did not mention Floyd again.

Defendant cites to rulings in two police misconduct cases, *Sappy v. City of Detroit*, 2021 WL 2986284, *5 (E.D. Mich. 2021), and *Ochana v. Flores,* 199 F. Supp. 2d 817, 831 (N.D. Ill. 2002), aff'd, 347 F.3d 266 (7th Cir. 2003) precluding evidence about nationally prominent use of force incidents. Clearly, that evidence could prejudice jurors in such cases. But, Defendant does not explain how the Floyd reference had *any* effect on this jury, let alone inflamed it, in a case about a white male losing his job.

It then turns to counsel's comments in closing argument about Novant's termination of Matthias Krebs the day after he told defense counsel he would testify favorably for Plaintiff. That fact was in evidence. Defendant did not object when Krebs testified to it and did not object during or after counsel's closing argument. And one factor for the jury to consider in the instruction on punitive damages approved by Defendant was to consider "the attitudes and actions of Novant Health's top management after the misconduct was discovered." ECF 119, p. 125. Terminating a witness fit within that instruction.

Defendant argues that it inflamed jurors to comment on Novant's assets in closing. In fact, the jury was *instructed* that it could consider "the financial resources of Novant Health in fixing the amount of damages," but should also consider "the effect of the damages award on Defendant's financial condition." [ECF 119, p. 125]. The punitive award was 0.25% or 1/4000th of the net assets of Novant in 2018.[4]

---

[4] $10 million divided by $4 billion.

Defendant then puts in bold-face that counsel told jurors not to worry about the judge's calculation of backpay in making its determination. That is the law. Its refusal to acknowledge *Corti* is key here. The Fourth Circuit allowed the Court to let jurors decide punitive damages while it took up backpay separately. Telling jurors that legal fact was not inflammatory.

Defendant then makes a bald assertion of vile motive -- that Plaintiff was trying to inflame the jury against a "woke" culture. That comes out of nowhere. Plaintiff supported D&I, just not being terminated to improve diversity. Also out of nowhere, Defendant argues that Plaintiff's closing was tantamount to a closing argument about the Golden Rule in a tractor product liability case. ECF 128, p. 21. *Burke v. Deere & Co.*, 6 F.3d 497, 512–13 (8th Cir. 1993). Plaintiff made no arguments about protecting others in his closing.

### E.     Entitlement to Punitive Damages Under North Carolina Law

Defendant argues last that North Carolina's punitive damages statute does not apply to this case under the instruction given by the Court – that it failed to instruct on the clear and convincing evidence standard and that the willful and wanton conduct standard is different than the Title VII standard. This argument raises a question of waiver by Defendant and plain error by the parties and Court, but there is a simple solution given that the state and Title VII standards for punitive damages are, in fact, identical.

### 1. Rule 51, Waiver of Objection

Under FRCP 51, Defendant should be estopped from objecting that the instruction does not support the punitive damages verdict under North Carolina law. Defendant acknowledged in its proposed jury instructions that state law applied a clear and convincing standard, but stated that a separate instruction was not needed. [ECF 74, p. 11, n. 10.]   Its counsel then made statements showing it clearly believed that the state law punitive damages claim was before the jury, and that North Carolina's statutory multiplier of three times compensatory damages applied under the instruction.

After the verdict, defense counsel twice referred to the need for the court to determine the amount of backpay and apply the North Carolina multiplier.

> MR. HOLLAND:
> With respect to the damages, if we're going to brief lost wages, you almost need a two-tiered briefing schedule where the punitive issue would be addressed following a determination on lost wages. In other words, we can't have a full conversation with respect to a punitives award until we agree with the lost wages.

ECF 120, p. 8, ll. 19-23

Still discussing a two-tiered briefing schedule he reiterated that the state law multiplier applied:

> MR. LARGESS: Why don't we do 14 days from that, Judge. I think it's -- since it's a fairly straightforward issue legally, I think it won't take.
> THE COURT: Mr. Holland?
> MR. HOLLAND: In fairness, we're doing math, 14

days should be sufficient.

*Id.* p. 10, ll. 15-20.

