# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CIVIL ACTION NO. 3:19-CV-00624-DSC

| | | |
|---|---|---|
| **DAVID L. DUVALL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| **NOVANT HEALTH INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

THIS MATTER is before the Court on the parties' Post-Trial Motions, including Defendant Novant Health, Inc.'s "Renewed Motion for Judgment as a Matter of Law" (Doc. 124), "Motion to Set Aside Punitive Damages" (Doc. 127), "Motion for Sanctions" (Doc. 130), and "Motion to Strike Plaintiff's Post-Trial Evidence" (Doc. 137); and "Plaintiff's Motion for Entry of Judgments and Enquitable (sic) Relief" (Doc. 132) and "Plaintiff's Motion for Entry of Judgment and Equitable Relief" (Doc. 135). These Motions have been fully briefed. (Docs. 125, 126, 128, 129, 131, 133, 134, 138-145, 149, 150, 152-157, 159, 160 and 161).

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff David Duvall brought three claims against Defendant Novant Health, Inc. under federal and state law for "reverse" discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2, 2000e-3 (as amended) and public policy under North Carolina General Statute § 143-422.2, respectively; and an ERISA §510 interference claim under 29 U.S.C. § 1140. All claims arise from his termination on July 30, 2018.

Because "other employee" evidence factors into several of Defendant's Motions, the Court summarizes the history here. Defendant filed a pre-trial Motion in Limine to exclude anticipated evidence regarding the terminations of other former Novant Health employees. (Docs. 70, 71). Defendant argued that the evidence was irrelevant, could create mini-trials that would confuse and distract the jury from the ultimate issue, and cause undue prejudice. (Doc. 71). The Court granted the Motion barring presentation of this "other employee" evidence at trial finding that "the probative value of this evidence is substantially outweighed by a danger of unfair prejudice and confusing the issues." (Doc. 84, p. 1).

On the first day of trial, Defendant's counsel expressed concern about Plaintiff violating the Motion in Limine Order. In response, Plaintiff's counsel confirmed his understanding that he could not introduce evidence of terminations by other decision makers. But he was allowed to present evidence of terminations by Jesse Cureton, the decision maker in this case. Defendant objected, arguing that this was a "classic 403 situation." (Doc. 114, Tr. 8:2-9:10). The Court clarified: "I'm going to allow the evidence as to those individuals who came under Mr. Cureton consistent with the Motion in Limine. I'll sustain the objection to the remainder." (Id., Tr. 41:3-8).

During trial, Plaintiff testified as follows:

> And then, you know, I was aware that several senior male executives had been let go from the company in the months prior to me being let go. And then in the weeks and months following my termination, more and more were being let go. And that's when you know, a very clear pattern started to emerge when you have, you know, your chief legal officer, your chief experience officer, your chief medical officer, your chief IT officer, your president of the Charlotte market, yourself.

(Doc. 116, Tr. 198:21-199:5).

Defendant's counsel did not object to this testimony. Instead, he asked the Court to take up the matter outside the presence of the jury following Plaintiff's direct testimony. He argued

that "this is the situation here where the ruling on the evidence would prejudice my client had I objected at the time. It would have made my client appear guilty in all of the 15 cases or however many it was that he laid out." (Doc. 116, Tr. 213:3-6). Defendant's counsel also argued that the evidence "was raised unilaterally by the party in – apparently in a knowing way." (Id., Tr. 214:3-4). Defendant's counsel also made it clear "what defendant is not doing right now is seeking a motion for a mistrial. Defendant is explicitly not seeking a mistrial. We believe this was knowing and an attempt to create a mistrial situation." (Id., Tr. 214:25-215:3). Defendant's counsel also noted that "Mr. Largess, apparently recognizing this, did follow-up with his next questioning there, just focusing on what the Court had ruled previously, the reports to Mr. Cureton which the Court did allow." (Id., Tr. 216:9-12).

In response, Plaintiff's counsel stated that "I don't think that Mr. Duvall did anything knowingly, You Honor." (Id., Tr. 219:3-4). He also argued there was evidence about the pattern of white male executives being terminated that fell outside the scope of the Motion in Limine, including testimony from Mr. Brunstetter, Mr. Grady and Mr. Armato. The Court ultimately gave the jury a limiting instruction following the bench conference:

> Ladies and gentleman, the Plaintiff, Mr. Duvall, testified yesterday identifying by position some employees who separated from Novant but did not report to Jesse Cureton. You are instructed to disregard that testimony. There is no evidence in the record concerning those separations.

(Doc. 117, Tr. 23:7-12).

This seven-day trial included five days of evidence. Plaintiff called eight witnesses and introduced over ninety-five exhibits, including nine joint exhibits. Defendant called two witnesses and introduced eight exhibits

On October 26, 2021, the jury returned a verdict finding that Plaintiff had proven his race (Caucasian) and/or his sex (male) were a motivating factor in Defendant's decision to terminate

him and that Defendant would not have made the same decision without regard to his race (Caucasian) and/or sex (male). It awarded $10 million in punitive damages[1]. (Doc. 99).

Following the jury verdict, this Court directed both sides to file post-trial motions addressing Plaintiff's eligibility for back pay and front pay as well as the ERISA claim. Both parties filed Motions, and the Court heard oral argument on May 24, 2022 related to Defendant's Motion to Set Aside Punitive Damages, Plaintiff's eligibility for back pay and front pay and the ERISA claim. For the reasons detailed herein, the Court DENIES Defendant's Renewed Motion for Judgment as a Matter of Law (Doc. 124), GRANTS IN PART AND DENIES IN PART Defendant's Motion to Set Aside Punitive Damages (Doc. 127), DENIES Defendant's Motion for Sanctions (Doc. 130), DENIES Defendant's Motion to Strike Plaintiff's Post-Trial Evidence (Doc. 137); and GRANTS IN PART and DENIES IN PART Plaintiff's Motion for Entry of Judgments and Equitable Relief (Docs. 132 and 135).

## II.     STANDARD OF REVIEW

Pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, a party may move for judgment as a matter of law before the case is submitted to the jury. If the court denies a motion made under Rule 50(a), Rule 50(b) allows the party to renew its motion for judgment as a matter of law after a jury verdict has been returned. Belk, Inc. v. Meyer Corp., 679 F.3d 146, 156 (4th Cir. 2012).

"When a jury verdict has been returned, judgment as a matter of law may be granted only if, viewing the evidence in a light most favorable to the non-moving party (and in support of the jury's verdict) and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party." Drummond Coal Sales,

---

[1] Plaintiff did not seek compensatory damages at trial but does seek back and front pay in these pending Motions.

Inc. v. Norfolk S. Ry. Co., 3 F.4th 605, 610 (4th Cir. 2021) (quoting Int'l Ground Transp. v. Mayor & City Council of Ocean City, MD, 475 F.3d 214, 218–19 (4th Cir. 2007)).

When considering a Rule 50 motion, the court must "review the record as a whole" and "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-51 (2000); see also, Konkel v. Bob Evans Farms, Inc., 165 F.3d 275, 279 (4th Cir. 1999). A jury's verdict will withstand a motion under Rule 50 unless the court "determines that the only conclusion a reasonable trier of fact could draw from the evidence is in favor of the moving party." Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc., 87 F.3d 654, 656-57 (4th Cir. 1996) (quoting Winant v. Bostic, 5 F.3d 767, 774 (4th Cir. 1993)); see also Konkel, 165 F.3d at 279. "[O]nce a jury has evaluated witness credibility, weighed evidence, and reached a verdict, a litigant seeking to overturn that verdict faces a steep hurdle." Westmoreland v. TWC Admin. LLC, 924 F.3d 718, 722 (4th Cir. 2019). Notably, if "reasonable minds could differ" as to the findings of the jury, then the court should deny the motion. Bresler v. Wilmington Tr. Co., 855 F.3d 178, 196 (4th Cir. 2017). The task of the court, then, is to determine whether "the evidence presented, combined with all permissible inferences ... provide[s] a legally sufficient basis for a reasonable to jury to find" in favor of the nonmoving party. Fry v. Rand Constr. Corp., 964 F.3d 239, 244 (4th Cir. 2020) (brackets added). The Court may allow judgment on the verdict, order a new trial, or direct entry of judgment as a matter of law. Fed. R. Civ. P. 50(b).

With this standard in mind, the Court turns to the parties' motions.

## III. DISCUSSION

### A. Defendant's Renewed Motion for Judgment as a Matter of Law (Doc. 124)

Defendant moves for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). It argues that Plaintiff failed to produce sufficient evidence from which a reasonable jury could conclude that the decision to terminate his employment was the result of intentional race or sex discrimination.

To establish intentional discrimination in violation of Title VII, Plaintiff had to prove by a preponderance of the evidence that he was terminated on account of his race (Caucasian) and/or sex (male) and that Defendant would not have made the same decision without regard to his race (Caucasian) and/or sex (male).