It also appears both from this colloquy and jury instructions that the Court believed state law would apply. The instructions expressly include both federal and state claims of discrimination. [ECF 119, p. 119, l. 5; ll. 9-13] (instructing jurors that Plaintiff made claims under "federal and state law" and then describing NCEEPA). Plaintiff made an explicit request for punitive damages under Chapter 1D of the North Carolina statutes. [ECF 1, p. 7, Prayer for Relief c.]

Thus, if the Court and the parties believed that state law applied to all claims, has Defendant waived any objection that the instruction it proposed and that it believed included state law punitive damages was deficient?

### 2. "Willful and Wanton" is Identical to "Reckless Disregard"

Given that the Court seemed to intend to cover the state and federal claims, including punitive damages, with its instruction, it has a straightforward option -- find that the evidence met the state law standard. There are two aspects to this remedy.

Defendant argues under *Ward, supra,* that the instruction was inadequate because the North Carolina standard of willful and wanton conduct is different than the Title VII standard of reckless disregard. In fact, they are identical.

*Kolstad* applied *Smith v. Wade,* 461 U.S. 30 (1983) to hold that "reckless disregard" means a " **'subjective consciousness' of a risk** of injury or illegality" and a " **'criminal indifference to civil obligations.'** " *Kolstad,* 527 U.S. at 536 (emphasis

added)  There is no distinction between that definition of "reckless disregard" and the definition of "willful and wanton" conduct in N.C.G.S. § 1D-5 (7).

> the **conscious** and **intentional disregard** of and **indifference** to the **rights and safety** of others, which the defendant **knows or should know is reasonably likely to result i**n injury, damage, or other harm.

See *Ward*, 958 F.3d 254.  The two standards are the same – subjective consciousness of rights of another, and criminal or intentional indifference to the risk of violating them.  This Court is not bound by *Ward's* misreading of *Kolstad*.

### 3.  This Court Can Find The Evidence Clear and Convincing

Second, this Court can find that the evidence of that subjective consciousness of the clear right at issue and criminal or intentional indifference to risk of violating it was "clear and convincing."  Courts assess the weight of evidence in every proceeding.  It would not be improper to do so here.  Indeed, if jurors had been instructed on a clear and convincing standard, Defendant would be asking the Court to find that evidence insufficient to meet it; and this court would have to weigh the evidence to decide that challenge.  Plaintiff's request is simply the converse.

Further, the "double" verdict here also supports a finding of clear and convincing evidence of consciousness of the law, and indifference to, the risk of harm.  Jurors found that Defendant relied on race and gender in the termination *and* that it would *not* have fired him absent them.  It reached that verdict on the clarity of the evidence regarding the utter falsity of the proffered justifications.  That supports a

finding of clear and convincing evidence of reckless disregard for/willful and wanton indifference to Plaintiff's rights.

### 4. Plain Error Would Apply Otherwise

If the Court finds that Defendant did not waive an objection to the charge in believing the instruction included the state multiplier, or if the Court believes it cannot find that the *Kolstad* and state law standards are identical, or cannot decide the evidence is clear and convincing, it should find plain error in the instruction. The parties and the Court intended that North Carolina's law cap on punitive damages would apply. That means, "there is an error; the error is plain; the error affects substantial rights; and the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *In re Celotex Corp.,* 124 F.3d 619, 63 (4th Cir.1997).

On that finding, the Court should order a new trial solely as to punitive damages with a correct instruction, after any appeal by Defendant from the verdict and any award of back and front pay.

## CONCLUSION

The Court should affirm the award of punitive damages under federal and state law and consider any proportionality arguments after it sets the amount of back and front pay.

Respectfully submitted, this 18th day of February, 2022.

/s/ **S. Luke Largess**
NC Bar No. 17486
*Attorney for Plaintiff*
Tin, Fulton, Walker & Owen, PLLC
301 East Park Avenue
Charlotte, NC 28203
Telephone: 704.338.1220
Fax: 704.338.1312
luke.largess@tinfulton.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing **MOTION** with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record:

Dated this the 18th day of February, 2022.

/s/S. Luke Largess
N.C. Bar No. 17486
*Attorney for Plaintiff*