Prior to submission of the case to the jury, Defendant orally moved for judgment as a matter of law on all claims. The Court denied the Motion. Defendant now renews its Motion arguing that the evidence at trial was insufficient as a matter of law to support Plaintiff's intentional discrimination claim. Defendant contends it is entitled to judgment as a matter of law because (1) Plaintiff's evidence of discriminatory animus was based on his testimony regarding the terminations of other non-similarly situated employees despite prior rulings from the Court excluding this evidence; (2) Plaintiff's evidence related to other employees reporting to Jesse Cureton, his supervisor, should not have been admitted at trial because those employees were not similarly situated to him; and (3) Plaintiff cited Defendant's diversity, inclusion and health equity (hereinafter "D&I") efforts as evidence of discriminatory animus but never established a connection between those efforts and his own termination other than mere speculation.

Plaintiff responds that there was sufficient evidence to prove every element of his claim from which reasonable jurors could find in his favor and reject Defendant's statutory mixed-motive affirmative defense. The jury heard prima facie evidence proving Plaintiff's claim. Plaintiff is a white male protected by Title VII. He was qualified for his job and held it for almost five years.

There was substantial evidence that Plaintiff had performed at a high level, gaining national recognition for himself and the marketing program he developed for Defendant. The jury also heard evidence that Plaintiff was terminated and Defendant replaced him with two women – a white female immediately named Senior Vice President for Communications and a black female hired ten months later. He was terminated under circumstances from which reasonable jurors could conclude resulted because of his race and gender, namely the "D&I" initiative with an expressed timeline to remake the workforce to reflect the community and "embed" a culture of "D&I" at Defendant between late 2016 and 2019. There was also statistical evidence showing the demographic effects of the initiative. Finally, the jury heard testimony of the reasons offered for Plaintiff's termination, none of which were documented in any respect by Defendant and, in fact, were contradicted by other evidence.

The Court instructed the jury that Plaintiff was required to prove "by a preponderance of the evidence that his race and/or gender was the motivating factor in his termination" (Doc. 119 at Tr. 117:11-14). The Court also instructed the jury that, if Plaintiff's race and/or gender was found to be a motivating factor in his termination, "Novant Health has the burden to establish by a preponderance of the evidence that it would have made the same decision in the absence of the improper motivation." (Id., Tr. 117:19-22). Considering the evidence in a light most favorable to Plaintiff, the Court finds that the evidence presented at trial is sufficient to support the jury's verdict.

At trial, the parties elicited conflicting testimony regarding the material elements of Plaintiff's intentional discrimination claims. The jury weighed the conflicting testimony and found in favor of Plaintiff. There was ample opportunity for the jury, as the judges of the facts and credibility of the witnesses, to reject in whole or in part evidence Plaintiff offered on his claims.

There was clearly sufficient evidence for a reasonable jury to have found in Plaintiff's favor on the intentional discrimination claims. Defendant has not overcome the steep hurdle necessary for the Court to grant a Motion for Judgment as a matter of law.  Defendant's Motion for a Judgment as a Matter of Law (Doc. 124) is therefore DENIED.

**B.  Defendant's Motion to Set Aside Punitive Damages (Doc. 127)**

Pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, Defendant argues that there is not a legally sufficient basis upon which a reasonable jury could award punitive damages and that the Court should set aside the award in its entirety.

"Punitive damages are allowed in a Title VII action only under limited circumstances." United States EEOC v. Consol Energy, Inc., 860 F.3d 131, 151 (4th Cir. 2017). "Congress plainly sought to impose two standards of liability—one for establishing a right to compensatory damages and another, higher standard that a plaintiff must satisfy to qualify for a punitive award." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 534 (1999). 42 U.S.C. § 1981a authorizes punitive damages for a Title VII plaintiff if he can demonstrate that an employer acted "with malice or with reckless indifference to [his] federally protected rights." 42 U.S.C. § 1981a(b)(1) (2003). Importantly, "the text and background of the Civil Rights Act of 1991, which authorizes punitive damages, emphasizes that this extraordinary remedy is not to be awarded automatically in every successful Title VII suit." Harris v. L&L Wings, Inc., 132 F.3d 978, 982 (4th Cir. 1997).

In Ward v. AutoZoners, LLC, 958 F.3d 254 (4th Cir. 2020), the Fourth Circuit summarized the standard for punitive damages as follows:

> Title VII authorizes punitive damages only when a plaintiff makes two showings. First, the plaintiff must show that the employer "engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact)...." 42 U.S.C. § 1981a(a)(1). Second, the plaintiff must show that the employer engaged in the discriminatory practice "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C.

§ 1981a(b)(1). That is, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law[.]" Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536 (1999).

When a plaintiff relies on vicarious liability to hold an employer liable for punitive damages under Title VII, as Ward did, he must do so under traditional principles of agency law. Agency law provides only four ways an employer can be held vicariously liable for punitive damages based on the act of an employee: (1) when the employer authorizes the employee's tortious act; (2) when an employee is unfit and the employer acts recklessly in employing the employee; (3) when the employee served in a managerial capacity and was acting within the scope of employment; or (4) when the employer or managerial agent of the employer ratified or approved the act. Id. at 542–43, 119 S.Ct. 2118.

Id. at 263-64.

It is undisputed that Executive Vice President Jesse Cureton was one of Defendant's managers and acted within that scope in terminating Plaintiff's employment. The issue is whether Cureton terminated Plaintiff in the "face of a perceived risk that his actions could violate the law." Kolstad, 527 U.S. at 536.

Defendant contends that Plaintiff cannot show that Cureton terminated him in the face of a perceived risk that his actions could violate the law. It points to the fact that Plaintiff admitted that neither Cureton nor any other individual within Novant Health discriminated against him at any time during his employment. Additionally, Defendant argues that Cureton did not terminate Plaintiff to make room for diverse candidates, nor did he have any personal or financial incentive to do so. It further argues that the D&I Program was lawfully implemented and did not result in termination of employees of one race or gender to make room for another.

In response, Plaintiff argues that he was fired on account of his race and gender to further the D&I Program and goal of remaking the workforce to look like the community it served. Plaintiff never alleged a hostile work environment or that Cureton acted from racial animus.

Rather, he claimed, and the jury found, that he was fired on account of his race and gender to promote diversity during the D&I Program implementation.

The Court concludes that the record contains sufficient evidence, when viewed in the light most favorable to Plaintiff, for a reasonable juror to find that in firing Plaintiff, Cureton did so in the face of a perceived risk that his decision would violate federal law. See Kolstad, 527 U.S. at 536. A reasonable juror could infer that Cureton, as a high-level executive at a large corporation, had knowledge of federal anti-discrimination laws, understood the goals of the D&I Program, and was willing to terminate a white male in order to advance diverse candidates and promote Defendant's clearly stated goal to promote diversity and inclusion. It would be unreasonable to infer that Cureton was ignorant of federal anti-discrimination laws. Evidence was presented to the jury that several white males were terminated by Cureton during the same time period as Plaintiff's termination. Evidence was also presented that executive bonus structures were tied to advancing the D&I Program. Cureton admitted there was no documentation supporting the reasons that he gave for Plaintiff's termination. Further, Cureton repeatedly stated that Defendant was moving in a "different direction" when explaining the reasons for Plaintiff's termination.

The Court must still consider Defendant's good faith efforts to comply with federal law. This good-faith exception rests on the notion that the existence and enforcement of an anti-discrimination policy shows that the employer itself "never acted in reckless disregard of federally protected rights." Kolstad, 527 U.S. at 544 (internal quotation marks omitted).

Following lengthy arguments during the charge conference, the Court instructed the jury on punitive damages including the good faith exception as follows:

> The Third Issue and final issue reads:
>     3. What amount of punitive damages, if any, should be awarded against Novant Health?

Duvall claims the acts of Novant Health were done with malice or reckless indifference to his federally protected rights so as to entitle him to an award of punitive damages.

In some cases punitive damages may be awarded for the purpose of punishing a defendant for its wrongful conduct and to deter others from engaging in similar wrongful conduct. However, an employer may not be held liable for punitive damages because of discriminatory acts on the part of its managerial employees where those acts by such employees are contrary to the employer's own good faith efforts to comply with the law by implementing policies and programs designed to prevent such unlawful discrimination in the workplace.

An award of punitive damages would be appropriate in this case only if you find for Duvall and then further find from a preponderance of the evidence:

First: That a higher management official of Novant Health personally acted with malice or reckless indifference to Duvall's federally protected rights, and

Second: That Novant Health itself had not acted in a good faith attempt to comply with the law by adopting policies and procedures designed to prohibit such discrimination in the workplace.

If you find that punitive damages should be assessed against Novant Health, you may consider the financial resources of Novant Health in fixing the amount of such damages.

Punitive damages must bear a reasonable relationship to Duvall's actual injury. In determining a reasonable relationship to the actual injury, you must consider all relevant factors. These include: the impact or severity of Novant Health's conduct; the amount of time Novant Health conducted itself in this manner; the potential profits Novant Health may have made from its conduct; the attitudes and actions of Novant Health's top management after the misconduct was discovered; the effect of the damages award on Novant Health's financial condition.

(Doc. 119, Tr. 124:5-125:20).

Defendant argues that it certainly did not believe its D&I Program was unlawful. In fact, it believed the opposite, that it was implementing a robust D&I Program to ensure compliance with the law, avoid any "blind spots," and create a workforce that represented the diversity of the communities it served. Therefore, it cannot be held vicariously liable for punitive damages for any discriminatory employment actions by Cureton, its managerial employee.

The jury heard evidence contradicting Defendant's presentation of its D&I program. Tanya Blackmon, Executive Vice President for D&I, testified that parts of the Program were not shared with employees including the executive teams' review of metrics; bonuses paid to executives based

on diversity and inclusion goals; and the declaration at the October 2018 DIEC meeting that set targets to remake the workforce until it mirrored the community. Defendant's CEO bragged in an article about the increased diversity on the executive team.

The Court is not persuaded that a reasonable juror could only conclude that Defendant engaged in good-faith efforts to comply with Title VII. "While an employer's institution of a written policy against race discrimination may go a long way toward dispelling any claim about the employer's reckless or malicious state of mind with respect to racial minorities, such a policy is not automatically a bar to the imposition of punitive damages." Lowery v. Cir. City Stores, 206 F.3d 431, 446 (4th Cir. 2000).

The Court is unable to conclude that a reasonable juror could only find that Defendant engaged in good-faith efforts to comply with federal law. By intentionally terminating Plaintiff, Cureton acted in the face of a perceived risk that his action violated federal law, in a managerial capacity, and within the scope of his employment. The Court DENIES Defendant's 50(b) Motion with respect to Plaintiff's punitive damages award.

The inquiry does not end here. Under federal law, a punitive damages award must be reduced to comply with the statutory cap of $300,000 under Title VII. 42 U.S.C. § 1981a(b)(3)(D). Punitive damages are also available in certain wrongful discharge claims under North Carolina law. Driskell v. Summit Contracting Grp., Inc., 828 F. App'x. 858, 870 (4th Cir. 2020) (citing Roberts v. First-Citizens Bank and Trust Co., 478 S.E.2d 809, 810, 815 (N.C. App. 1996)). Punitive damages are "only proper, however, where there's 'clear and convincing evidence' that the defendant's conduct involved fraud, malice, or willful or wanton conduct." Id. (citing Scarborough v. Dillard's, Inc., 693 S.E.2d 640, 644 (N.C. 2009) (citing N.C. Gen. Stat. § 1D–15(a)). Specifically in North Carolina:

Punitive damages may be awarded only if the claimant proves the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded: (1) Fraud; (2) Malice; and (3) Willful or wanton conduct.

N.C. Gen. Stat. § 1D-15(a). The "claimant must prove the existence of an aggravating factor by clear and convincing evidence." N.C. Gen Stat. § 1D-15(b). Punitive damages may only be awarded against a corporation if "the officers, directors, or managers of the corporation participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages." N.C. Gen. Stat. §1D-15(c).

Defendant argues that Plaintiff's claim for punitive damages under North Carolina law fails because he is not seeking compensatory damages and did not request an applicable jury instruction.

Plaintiff argues that the North Carolina and Title VII standards for punitive damages are identical. He further contends that Defendant should be estopped from objecting that the instruction does not support the punitive damages verdict under North Carolina law. Defendant acknowledged in its proposed jury instructions that state law applied a clear and convincing standard and represented that a separate instruction was not necessary.

The Court disagrees with Plaintiff. As the Fourth Circuit has recognized, the standard for punitive damages under North Carolina law is separate and distinct from the standard under Title VII in two significant ways. Ward, 958 F.3d at 270. First, the burden is much higher. Id. The existence of an aggravating factor under North Carolina law must be proved by clear and convincing evidence. N.C. Gen. Stat. § 1D-15(b). "[The clear and convincing standard] is more exacting than the preponderance of the evidence standard generally applied in civil cases." Scarborough, 693 S.E.2d at 643 (internal quotation marks omitted). "Second, North Carolina's definition of willful or wanton conduct differs markedly from Title VII's definition of reckless indifference." Ward, 958 F.3d at 270. When a plaintiff cannot provide evidence that "fully

convince[s]" that the manager participated in or condoned willful or wanton conduct as required under North Carolina law, courts in this Circuit have regularly found punitive damages to be improper as a matter of law. <u>Ward</u>, 958 F.3d at 271 (finding punitive damages improper as a matter of law under North Carolina law); <u>Equal Emp. Opportunity Comm'n v. Joe's Old Fashioned Bar-B-Que, Inc.</u>, No. 518-CV-00180-KDB-DSC, 2020 WL 3128599, at *10 (W.D.N.C. June 12, 2020) (dismissing punitive damages under North Carolina law on summary judgment where the evidence did not "fully convince").

This jury was not instructed on the clear and convincing evidence standard under North Carolina law nor was the issue submitted to them. Plaintiff failed to submit a proposed jury instruction for punitive damages under North Carolina law. Docs 73-2, 74, 77 and 78. The Court has reviewed the trial transcript on this issue. While there was significant discussion during the charge conference about punitive damages, it centered around the language related to good faith efforts in the instruction. Plaintiff did not raise an issue as to the differing evidentiary standards under Title VII and state law. Nor did Plaintiff raise any objections to the punitive damage instruction aside from the good faith efforts language.

"[W]here a party fails to object to jury instructions, 'it is conclusively presumed that the instructions conformed to the issues submitted and were without legal error.'" <u>Jong Sung Park v. Young Homes, Inc.</u>, 650 S.E.2d 676 (N.C. App. 2007) (quoting <u>Dailey v. Integon Gen. Ins. Corp.</u>, 331 S.E.2d 148, 156 (N.C. App. 1985)). Consequently, the Court finds that Plaintiff assented to the punitive damage instruction as conforming to the issues submitted and legally correct. Plaintiff cannot now argue that Defendant is estopped from objecting. The Fourth Circuit has made clear that these punitive damages standards are very different. The Court concludes that Plaintiff is not allowed to recover punitive damages under North Carolina law. The amount of punitive damages

under applicable federal law must be reduced to the $300,000 cap under Title VII. Defendant's Motion to Set Aside Punitive Damages (Doc. 127) is GRANTED IN PART AND DENIED IN PART.

### C. Defendant's Motion for Sanctions (Doc. 130)

Defendant moves for sanctions against Plaintiff and his counsel alleging certain bad faith conduct and seeking dismissal with prejudice and attorneys' fees.

Controlling Supreme Court and Fourth Circuit precedent makes clear that "[f]ederal courts have the inherent power to manage their own proceedings and to control the conduct of those who appear before them." Chambers v. NASCO, Inc., 501 U.S. 32, 33 (1991). In Chambers, the Supreme Court held that district courts are "vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." 501 U.S. at 43. (citations omitted). The Supreme Court has cautioned that "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." Id. at 44–45. "The case law is well established that district courts have the inherent power to sanction parties for certain bad faith conduct, even where there is no particular procedural rule that affirmatively invests the court with the power to sanction." Strang v. Bd. of Trustees, Craven Cmty. Coll., 55 F.3d 943, 955 (4th Cir. 1995).

This inherent authority "extends to a full range of litigation abuses." Chambers, 501 U.S. at 46. It is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Id. at 43. Appropriate sanctions "may range from dismissal of a lawsuit to an assessment of attorney's fees." Id. at 33. A court may exercise its inherent power to sanction when a party or counsel willfully

disobeys a court order or when a party acts in bad faith, vexatiously, wantonly, or for oppressive reasons. Chambers, 501 U.S. at 44-46; Marx v. Gen. Revenue Corp., 568 U.S. 371, 382 (2013).

Defendant argues that sanctions are warranted here for misconduct occurring throughout the trial. Specifically, Defendant alleges that:

> Plaintiff and Plaintiff's counsel displayed a pattern of misconduct throughout the trial that warrants the imposition of sanctions, including (1) deliberately referencing improper comparator evidence to support an unfounded "pattern" of discrimination, in direct violation of the Court's orders; (2) telling the jury "round one for punitive damages" was that Defendant had a witness fired to prevent him from testifying for Plaintiff, despite receiving three sworn declarations uniformly confirming the witness was terminated as part of a position elimination and the decision makers did not even know he was testifying; and (3) repeatedly referencing "diversity bonuses," "targets" and "quotas" when arguing Plaintiff was improperly terminated to further diversity initiatives where the uncontroverted evidence established that no such bonuses, targets or quotas even existed during Plaintiff's employment.

(Doc. 130 at 1-2).

The Court is not persuaded that Plaintiff or his counsel willfully disobeyed its Order regarding the "other employee" evidence. Furthermore, the Court does not find that Plaintiff or his counsel acted in bad faith during the trial. Ultimately, the exercise of the Court's inherent authority to sanction is discretionary. Therefore, Defendant's Motion for Sanctions (Doc. 124) is DENIED.

### D. Plaintiff's Motion for Entry of Judgment and Equitable Relief (Doc. 132/Doc. 135[2])

Plaintiff moves the Court, pursuant to Federal Rule of Civil Procedure 58, to enter judgment in his favor upon the jury's verdict of October 26, 2021 as to his Title VII and North Carolina wrongful discharge claims; to enter judgment in equity in his favor on his ERISA claim; and to enter an order awarding full back and front pay in lieu of reinstatement as relief for all claims.

---

[2] Doc. 132 was entitled "Plaintiff's Motion for Entry of Judgment and Enquitable Relief." Plaintiff filed an identical Motion at Doc. 135 with the corrected title "Plaintiff's Motion for Entry of Judgment and Equitable Relief."

### 1. Plaintiff's ERISA Claim

Plaintiff's second claim is filed under Section 510 of ERISA, which provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan[.]

29 U.S.C. § 1140. The Fourth Circuit has interpreted the language "attainment of any right to which such participant may become entitled" to provide an employee a cause of action when he is discharged either to prevent vesting in a qualified pension plan or the accrual of additional benefits. Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 236, 237-38 (4th Cir.1991). "ERISA does not guarantee every employee a job until he or she has fully vested into a company's benefit plan. Rather, ERISA guarantees that no employee will be terminated where the purpose of the discharge is the interference with one's pension rights." Id. at 238. To distinguish between "firings which have an incidental, albeit important effect on an employee's pension rights from the actionable firings, in which the effect of the firing on the employer's pension obligation was a motivating factor in the firing decision," a plaintiff must "prove a specific intent of the employer to interfere with the employee's pension rights." Id. at 238–39. The employee may prove specific intent using direct evidence or the McDonnell Douglas burden-shifting scheme. Id.

In order to demonstrate a prima facie case of discharge in order to interfere with a beneficiary's rights under an ERISA-governed plan, Plaintiff must prove three elements: (1) that he was a member of the protected class under section 510 – that is, that he was a beneficiary under the plan; (2) that he was qualified for the position; and (3) that he was discharged under circumstances that give rise to an inference of discrimination. Henson v. Liggett Grp., Inc., 61 F.3d 270, 277 (4th Cir. 1995). If Plaintiff succeeds with a prima facie case, the burden shifts to

Defendant to articulate some legitimate, non-discriminatory reason for the termination. <u>Blair v. Young Phillips Corp.</u>, 235 F.Supp.2d 465, 473 (M.D.N.C. 2002). The burden then shifts back to Plaintiff to show by a preponderance of evidence that the legitimate reasons proffered by Defendant were actually a pretext for discrimination. <u>Id.</u>

Plaintiff alleges that he was fired on July 30, 2018-five days before his fifth anniversary-in order to deny him the fifth-year severance enhancement under the 2013 Executive and Leader Severance Pay Policy, in effect at the time of his hiring. He was classified as a Tier II executive under the 2013 Policy. Pursuant to the 2013 Policy, eligible Tier II executives with five or more years of service would be entitled to eighteen months of base salary and an amount equal to one and a half times the annual incentive award paid for the fiscal year prior to the year of termination.

There is no dispute that Defendant had such a severance policy at the time Plaintiff was employed in 2013. He testified to the note he made on his offer letter when that severance enhancement was explained to him by human resources. But the 2013 Policy was no longer in effect at the time of his termination on July 30, 2018. Defendant had amended the Executive and Leader Severance Pay Policy three years prior in 2015. The 2015 Policy does not provide any special benefit based upon years of service. Tier II leaders such as Plaintiff were eligible for a set rate of severance pay regardless of years of service.

Under the first element of the McDonnell Douglas analysis, Plaintiff must show he is a member of the protected class and a participant in an employee benefit plan. <u>See</u> <u>Blair</u>, 235 F. Supp. 2d 465 at 473; <u>see also</u> <u>Holtz v. Jefferson Smurfit Corp.</u>, 408 F. Supp. 2d 193, 208 (M.D.N.C. 2006) ("Plaintiff must show that he was in the protected class (within the group qualified for the ERISA plan)."). Defendant does not dispute that Plaintiff was generally a participant in an

employee benefit plan. He was eligible under the 2015 Policy and Defendant offered to pay him severance under the terms of that Policy, which he refused.

Plaintiff argues he was intentionally discharged for the purpose of denying him the fifth-year severance enhancement under the 2013 Policy. He alleged in his Complaint that Defendant prevented him "from attaining the severance benefit available to those with five years of service" citing a severance amount that consisted of eighteen months of base pay and benefits plus a lump sum of one and a half the bonus received in the prior fiscal year. (Doc. 1, ¶¶ 14, 45). This enhancement was not in effect at the time of his termination. At the time of his termination, Plaintiff was not a participant in the employee benefit plan alleged in the Complaint since it no longer existed.

Under the 2015 Policy, Tier II executives such as Plaintiff were entitled to a straightforward severance benefit of twelve months' base salary. Plaintiff refers to language in the 2013 Policy, which made a distinction between Tier II executives with less than five years of service and those with more. Tenure was immaterial at the time of Plaintiff's July 30, 2018 termination. It made no difference under the 2015 Policy whether Plaintiff was terminated before or after his fifth anniversary. Either way, he was entitled to a benefit of twelve months' base salary.

Under ERISA, an employer may unilaterally amend or eliminate the provisions of a severance plan. Sejman v. Warner-Lambert Co., 889 F.2d 1346, 1348–49 (4th Cir. 1989). Severance benefits are contingent and unaccrued. An employer has no ongoing obligation to pay severance benefits unless provided for under the terms of the then-existing plan. Fuller v. FMC Corp., 4 F.3d 255, 258 (4th Cir. 1993). Any modification to a plan must be in writing and implemented in conformity with the formal amendment procedures. Yarber v. Cap. Bank, 944 F. Supp. 2d 437, 445 (E.D.N.C. 2013).

Here the 2013 Policy unequivocally stated that Novant Health had the authority to modify the severance plan:

**Modification**

The Corporation reserves the right to amend, modify, or terminate this Policy at any time for any reason.

Doc. 37. Defendant did precisely that and modified the 2013 Policy in writing with the 2015 Policy.

On similar facts where employees sought benefits from a severance policy formerly in place before an acquisition, the Fourth Circuit rejected their claim and held, "Nothing in ERISA thus required Warner–Lambert to pay plaintiffs at 1981 benefit levels or to provide continuing coverage for them under its severance policy. Plaintiffs' interest in the severance plan did not vest simply because they once were covered by it." Sejman, 889 F.2d at 1349 (holding plaintiffs must look to the new severance policy of the company to which their division was sold and where they continued to work).

The fact that Plaintiff was covered under Defendant's 2013 Policy does not entitle him to benefits when it was supplanted by the 2015 Policy. Plaintiff's claim that Defendant acted unlawfully to deprive him of benefits is unsupported by the written terms of the 2015 Policy.

The Supreme Court has emphasized the importance of looking to the plan documents as written in ERISA cases. "The principle that contractual limitations provisions ordinarily should be enforced as written is especially appropriate when enforcing an ERISA plan. 'The plan, in short, is at the center of ERISA.'" Heimeshoff v. Hartford Life & Acc. Ins. Co., 571 U.S. 99, 108 (2013). The focus on the written terms of the plan is the linchpin of "a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place." Id. (citing Varity Corp. v. Howe, 516 U.S. 489, 497 (1996)). By asserting

a claim under an outdated plan, Plaintiff has failed to show that he is a participant in an employee benefit plan entitling him to severance benefits.

Plaintiff has failed to prove that Defendant had a specific intent to interfere with his severance rights under § 510 of ERISA. He has not demonstrated that Defendant's decision to terminate him was motivated by a desire to deprive him of severance benefits. Plaintiff's evidence of discrimination under ERISA consists of his termination five days before his fifth anniversary. (Doc. 1 ¶ 45). But it made no difference to Defendant whether it terminated him before or after his fifth anniversary. Either way he would be entitled to the same severance benefit of twelve months' base salary under the 2015 Policy. The timing of Plaintiff's termination thus cannot support an inference that Defendant acted with specific intent to interfere with his benefits.

The Court finds that Plaintiff's ERISA claim fails. The jury's verdict, which addresses only discrimination under Title VII, does not entitle him to judgment on his separate ERISA claim. Plaintiff was not entitled to benefits under the 2013 Policy that was not in existence at the time of his termination and he has failed to establish that Defendant's actions were specifically motivated by a desire to deny him benefits under ERISA. Accordingly, the Court DENIES Plaintiff's request for judgment on his ERISA claim.

### 2. Plaintiff's Request for Equitable Award of Back Pay and Front Pay

#### a. Back Pay

The authority to award back pay is found in Section 706(g) of the Civil Rights Act of 1964, 78 Stat. 261, as amended, 42 U.S.C. § 2000e–5(g). Back pay is generally awarded to successful Title VII plaintiffs. Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 651 (4th Cir. 2002). A finding of discriminatory discharge is presumptive proof that back pay is owed. Albemarle Paper Co. v. Moody, 422 U.S. 405, 420 n.12 (1975). "The injured party is to be

placed, as near as may be, in the situation he would have occupied if the wrong had not been committed." Id. at 418–19. "[G]iven a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." Id. at 421. Where a court declines to award back pay, it must articulate its reasons for doing so. Id. at 421 n.14, 422. ("[T]he mere absence of bad faith" is "not a sufficient reason for denying back pay.").

While a Title VII plaintiff is generally entitled to back pay, that right is limited by the statutory duty to mitigate damages. Section 2000e–5(g)(1) provides in pertinent part that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g). The duty to mitigate damages requires that the plaintiff be reasonably diligent in seeking and accepting new employment substantially equivalent to that from which he was discharged. Ford Motor Co. v. EEOC, 458 U.S. 219, 232 (1982). A "plaintiff cannot remain idle after an unlawful discharge and receive back pay for that period where he was not actively seeking employment." Brady v. Thurston Motor Lines, Inc., 753 F.2d 1269, 1273 (4th Cir. 1985). "An employer ordinarily must come forward with evidence that comparable work is available unless the employer can demonstrate that the plaintiff 'made no reasonable attempt to find work.'" Brown v. Mountainview Cutters, LLC, 222 F. Supp. 3d 504, 509 (W.D. Va. 2016)(quoting Wagner v. Dillard Dep't. Stores, Inc., 17 F. App'x 141, 154-53 (4th Cir. 2001).

But the duty to mitigate is not without limits. Miller v. AT&T Corp., 250 F.3d 820, 838 (4th Cir. 2001) ("[A] plaintiff need not go into another line of work, accept a demotion, or take a demeaning position." (quoting Ford Motor Co. v. E.E.O.C., 458 U.S. 219, 231–32 (1982) (internal

quotations omitted)). An "illegally demoted employee is not required to accept alternative employment of an inferior kind," including work which "might injuriously affect the employee's future career or reputation in his profession." <u>Williams v. Albemarle City Bd. of Ed.</u>, 508 F.2d 1242, 1243 (4th Cir. 1974). The comparability and suitability "of any alternative position must be judged by a broad range of factors, and not merely any one criterion alone." <u>Id.</u>; <u>see also</u> <u>Spagnuolo v. Whirlpool Corp.</u>, 717 F.2d 114, 117–18 (4th Cir. 1983) (considering stature and prospects for advancement and compensation).

### b. Mitigation

Plaintiff seeks more than $2.3 million in back pay.

Defendant contends that Plaintiff did not make reasonable efforts to mitigate his damages and has failed to satisfy the standards of reasonable diligence, persistence, and industriousness that courts in the Fourth Circuit have imposed on a Title VII plaintiff seeking back pay. It points to Plaintiff's testimony that he did not technically apply for any jobs after he was terminated but instead waited for recruiters to contact him. It further points to Plaintiff's refusal to even consider opportunities where he deemed himself over qualified, including a position with the Cape Fear Health System in Fayetteville. Defendant argues that Plaintiff took a casual attitude towards his employment prospects and relied entirely on a strategy of waiting for job offers to come to him. The Court disagrees.

Evidence at trial supports a finding that Plaintiff made reasonable efforts to mitigate his damages. He sought and accepted a better paying job at the Henry Ford Health System ("HFHS") in Detroit as its Chief Marketing, Communications and Experience Officer in April 2019. He made his first contacts in that ultimately successful search in September 2018, less than sixty days after he was terminated. He also explored other comparable opportunities over the months it took

for the HFHS offer to develop. The jury heard the deposition testimony of executive recruiter Shane Grady about his conversation with Plaintiff's former Novant supervisor Jesse Cureton in December 2018. Cureton praised Plaintiff and said he was not fired for poor performance during a reference check for a chief of marketing position he sought at Johns Hopkins in Baltimore. Plaintiff interviewed for that position but was not selected.

Plaintiff testified that he was fired by HFHS weeks after the CEO there learned that he had sued Defendant here. Plaintiff asserts that his diligent efforts at mitigation were damaged as a result of asserting his rights under federal and state law. After he was terminated, Plaintiff testified about discussions with three executive recruiters for substantially comparable opportunities at Brigham and Women's Hospital in Boston, the Ohio State Medical Center in Columbus, and a large hospital system in Westchester County, New York. Evidence at trial showed that each recruiter ceased communications with Plaintiff after learning of this lawsuit and his short tenure at HFHS.

Defendant argues that Plaintiff's refusal to pursue the opportunity at the Cape Fear Hospital shows his lack diligence. That hospital system was approximately one-seventh the size of Defendant (assuming it is a $7 billion operation) and had a staff of ten compared to eighty at Novant. Applying Williams, 508 F.2d at 1243, that was not substantially equivalent employment but work of less stature and responsibility that could injure his "career or reputation in his profession." And this discussion was shortly after his separation from HFHS, not after an "extended period" of looking unsuccessfully for work. Ford Motor Co., 458 U.S. at 232.

Plaintiff did not rely solely on recruiters. He testified about reading trade journals such as Becker's to search for openings and then networking for any connections at those institutions as well as with some five hundred people on LinkedIn who have ties to health care marketing.

Finally, Plaintiff's job search took place during the COVID-19 pandemic. He was terminated from HFHS in January 2020. A month later, the pandemic began its ravaging global and national effects, leading to lock-downs and travel limits. This was a challenging time for all businesses and affected Plaintiff's ability to seek comparable employment.

The mitigation evidence shows that Plaintiff sought and accepted a better job. But he was fired, and lost viability as a candidate for comparable employment due to asserting his rights against Defendant under Title VII and state law. A plaintiff must "be reasonably diligent in seeking and accepting new employment substantially equivalent to that from which he was discharged." Brady, 753 F.2d at 1273. Plaintiff was not required to make a herculean effort to mitigate his damages. See Miller, 250 F.3d at 838. He only had to exercise reasonable diligence. See Ford Motor Co., 458 U.S. at 231.

Back pay is generally awarded to successful Title VII plaintiffs. See Dennis, 290 F.3d at 651. The jury's finding on Plaintiff's discrimination claim supports such an award. See Albemarle Paper Co., 422 U.S. at 420 n.12. The jury found that Defendant discriminated against Plaintiff in terminating him. As the court held in Tinsley v. City of Charlotte, "Defendant cannot now fault Plaintiff for an inability to find comparable work when it was Defendant's discriminatory conduct that prevented Plaintiff from obtaining such work in the first place." No. 3:16-CV-00656-GCM, 2019 WL 1874044, at *1 (W.D.N.C. Apr. 26, 2019). Plaintiff was reasonably diligent in seeking other work. This lawsuit negatively impacted his efforts. Defendant has not met its burden of proving a failure to mitigate. Therefore, the Court finds that an award of back pay is appropriate.

### c. Calculation of Backpay

Backpay period runs from the date of the unlawful employment action to the day of the judgment. Patterson v. Am. Tobacco Co., 535 F.2d 257, 269 (4th Cir. 1976). In order to make the

remedy complete, Title VII backpay awards against employers include all "fringe benefits they would have provided" to the employee during the relevant period. Farris v. Lynchburg Foundry, 769 F.2d. 958, 964 (4th Cir. 1985). Courts calculate the amount of backpay by taking the sum of wages and benefits the former employee would have earned during that period minus any wages and benefits from other work during that time. 42 U.S.C. § 2000e-5(g); Tinsley, 2019 WL 1874044, at *2.

Make whole relief also includes pre-judgment interest. In holding that pre-judgment interest was not barred by sovereign immunity in a Title VII case against the U.S. Postal Service, the Supreme Court held:

> Respondent concedes, and apparently all the United States Courts of Appeals that have considered the question agree, that Title VII authorizes prejudgment interest as part of the backpay remedy in suits against private employers. This conclusion surely is correct. The backpay award authorized by § 706(g) of Title VII, as amended, 42 U.S.C. § 2000e–5(g), is a manifestation of Congress' intent to make "persons whole for injuries suffered through past discrimination." Prejudgment interest, of course, is "an element of complete compensation."

Loeffler v. Frank, 486 U.S. 549, 557–58 (1988)(citations omitted).

The Fourth Circuit has approved the use of a state's statutory rate for pre-judgment interest. Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1031 (4th Cir.1993) (en banc) (approving use of Virginia statutory rate); Hylind v. Xerox Corp., 481 F. App'x 819, 822 (4th Cir. 2012) (affirming use of Maryland's statutory rate). In Tinsley, this Court followed those decisions in applying North Carolina's eight percent pre-judgment interest from N.C. Gen.Stat. § 24-1 in a Title VII backpay award. Tinsley, 2019 WL 1874044, at *2. Pre-judgment interest on lost wages in Title VII cases runs from the date each payment would have been made less any outside earnings. Hyde v. Land-of-Sky Reg'l Council, 572 F.2d 988, 993 (4th Cir. 1978).

Plaintiff testified to the creation and content of Exhibit 76 at trial, a spreadsheet detailing the components of his lost wages and benefits from the date of his termination to mid-September 2021 reduced by the earnings and severance payments from HFHS. He filed an updated version of this spreadsheet on May 23, 2022, which adjusted the backpay calculations through June 1, 2022. Doc. 160-1. The spreadsheet is incorporated by reference.

The Court finds that these calculations are supported by the record, and therefore adopts the backpay calculations submitted by Plaintiff. Based on this chart, Plaintiff is entitled to $3,666,561 in backpay plus pre-judgment interest. Plaintiff earned wages from HFHS from June 2019 until January 6, 2020 and severance pay through February 13, 2021. The sum of these earnings is $1,324,677. Plaintiff is entitled to the difference of $2,341,884, adjusted to include pre-judgment interest in the amount of eight percent, see N.C. Gen.Stat. § 24-1.

In addition to its deterrent value, "an award of back pay is designed 'to make persons whole for injuries suffered on account of unlawful employment discrimination.' Computation of Plaintiff's back pay by measuring it against the pay that she would have, hypothetically, earned but for the unlawful discrimination achieves this equitable purpose." Armstrong v. Index Journal Co., 647 F.2d 441, 446 (4th Cir. 1981) (internal citation and alterations omitted). Accordingly, insofar as Plaintiff seeks backpay, the Motion is GRANTED.

### d. Reinstatement

Title VII looks to place a plaintiff in the same position he would have occupied but for the discriminatory conduct occurring against him. See Duke v. Uniroyal Inc., 928 F.2d 1413, 1423 (4th Cir. 1991); Hunter v. Town of Mocksville, 201 F. Supp. 3d 750, 756-57 (M.D.N.C. 2016). Reinstatement is one way for a court to achieve the goal of rectifying losses occurring from the

time of judgment moving forward. See Uniroyal, 928 F.2d at 1423-24; Hunter, 201 F. Supp. 3d at 756.

In the Fourth Circuit, reinstatement is the preferred remedy over front pay. Uniroyal, 928 F.2d at 1424; Hunter v. Town of Mocksville, 897 F.3d 538, 562 (4th Cir. 2018). Reinstatement may eliminate some of the speculation required in crafting a front pay award. But reinstatement is not always the best remedy. Courts have held reinstatement to be inappropriate when the litigation has caused continued hostility between the parties. Hunter, 897 F.3d at 562 (citing Uniroyal, 928 F.2d at 1423).

Here, reinstatement is impractical if not impossible. The relationship between Plaintiff and Defendant has been irreparably damaged over the course of this litigation. Plaintiff argues, and the facts support, that Defendant "has no interest in reinstatement." Doc. 157 at 13. Defendant has not offered to reinstate Plaintiff and makes clear through its briefs, cross-examination at trial, and Motion for Sanctions that a future working relationship between the parties is not possible. See Docs. 130, 131, 134. Therefore, the Court finds that reinstatement is not an equitable remedy available in this case.

### e. Front Pay

The Court must now consider equitable relief in the form of front pay. Title VII allows for an award of front pay as "other equitable relief" pursuant to 42 U.S.C. § 2000e-5(g)(1) to compensate a prevailing plaintiff. "Although courts have defined 'front pay' in numerous ways, front pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 846 (2001); accord Uniroyal, 928 F.2d at 1423-24. "The equitable remedy of front pay is generally available when an employer has terminated an employee unlawfully and the employee's

reinstatement is not possible." Loveless v. John's Ford, Inc., 232 F. App'x. 229, 238 (4th Cir. 2007) (unpublished per curiam decision) (citation omitted). Front pay is designed to place a plaintiff in the financial position he would have been in had he been reinstated, but such an award should "be granted sparingly" because it could "result in an unfair windfall." Ford v. Rigidply Rafters, Inc., 984 F. Supp. 386, 392 (D.Md.1997) (citation omitted).

An award of front pay "is a matter left to the discretion of the trial judge who must consider a host of factors, including whether reinstatement is practical. . . [the award] is one for the court sitting in equity to consider and not the jury." Uniroyal, 928 F.2d at 1424; see also, Hartnett v. Sch. Bd. of Brunswick Cnty., No. 3:08-CV-128-HEH, 2008 WL 5381350, *1 (E.D.Va. Dec. 23, 2008) (citing Uniroyal, 928 F.2d at 1424).

Front pay may be denied if such award would result in a windfall for the plaintiff. See Uniroyal, 928 F.2d at 1424 ("While reinstatement, which is clearly an equitable remedy, is the much preferred remedy, front pay may serve as a substitute or a complement. Because of the potential for windfall, however, its use must be tempered."); Taylor v. Republic Servs., Inc., 968 F. Supp. 2d 768, 803 (E.D. Va. 2013) ("The Fourth Circuit has cautioned courts to award front pay damages sparingly as it can result in an unfair windfall for the plaintiff." (citing Uniroyal, 928 F.2d at 1424)).

"[T]here is no bright line test for awarding front pay." Hunter, 897 F.3d at 562 (citations omitted). In deciding whether to award front pay, the court may consider that the determination is inherently speculative.  The Court may also consider plaintiff's age, education, experience, and diligence in seeking new employment. Dotson v. Pfizer, Inc., 558 F.3d 284, 300 (4th Cir. 2009); Loveless, 232 F. App'x. at 238. Although the Fourth Circuit has not enumerated a list of factors to consider in deciding whether to award front pay, the Middle District of North Carolina and other

courts have identified ten factors to determine whether front pay is appropriate: "'(1) the plaintiff's age; (2) the length of time the plaintiff was employed by the defendant employer; (3) the likelihood that plaintiff's employment would have continued absent the discrimination; (4) the length of time it will take the plaintiff, using reasonable effort, to secure comparable employment; (5) the plaintiff's work life expectancy; (6) the length of time other employees typically held the position lost; (7) the plaintiff's status as an at-will employee; (8) the plaintiff's ability to work, including the ability to work for the defendant employer; (9) the plaintiff's subjective intention to remain in the position; and (10) the plaintiff's efforts to mitigate the damages.'" <u>Tinsley</u>, 2019 WL 1874044 at *5 (quoting <u>Hunter</u>, 201 F. Supp. 3d at 756-57 (M.D.N.C. 2016)).

As discussed above, Plaintiff was reasonably diligent in seeking other employment. Reinstatement is not possible given the parties' irreparably damaged relationship. Therefore, Plaintiff should be awarded front pay in the amount calculated below based upon the Court's analysis of the ten factors considered in <u>Tinsley</u>.

### i. Plaintiff's Age and Work Life Expectancy

Courts analyze factors one (age) and five (work life expectancy) together given the innate relationship between a plaintiff's age and how long he expects to work. <u>See</u> <u>Hunter</u>, 201 F. Supp. 3d at 758 (citing <u>Uniroyal</u>, 928 F.2d at 1424 ("If a plaintiff is close to retirement, front pay may be the only practical approach.")). Plaintiff is fifty-seven years old. He was fifty-three when he was terminated in 2018. Plaintiff's work life expectancy likely runs for at least another ten years, when he will be sixty-seven and eligible for full Social Security benefits. When a plaintiff is near the end of his work life expectancy, courts have found that age weighs in favor of a front pay award. <u>Hunter</u>, 201 F. Supp. 3d. at 758-765 (citing <u>Uniroyal</u>, 928 F.2d at 1423 ("[W]hen the period for reinstatement was expected to be a relatively short one, such as if the plaintiff was close to

retirement, the strong preference in favor of reinstatement has been found to be neutralized by the increased certainty of the potential loss of pay, permitting consideration of a front pay award.")); Davis v. Combustion Eng'g, Inc., 742 F.2d 916, 923 (6th Cir. 1984) (upholding front pay award to a fifty-nine year-old). Here, Plaintiff's age and work life expectancy weigh in favor of a front pay award.

### ii. Length of Employment and Likelihood of Continued Employment

Courts also analyze factors two (length of time plaintiff was employed by defendant employer) and three (likelihood that plaintiff's employment would have continued absent the discrimination) together. Generally, courts have held that the longer plaintiff works for the defendant, the more heavily that time weighs in favor of an award of front pay. Tinsley, 2019 WL 1874044 at *5; Hunter, 201 F. Supp. 3d at 758 (citing Barbour v. Merrill, 48 F.3d 1270 (D.C. Cir. 1995) and Ogden v. Wax Works, Inc., 29 F. Supp. 2d 1003 (N.D. Iowa 1998) (collecting cases)). In Hunter, the Middle District of North Carolina court held that employment lengths of thirteen and twenty-seven years weighed in favor of a front pay award, while employment for just over five years weighed "somewhat in favor" of a front pay award. Hunter, 201 F. Supp. 3d at 762. Similarly, a fifteen-year term of employment was found to weigh in favor of a front pay award in Tinsley. 2019 WL 1874044, at *5

Here, Plaintiff worked for Defendant "just days shy" of five years. Doc. 134 at 20. A five-year employment term falls on the lower end of the spectrum in which courts have awarded front pay. This is a factor in tempering but not denying a front pay award. Plaintiff has demonstrated a high likelihood of continued employment with Defendant absent the discriminatory action. Plaintiff cites in his Memorandum in Support of An Equitable Award the lengthy tenures of peer executives who worked for Defendant and offered exhibits at trial evidencing Defendant's

satisfaction with his job performance. This evidence supports the conclusion that Plaintiff likely would have continued employment with Defendant absent discriminatory action. See Hunter, 201 F. Supp. 3d at 762 (holding that an employee with an "effectively unblemished" service record was more likely than not to have remained employed with defendant); Tinsley, 2019 WL 1874044 at *5 (holding that an employee's positive year-end reviews and division leadership evidenced a high likelihood of continued employment absent the employer's discrimination). Therefore, Plaintiff's length of employment weighs somewhat in favor of front pay.  His likelihood of continued employment weighs in favor of front pay.

### iii.  Time to Secure Comparable Employment and Mitigation Efforts

The next pair of factors address mitigation and the length of time it will take Plaintiff, using reasonable efforts, to secure comparable employment. This issue has been discussed at length in the context of Plaintiff's mitigation efforts after Defendant and HFHS terminated him. Plaintiff contends that "this factor is the single most important," given the public impact the litigation has placed on his career prospects. Doc. 134 at 21. Courts have held that "if the plaintiff has the skill set and qualifications to secure comparable employment through reasonable effort moving forward, then this weighs against a long term front pay award." Hunter, 201 F. Supp. 3d at 758 (citing Barbour, 48 F.3d at 1280; Ogden, 29 F. Supp. 2d at 1012-15 (collecting cases); Ford v. Rigidply Rafters, Inc., 984 F. Supp. 386, 392 (D. Md. 1997); Snow v. Pillsbury Co., 650 F. Supp. 299, 300 (D. Minn. 1986)).

The Court gives weight to Plaintiff's concerns about finding a chief marketing and communications officer position in the wake of public perception following this litigation and his contention that "no CMO doors have opened as a result of this verdict." Doc. 134 at 22. Since his termination from HFHS, Plaintiff has not been able to get beyond introductory contacts in looking

for comparable employment. He testified that post-HFHS discussions with recruiters for chief of marketing positions at Brigham and Women's hospital in Boston, the Ohio State University/Wexler Medical Center, and Westchester Medical Center Health Network ended after he disclosed his involvement in this litigation. Despite the present uncertainty as to his job prospects, Plaintiff's specialized skills and the demand for high-level executive talent suggest that he reasonably may be able to find a comparable or better position at some point in the future. See Dotson v. Pfizer, Inc., 558 F.3d 284, 300 (4th Cir. 2009) (holding that the inherently speculative determination of front pay combined with plaintiff's age, experience, education, and period sought for front pay were all within the district court's discretion to consider when denying front pay); Williams v. Pharmacia, Inc., 137 F.3d 944, 954 (7th Cir. 1998) ("[A]n employee receiving front pay in lieu of reinstatement is entitled to front pay only until such time that the employee can reasonably be expected to have moved on to similar or superior employment."). Thus, the time to secure comparable employment weighs in favor of a front pay award.

### iv. Length of Time Other Employees Held Position

Courts have held that if a position "is not typically held for a long duration or beyond a certain age, this weighs against a front pay award beyond that term." Hunter, 201 F. Supp. 3d at 759 (citing Barbour, 48 F. 3d at 1280; Ogden, 29 F. Supp. 2d at 1012-15). Plaintiff again cites the tenures of senior executives in Defendant's marketing and communications department as evidence that employees hold their positions for longer periods. Plaintiff's position was unique and held by only one individual at a time, making a clear determination of this factor difficult. Other cases often involve positions occupied by multiple individuals such as police officers. This provides courts with more data points for comparing how long others held the position of the

terminated employee. Given the lack of certainty as to this factor, it is neutral in determining an appropriate front pay award.

### v. Plaintiff's Employment Status and Ability to Work

Another pair of factors in determining front pay is Plaintiff's ability to work and status as an at-will employee. Plaintiff is not disabled and available to work for Defendant or another employer. The parties agree that Plaintiff was an at-will employee and subject to discharge in North Carolina for any reason or no reason at all. Horne v. Cumberland Cnty. Hosp. Sys., Inc., 746 S.E.2d 13 (N.C. App. 2013). These factors weigh against an award of front pay.

### vi. Plaintiff's Subjective Intention to Remain

Finally, courts analyze a plaintiff's subjective intention to remain with their employer prior to termination. "If the plaintiff intended to remain in the position long term, then a front pay award is more reasonable." Hunter, 201 F. Supp. 3d at 759 (citing Barbour, 48 F.3d at 1280; Ford, 984 F. Supp. at 392). Plaintiff argues that he and his wife built a home in Charlotte a few years after he began working for Defendant, evidencing his intention to continue in his position and remain here "until and after his retirement." Doc. 134 at 23. There is no evidence to the contrary. Therefore, this factor weighs in favor of a front pay award.

The Court finds that the factors listed above, when considered together, weigh in favor of granting Plaintiff a limited front pay award. Reinstatement is not a feasible equitable remedy here. The Court must now determine the appropriate amount of that award.

### f. Front Pay Calculation

Front pay awards must be tempered due to their speculative nature. Uniroyal, 928 F.2d at 1424. "The Fourth Circuit has cautioned courts to award front pay damages sparingly as it can result in an unfair windfall for the plaintiff." Taylor, 968 F. Supp. 2d at 803 (citing Uniroyal, 928

F.2d at 1424). In this case, Plaintiff seeks an award of ten and a half years of front pay in the amount of $11,959,753. Plaintiff's front pay spreadsheet calculation is incorporated by reference. The Court concludes that a lesser amount will adequately serve the intended purpose of front pay. See Hunter, 897 F.3d at 562 ("The purpose of awarding front pay is to provide resources to a wrongfully terminated plaintiff 'to complement a deferred order of reinstatement or to bridge a time when the court concludes the plaintiff is reasonably likely to obtain other employment.'" (quoting Uniroyal, 928 F.2d at 1424)). In Hunter, the Fourth Circuit held that a district court reasonably exercised its discretion in applying the front pay factors to award a plaintiff 1.75 years of front pay instead of the 13.75 years recommended by the jury. Hunter, 897 F.3d at 562.

Plaintiff is returning to the workforce after a period of public exposure during the course of this litigation. The Court finds that he is eminently employable based upon his performance at Novant and his ability to obtain employment with HFHS. Therefore, an award of one year of front pay – in the amount of $1,078,066 – is adequate to compensate Plaintiff until he is able to secure employment. See Hunter, 897 F.3d at 561 (stating that the decision to award or deny equitable relief, such as reinstatement or an award of front pay, is a discretionary decision for the district court). Furthermore, the Court finds that determining the present value of the stream of income due to Plaintiff over the next year would not alter this amount. See Xiao-Yue Gu v. Hughes STX Corp., 127 F. Supp. 2d 751, 763 (D. Md. 2001) ("Given the relatively short duration of its award, the Court believes that presupposing salary increases over the next four years only to discount the award to account for the time value of money presents a rather redundant venture.").

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Entry of Judgment and Equitable Relief (Doc. 132 and 135) is GRANTED IN PART and DENIED IN PART. The Court denies Plaintiff's Motion for judgment on his ERISA claim. The Court grants Plaintiff's Motion

for backpay and awards the amount of $2,341,884, adjusted to include pre-judgment interest in the amount of eight percent. The Court grants in part Plaintiff's Motion for front pay and awards one year of front pay in the amount of $1,078,066.

### E. Defendant's Motion to Strike Plaintiff's Post-Trial Evidence (Doc. 137)

Pursuant to Rule 7 of the Federal Rules of Civil Procedure, Defendant moves to strike the new evidence included in Plaintiff's Memorandum in Support of an Equitable Award of Back Pay and Front Pay (Doc. 134) because it was not introduced at trial.

Defendant challenges Plaintiff's front pay calculations on two grounds. First, that front pay calculations constitute new evidence that cannot be considered post-trial and second, that Plaintiff waived his right to reinstatement or, in the alternative, for front pay. Plaintiff argues that the calculations are based on evidence introduced at trial and based on the Court's decision to resolve the equitable issues post-trial if the jury found liability.

The Court finds that Plaintiff's front pay calculations are based on evidence presented at trial. The Court has also reviewed the trial transcript and determined that front pay was mentioned during discussions between counsel and the Court. Furthermore, the Court's limited award of front pay minimizes the use of Plaintiff's front pay calculations. The Court has considered all the parties' filings. For these reasons, the Defendant's Motion to Strike (Doc. 137) is DENIED.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, the Court DENIES Defendant's Renewed Motion for Judgment as a Matter of Law (Doc. 124), GRANTS IN PART AND DENIES IN PART Defendant's Motion to Set Aside Punitive Damages (Doc. 127), DENIES Defendant's Motion for Sanctions (Doc. 130), DENIES Defendant's Motion to Strike Plaintiff's Post-Trial Evidence (Doc.

137); and GRANTS IN PART and DENIES IN PART Plaintiff's Motion for Entry of Judgment and Equitable Relief (Docs. 132 and 135).

The Court ORDERS that Plaintiff's jury award for punitive damages in the amount of $10 million be reduced to $300,000.  The Court further ORDERS that Plaintiff's Motion for Judgment on his ERISA Claim is DENIED. The Court further ORDERS that Plaintiff be awarded backpay damages in the amount of $2,341,884 and pre-judgment interest thereon at a rate of eight percent. As set forth above, pre-judgment interest is to be calculated as outlined in the back pay chart that is attached to this Order from the date it would have been due to the date of this Order. The Court further ORDERS that Plaintiff be awarded front pay damages in the amount of $1,078,066.  The Court further ORDERS an award of post-judgment interest beginning on the date of this Order.

Having determined Plaintiff's equitable damages, and the jury verdict having been entered (Doc. 99), the Clerk is ORDERED to enter judgment pursuant to this Order and Rule 58 of the Federal Rules of Civil Procedure.

**SO ORDERED**.

Signed: August 11, 2022

David S. Cayer
United States Magistrate Judge

**BACK PAY**

| | 2018 | Actual | 2019 | 2020 | 2021 | May-22 | | Lost Earnings | HFHS Offset | Difference |
|---|---|---|---|---|---|---|---|---|---|---|
| Base | 402,676 | | 430,863 | 461,024 | 493,295 | 220,103 | 527,826 | | | |
| AIP | **183,745** | | **196,607** | **210,370** | 225,096 | **240,852** | | | | |
| LTI | 64,694 | | 71,102 | 106,248 | 89,092 | 95,328 | | | | |
| DC SERP | 58,642 | | 60,401 | 64,629 | 69,154 | 73,994 | | | | |
| 457(f) | 7,500 | | 7,500 | 7,500 | 7,500 | 7,500 | 417,675 | | | |
| Health | 3,437 | | 8,592 | - | 18,043 | 8,592 | | | | |
| Exec Perk | 10,000 | | 10,000 | 10,000 | 10,000 | **10,000** | | | | |
| Vehicle | 12,000 | | 12,000 | 12,000 | 12,000 | **5,000** | | | | |
| 401(a) | 17,315 | **10,100** | 18,527 | 19,824 | 21,212 | 9,464 | | | | |
| Total | **760,009** | **627,307** | **815,593** | **891,595** | **945,391** | **670,835** | | | | |
| 457 forfeit | | 210,445 | | | | | | | | |
| Total 2018 | 760,009 | **416,862** | | | | | 2018 loss | **343,147** | - | **343,147** |
| Total 2019 | | | | | | | | 815,593 | 551,127 | 264,466 |
| Total 2020 | | | | | | | | 891,595 | 700,567 | 191,028 |
| Total 2021 | | | | | | | | 945,391 | 72,983 | 872,408 |
| 2022 loss of pay and benefits | | | | | | | | 670,835 | - | 670,835 |
| | | | | | | | | 3,666,561 | 1,324,677 | |
| | | | | | | | | | | **2,341,884** Net Loss |

Notes:  See Plaintiff's Ex. 75 for actual amounts of base salary, AIP, LTI and DC SERP paid from 2013 to 2018
1.  Base pay increases by 7% per year from actual 2018 rate, a rate <market adjustments made for Plaintiff from 2013-2018 and < annual adjustments for other executives reported in Form 990 a
2.  AIP is based on a 7% annual increase from the actual amount paid in 2018
3.  LTI = 30% x  % goals achieved in 3Y LTI cycle x Y1 base salary.  2021 and 2022 use 73.75% average % goals achieved based on average % goals achieved 2017-2019.
4.  DC SERP = 15% of base salary for that year
5.  457(f) contribution capped at $7500 annually
6.  COBRA for health cost $20,620 per year, began Nov 2018; 2022 benefit is cost of 5 months (.42) of annual
7.  Executive perk and vehicle allownance remained constant
8.  401(a) contribution rate of 4.3% is averarge of 2016 employer contribution of $15,900 on a salary of $358,667 (rate of 4.144%) and $16,200 on base salary of $390,947 (4.433%)
9.  HFHS offered a 403(b) match instead of 401(a) but it had not vested and was forfeited on termination there, so 401(a) losses are included for entire period
10.  2018 "actual" amount includes $617,207 reported on 2018 Novant W2, and $10,100 in estimated 401(a) contribtions
11.  2018 comp owed (box I15) = total 2018 of $760,009 less actual paid of $406,762 after deduction of forfeited 457 funds of $210,445
12.  HFHS provided health benefits from June 2019 to January 2020 and then COBRA coverage through March 2022
13.  Box H4 is the annualized base pay for 2022; Box G4 is base pay through May 2022 (base x .42)□
14.  Box H8 is the sum of the AIP, LTI, DC SERP and 457 payments owed from 2021 and paid by March 2022 (G5 - G8)
15.  Box J-18 shows HFHS 2021 severance payments paid through Feb 13, 2021, as shown in W-2 (Pl's Ex. ___).

### Backpay with 8% Interest thorugh June 1, 2022

| | Type/Date | Backpay | Interest | Total |
|---|---|---|---|---|
| **2018** | lump 0818 | **210,445** | **64531** (8% x 3.833 yrs) | **274,976** |
| **2018** | inst. 2018 | **132,702** | **38484** (8% x 3.625 yrs) | **171,186** |
| **2019** | lump 0319 | **264,466** | **68761** (8% x 3.25 yrs) | **333,227** |
| **2020** | lump 0320 | **191,028** | **34385** (8% x 2.25 yrs) | **225,413** |
| **2021** | lump 0321 | **400,841** | **40084** (8% x 1.25 yrs) | **440,925** |
| **2021** | inst. 2021 | **471,567** | **34556** (8% x 0.916 yrs) | **506,123** |
| **2022 through 6/1/22** | lump 0322 | **427,675** | **8554** (8% x 0.25 yrs) | **436,229** |
| **2022 through 6/1/22** | inst. 2022 | **243,160** | **4046** (8% x 0.208 yrs) | **247,206** |
| | | **2,341,884** | **293,401** | |
| **TOTAL BACKPAY WITH INTEREST** | | | | **2,635,284** |

Note: See Memorandum for explanation of interest calculations on lump sum amounts versus installment payments ("inst"), all calculated through June 1, 2022

**FRONT PAY**

| | 56 | 57 | | 58 | 59 | 60 | 61 | 62 | 63 | 64 | 65 | 66 | 67 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2021 Reference | 2022 Reference | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 Prorated through 8/18 | 2032 Annualized |
| **Base** | 493,295 | 527,826 | 564,773 | 604,308 | 646,609 | 691,872 | 740,303 | 792,124 | 847,573 | 906,903 | 970,386 | 654,137 | 1,038,313 |
| **AIP** | 225,096 | 240,852 | 257,712 | 275,751 | 295,054 | 315,708 | 337,807 | 361,454 | 386,756 | 413,829 | 442,797 | 298,489 | 473,792 |
| **LTI** | 89,092 | 95,328 | 102,002 | 109,142 | 116,781 | 124,956 | 133,703 | 143,062 | 153,077 | 163,792 | 175,257 | 118,141 | 187,525 |
| **DC SERP** | 69,154 | 73,994 | 79,174 | 84,716 | 90,646 | 96,991 | 103,781 | 111,045 | 118,819 | 127,136 | 136,035 | 91,701 | 145,558 |
| **457(f)** | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | **7,500** | 7,500 |
| **Health** | 18,043 | 20,620 | 20,620 | 20,620 | 20,620 | 20,620 | 20,620 | 20,620 | 20,620 | 20,620 | 20,620 | 12,991 | 20,620 |
| **Exec Perk** | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | **10,000** | 10,000 |
| **Auto** | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 7,560 | 12,000 |
| **401(a)** | 21,212 | 22,697 | 24,285 | 25,985 | 27,804 | 29,750 | 31,833 | 34,061 | 36,446 | 38,997 | 41,727 | 26,288 | 41,727 |
| **Total** | 945,392 | 1,010,817 | 1,078,066 | 1,150,022 | 1,227,015 | 1,309,398 | 1,397,547 | 1,491,867 | 1,592,789 | 1,700,776 | 1,816,322 | 1,220,332 | 1,937,035 |
| **2022 Backpay through 6/1/22** | | 670,835 | | | | | | | | | | | |
| **Adjusted Total** | | 339,982 | 1,078,066 | 1,150,022 | 1,227,015 | 1,309,398 | 1,397,547 | 1,491,867 | 1,592,789 | 1,700,776 | 1,816,322 | 1,220,332 | 1,937,035 |

|  |  |
|---|---|
| **Total Undiscounted** | 14,324,115 |
| **Total Discounted (NPV)** | 11,959,753 |

**Notes:**
1. Base pay increases by 7% per year from actual 2018 rate, a rate <market adjustments made for Plaintiff from 2013-2018 and < annual adjustments for other executives reported in Form 990 annually
2. AIP is based on a 7% annual increase from the actual amount paid in 2018
3. LTI is calculated as 30% x Y1 base salary x 73.75% goals achieved in 3Y cycle; (73.75% is average score from 2017 to 2019)
4. DC SERP, 15% of base☐
5. 457(f) contribution capped at $7500 annually
6. COBRA for health cost $20,620 per year
7. 401(a) contribution rate of 4.3% is average of 2016 employer contribution of $15,900 on a salary of $358,667 (rate of 4.144%) and $16,200 on base salary of $390,947 (4.433%)
8. Duvall turns age 67 on August 18, 2032, the loss of base pay, health coverage and auto allowance for 2032 are prorated to that date (63% of year)