IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:19-cv-624

DAVID DUVALL,          )
                       )
    Plaintiff,         )
                       )
    v.                 )        **MEMORANDUM OF LAW IN**
                       )        **SUPPORT OF**
NOVANT HEALTH, INC.    )        **PLAINTIFF'S MOTION FOR AN**
                       )        **AWARD**
    Defendants.        )        **OF ATTORNEYS' FEES AND COSTS**
                       )
                       )
_____)

Plaintiff, through counsel, files this memorandum of law in support of
his petition for attorneys' fees as part of his costs pursuant to 42 U.S.C.
§2000e-5(k).

## STATEMENT OF THE CASE

Plaintiff provides the following statement of the case history to
highlight the legal work involved in obtaining discovery, succeeding at trial
and responding to Defendant's post-trial motions and briefings.

Plaintiff filed this action on November 18, 2019, alleging he had been
terminated unlawfully as a Senior Vice President with Defendant on July
30, 2018 on account of his race and sex. [ECF 1] He claimed, and later

proved at trial, that he was fired and replaced by two women, one White and the other Black, as part of Defendant's intentional efforts to increase diversity in its leadership ranks. He brought that claim under Title VII and under state law, a claim of wrongful discharge in violation of the public policy against discrimination in employment set out in N.C.G.S. § 143-422.2. He also alleged that he was terminated just days before his fifth work anniversary to keep him from seeking an 18- month severance enhancement promised to him when hired. He claimed the timing of his termination violated § 510 or ERISA or, alternatively, constituted wrongful discharge in violation of North Carolina's wage and hour statutes.

Defendant refused to provide any information about its Diversity and Inclusion initiative in discovery or to make its CEO available for deposition. Plaintiff moved to compel discovery on June 24, 2020 [ECF 20] and, after briefing, the Court granted the motion on July 21, 2020. [ECF 29]. That discovery produced key exhibits that Plaintiff introduced at trial. Plaintiff also deposed the CEO, Carl Armato, and then called him as a witness at trial.

The parties filed cross-motions for summary judgment in late September 2021. After extensive briefing by the parties, the Court denied the motions on November 9, 2020. [ECF 66].

In April 2021, at the Court's request, the parties conferred over several days about a pre-trial order and submitted multiple filings reflecting their inability to reach complete agreement on its content.

The case was then set for trial on September 13, 2021. On September 2, 2021, Defendant moved to quash trial subpoenas Plaintiff served on some current and former Novant employees as trial witnesses. Plaintiff's response included the cover letters to the witnesses explaining the limits of the subpoena, and a declaration from a witness that Defendant had fired him the day after he told Novant's counsel he would testify favorably for Plaintiff. The Court denied Defendant's motion as moot.

On September 10, 2021, Defendant's counsel disclosed that Jesse Cureton, Plaintiff's former supervisor, had tested positive for Covid-19 and could not appear in person at the trial. After a conference call discussion, the Court continued the trial to October 18, 2021.

The trial commenced on October 18 and the jury returned a verdict for Plaintiff on October 26, finding his race and/or gender had been a motivating factor in Plaintiff's termination, that Defendant had not proven it would have made that decision in the absence of that unlawful motive, and awarded Plaintiff $10 Million in punitive damages. The ERISA claim

and the issues of backpay and front pay in lieu of reinstatement were reserved for the Court to resolve.

Both parties filed post-trial motions. The Defendant hired additional counsel and the team of six lawyers moved the Court to set aside the liability verdict and enter judgment for Defendant as a matter of law [ECF 124], to set aside the punitive damages verdict [ECF 127] and to sanction Plaintiff and his counsel for their conduct at trial [ECF 130]. Defendants also filed an anticipatory brief against Plaintiff's ERISA claim [ECF 129].

Plaintiff moved for an award of backpay and front pay and for judgment on his ERISA claim [ECF 132]. In response, Defendant moved to strike the front pay calculations as post-trial evidence [ECF 137]. The briefing on these post-trial motions was extensive, exceeding 300 pages of filings between February 1 and March 18, 2022.

On May 24, 2022, the Court heard oral arguments on three of the motions – to set aside punitive damages, for judgment on the ERISA claim, and for back and front pay. Plaintiff updated his calculations of lost wages and benefits through June 1, 2022 for that hearing.

On August 11, 2012, this Court entered an Order denying Defendant's motions to set aside the liability verdict, to sanction Plaintiff and his counsel and to strike Plaintiff's front pay calculations [ECF 164]. The

Court denied the motion to set aside the punitive damages verdict, finding them supported by the evidence, but reduced the amount of the award to $300,000, the cap imposed by 42 U.S.C. § 1981a(b)(3)(D).

The Court then granted Plaintiff's motion for back and front pay and awarded him $2,341,884 in backpay plus an unspecified amount of prejudgment interest[1] and $1,078,066 in front pay.

The Clerk entered the Judgment on August 12, 2022 incorporating the terms of the Court's August 11, 2022 Order but also not specifying the amount of prejudgment interest [ECF 165].

On August 23, 2022, Plaintiff filed a motion to amend the Judgment under Rule 59(e), asking that the backpay and prejudgment interest be calculated through August 12, 2022, that the Court specify the amount of prejudgment interest it was awarding, and that the Court gross up the lump sum award to adjust for the negative tax impact of receiving several years of lost earnings plus interest in a lump sum [ECF 166].

## ARGUMENT

There is no dispute that Plaintiff is the prevailing party under this verdict and Judgment. A party has prevailed if there has been a "material

---

[1] It appears but is not clear that the Court adopted the interest calculation in Plaintiff's chart.

5

alteration of the legal relationship of the parties," and there is a "judicial imprimatur on the change." *Grissom v. The Mills Corp.,* 549 F.3d 313, 318 (4th Cir. 2008). The substantial award of back and front pay and the affirmation of punitive damages, enforceable by a judgment makes Plaintiff the prevailing party for purposes of the federal fee-shifting statutes like 42 U.S.C. §2000e-5(k). That statute authorized the award of fees in a Title VII case. The case law interpreting it and other federal fee shifting statutes makes the entitlement to fees straightforward.

## I. A PREVAILING TITLE VII PLAINTIFF IS ORDINARILY ENTITLED TO REASONABLE ATTORNEYS' FEES

In § 706(k) of Title VII of the Civil Rights Act of 1964, now codified as 42 U.S.C. § 2000E-5(k), Congress authorized the courts to award a "prevailing party" reasonable attorney's fee as part of the costs.

> In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs,

42 U.S.C.A. § 2000e-5(k). The Supreme Court then established that a prevailing plaintiff ordinarily will receive reasonable attorney's fees under this statute absent some extraordinary injustice in doing so.

Over 50 years ago, in *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402 (1968), a public accommodations case under Title II of the

Civil Rights Act, the Supreme Court held that a successful Title II plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." Five years later, it adopted the same standard in school desegregation cases. *Northcross v. Memphis Board of Education,* 412 U.S. 427, 428 (1973). Then, in *Albemarle Paper Co. v. Moody,* the high Court applied the *Piggie Park* standard to a prevailing plaintiff in a Title VII action. 422 U.S. 405, 415 (1975). Three years later, in holding that a prevailing defendant must show that a plaintiff's claims were frivolous to be awarded fees, the Supreme Court held, "It can thus be taken as established . . . . that under § 706(k) of Title VII a prevailing *plaintiff* ordinarily is to be awarded attorney's fees in all but special circumstances." *Christiansburg Garment Co. v. Equal Emp. Opportunity Comm'n,* 434 U.S. 412, 417 (1978)(emphasis in original).

Congress also passed the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, with very similar language about awarding fees to the prevailing party in actions brought under 42 U.S.C. § 1983. The subsequent cases on attorney's fees under Title VII and § 1988 and other fee-shifting statutes all began sharing the same standards. Indeed, the Supreme Court eventually declared its guiding principles that limited fee enhancements under "the federal fee shifting statutes." *Perdue v. Kenny*

*A.*, 559 U.S. 542, 552 (2010). And those shared principles extend beyond Title VII and § 1983.

For example, the Fourth Circuit applied its definition of a" prevailing party" under the Sarbanes Oxley statute in *Grissom v. The Mills Corp.,* 549 F.3d 313, 318 (4th Cir. 2008) to authorize a § 1988 fee award to a plaintiff following a jury verdict of only $2,943 in a § 1983 police misconduct case. *McAfee v. Boczar*, 738 F.3d 81, 88, 93 (4th Cir. 2013), <u>as amended</u> (Jan. 23, 2014). And *Hensley v. Eckerhart,* 461 U.S. 424 (1983), a case analyzing a fee award under § 1988 in a case involving partial success, has been cited by this District's courts for determining Title VII fee awards. *See, Tinsley v. City of Charlotte*, 397 F. Supp. 3d 803, 806 (W.D.N.C. 2019), <u>rev'd,</u> 854 F. App'x 495 (4th Cir. 2021).

### A.   Calculating a Reasonable Fee

Much of the fee-shifting jurisprudence from *Hensley* to *Perdue* involved the almost arbitrary subjectivity inherent in the lower courts enhancing fees in a case, either boosting the hourly rate or adding a multiplier to the award to reward the success achieved. In doing so, courts have relied on the 12-factors devised in *Johnson v. Georgia Highway Exp., Inc.* 488 F.2d 714, 717 (5th Cir. 1974). *See Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 (4th Cir. 1978).

In *Perdue, supra,* the Supreme Court rejected the use of *Johnson* to enhance fee awards 559 U.S. at 551, and declared the "lodestar" approach - a determination of the market rate needed for a lawyer to take on a particular case – superior to *Johnson's* 12 factor analysis for three reasons. It "produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case," it is "readily administrable," and it is "objective." 559 U.S. at 552. *Perdue* cited its earlier opinion in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546 (1986) *supplemented*, 483 U.S. 711 (1987)

> [W]hen an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests. Calculating the fee award in a manner that accounts for these factors, either in determining the reasonable number of hours expended on the litigation or in setting the reasonable hourly rate, thus adequately compensates the attorney.

478 U.S. at 565-66, cited in *Perdue,* 559 U.S. at 552.

Under *Perdue's* preferred lodestar approach, if the rate of $450 per hour requested for Plaintiff's counsel is objectively within the market range and the number of hours expended are objectively reasonable, the inquiry

is over except for considering any reductions under *Hensley* for not succeeding on the ERISA claim.

As for the fee, an affidavit or declaration of a local attorney "familiar both with the skills of the fee applicants and more generally with the type of work in the relevant community" is sufficient to verify the prevailing market rate. *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 245 (4th Cir. 2009). Plaintiff submits three affidavits/declarations from well-known employment law practitioners to meet this standard. They all attest that the rate Plaintiff's counsel seeks -- $450 per hour -- is reasonable for this case in this market for someone with over 30 years of experience.

The three affiants/declarants are employment and civil rights attorneys with vast experience in employment litigation across the North Carolina. Mr. Robert Elliott and Mr. Steward Fisher have both practiced for over 35 years in the state and federal trial and appellate courts. Kevin Murphy is a highly regarded, Charlotte-based employment lawyer who has worked here in both the large firm setting and now in his small practice. He testifies to his personal knowledge that some Charlotte area lawyers charge up to $800 per hour for employment cases. *Murphy* Affidavit, ¶ 7. He graduated from law school in 2010 and charges $500 per hour for his hourly work. *Id.* Plaintiff's counsel charges up to $500 for his hourly work as well. These

affidavits/declarations show the requested hourly rate is objectively reasonable in the Charlotte market.

As for the time expended, 886.9 hours through the date of judgment, the affidavits all find the time spent to be reasonable. Another case in this District, the court approved more than twice the time expended here in a roughly comparable case. Chief Judge Frank Whitney approved a fee petition for 2,010 hours for a successful plaintiff's legal team in an employment case in 2017. *Eschert v. City of Charlotte*, No. 3:16-CV-295-FDW-DCK, 2017 WL 3840275, at *4 (W.D.N.C. Sept. 1, 2017). *Eschert* involved a six-day trial and then a day of jury deliberations, and the case lasted two years and 10 months from filing to the judgment. The trial in this case spanned five days and then 1.5 days in charging the jury and it deliberating. And this case was two years and nine months old when the Judgment was entered. Plaintiff's counsel achieved a substantial result in this case after expending about 45% of the hours approved in *Eschert*. That is manifestly reasonable.

This Court needs to consider any reduction in the hours expended based on the Court's entry of Judgment for Defendant on the ERISA claim and its decision to reduce the punitive damages award. See *Hensley,*

11

*supra,* and *Tinsley, supra* .   Plaintiff addresses that issue below, but first

turns to the *Johnson* factors.

## B.    The Johnson Factors

Despite the admonition in *Perdue* to use the objective lodestar

approach and to enhance fees only in the rarest of circumstance,[2]  many

courts, including those in this Circuit, still rely on *Johnson* to establish the

reasonableness of a fee award, often citing the *Barber* decision that pre-

dated *Perdue* by 22 years

> This court has summarized the Johnson factors to include: (1) the
> time and labor expended; (2) the novelty and difficulty of the
> questions raised; (3) the skill required to properly perform the legal
> services rendered; (4) the attorney's opportunity costs in pressing the
> instant litigation; (5) the customary fee for like work; (6) the
> attorney's expectations at the outset of the litigation; (7) the time
> limitations imposed by the client or circumstances; (8) the amount in
> controversy and the results obtained; (9) the experience, reputation
> and ability of the   attorney; (10) the undesirability of the case within
> the legal community in which the suit arose; (11) the nature and
> length of the professional relationship between attorney and client;
> and (12) attorneys' fees awards in similar cases.

*Barber*, 577 F.2d at 226 (4th Cir. 1978)).   Thus, Plaintiff will comment on

each of the twelve factors, not knowing what the Court might deem

significant.

### *1.  Time and labor expended*

Plaintiff's counsel submits with the petition a detailed statement of

the time spent in the case from the first meeting with Plaintiff through the

hearing on the post-trial motions. It does not include time spent preparing

the Rule 59(e) motion to amend the judgment or the time spent this fee

[2]

petition. The case involved considerable effort – in discovery, at dispositive motions, in twice preparing for trial, in trying the case to a successful verdict and then responding to the nearly overwhelming post-trial briefing.

## 2. *Novelty and Difficulty of the Questions Raised*

This case involved the fairly novel issue of proving that a white man had been discriminated against on account of his race and gender in violation of federal and state law. While most major employers embrace Diversity and Inclusion principles in recent years, there has been little litigation to date on challenges to employment decisions that further such initiatives. And Defendant attempted post-trial to find every possible legal argument against the verdict that raised numerous issues and required an exhaustive response to each and every argument.

## 3. **Skill Required to Perform Properly the Legal Services Rendered**

Plaintiff's counsel found the case very challenging, particularly in having to wrest the details of the D&I initiative from Defendant in discovery to obtain the information needed to survive summary judgment and then prove Plaintiff's claim at trial. It also required determining how to present the case at trial to prove that Plaintiff's termination was driven by this deliberate plan to transform the demographics of the leadership of its hospital system. It required counsel to call three of Defendant's senior executives as adverse witnesses in the case in chief to establish both the details of the D&I initiative and its attendant incentives, and to establish from those witnesses that Plaintiff had performed his work at a very high, nationally-recognized level and that the justifications for his termination

lacked merit. The undersigned had never used that strategy to that extent in trying a case and was very uncertain how it would work out, but it proved effective and seemed to capture that attention of the jury. The Court commented near the end of the case that the jury had remained very engaged throughout.

### 4. Attorney's opportunity costs in pressing the instant litigation

Given that the case involved close to 900 hours of time through the May 24, 2022 hearing, it certainly took away from counsel's ability to work on other matters.

### 5. Customary fee for like work

Plaintiff's counsel generally takes on litigation on a contingent basis, but charges up to $500 per hour for hourly work depending on the means of the client. He commonly charges executive-level employee that $500 rate.

### 6. Attorneys' expectations at outset of litigation

Counsel had no prior experience in challenging a D&I-driven termination and had mixed expectations as to how a court or jury might react to such a potentially polarizing claim; and Plaintiff had found an excellent new job at the time the suit was filed. So, counsel did not know what to expect of the litigation or that it would have the profound professional impact it has upon Plaintiff.

### 7. Time limitations imposed by the client or circumstances;

No time limits were imposed uniquely by the client or the circumstances, except that the case consumed a great deal of counsel's time in 2020 and 2021 and 2022.

### 8. *Amount in controversy and the results obtained*

Plaintiff obtained a substantial recovery of several million dollars, and the court affirmed that the trial evidence supported an award of punitive damages, even though the Court applied the statutory cap to that award.

### 9. *Experience, reputation and ability of the attorney*

Plaintiff's counsel has practiced law since 1990, primarily in the areas of employment and civil rights litigation and has established a reputation for skill and competence in both areas of law. Counsel's success in this case demonstrated that ability to some extent.

### 10. *Undesirability of the Case Within the Legal Community*

As noted, this was counsel's first lawsuit involving a claim of so-called "reverse" discrimination. The plaintiffs' employment law and civil rights bar in the state tends to view skeptically claims of discrimination by white males given our nation's history of race and gender discrimination and the significant legal and societal efforts to address them. The undersigned experienced some incredulity from colleagues about bringing the claims in this case and is uncertain how many other plaintiff's attorneys would have taken on the matter.

**11.  *Nature and Length of the Professional Relationship Between Attorney and Client***

Plaintiff and his counsel did not know each other or have any prior professional relationship.   Counsel took the case on a contingent basis.

**12.  *Attorneys' fees awards in similar cases.***

Plaintiff's attorney seeks $399,105 in fees at $450 per hour. Other judges in the Western District have granted awards similar to those requested here.   In *Tinsley,* the Court awarded $330,79.250 in fees, including a rate of $450 for the lead attorney, Geraldine Sumter.[3]   397 F. Supp. 3d at 811. In *Eschert,* the Court awarded $561,166.25 in fees in a case similar in both the length of trial and time span of the litigation.   *Eschert,* 2017 WL 3840275, at *2 (W.D.N.C. Sept. 1, 2017).

## C.  The Impact of Partial Success

Plaintiff did not prevail on his ERISA claim and the Court reduced the punitive damages award to impose the federal cap of $300,000, finding the jury instruction did not support a state law award of punitive damages. The question arises, then, whether the attorney's fee award should be reduced to reflect partial success. The case law gives this Court ample

---

[3] Ms. Sumter and Plaintiff's counsel in this matter were law partners for 19 years.

reason not to reduce the award given the substantial result achieved as the courts of this district reasoned in *Tinsley* and *Eschert.*

In *Hensley,* the Supreme Court established the standard for assessing an award of attorney's fees in a case where a plaintiff prevails on some but not all claims.

> In this situation two questions must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

*Hensley,* 461 U.S. at 434. The answer to that first question turns on whether the claims are related legally or turn on a "common core of facts." If so:

> Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised.

*Id.,* at 435.

Here, as to the ERISA claim, Plaintiff has explained in post-trial briefing that this claim related to the *timing* of his dismissal – days before his fifth work anniversary – to block him for making a claim to a 5th anniversary severance enhancement he had been promised. This claim was based on a common core of facts, as Plaintiff's circumstantial proof of the ERISA claim – an attack on the utter

17

pretext in the stated reasons for his termination – was identical to the circumstantial evidence presented at trial regarding this race and gender discrimination claims.

And, as to the reduction of the punitive damages award, the facts presented for punitive damages were the same as to the federal and state claims, and the claims were legally related.

Thus, the answer to the first *Hensley* question is a double negative: the claims Plaintiff prevailed on were <u>not</u> <u>un</u>related to the claims he lost. Instead, they shared a common core of facts. The *Eschert* and *Tinsley* courts relied on this approach in declining to reduce the attorney fee awards in those cases.

In *Eschert*, the plaintiff prevailed on only four of eight claims, but the court did not reduce the fee, citing the first question in *Hensley*.

> Although the hours submitted by Plaintiff's counsel relate to both successful and unsuccessful claims against Defendant, all claims in this case were based on the same intertwined nucleus of operative facts—that is, Plaintiff's termination from the fire department. While Plaintiff presented several legal theories for her termination, it is reasonable that most of the attorneys' time was directed at all claims, as opposed to on a claim-by-claim basis. Because the hours submitted related to the issues on which Plaintiff prevailed and issues that are inextricably intertwined, all of the work of Plaintiff's attorneys related to the

litigation as a whole, and apportionment of fees is unnecessary.

*Eschert,* 2017 WL 3840275, at *4.

Similarly, in *Tinsley*, the jury found the employer liable for sex discrimination but not race discrimination. Both were alleged. Also citing *Hensley,* the court declined to reduce the attorney's fees requested.

> Here, Plaintiff's sex and race discrimination claims involve a common core of facts. While the actions discussed at trial took place over the course of several years, the facts that ultimately supported the discrimination claim came from the different treatment experienced by Plaintiff and fellow officer, Aimee Aquino. Ms. Aquino is a Caucasian female while Plaintiff is an African American male. Thus, the evidence used to support Plaintiff's sex discrimination claim also supported his race discrimination claim. The jury was ultimately able to parse the evidence to find that it was sex, not race, that led to Plaintiff's discriminatory treatment; however, the evidence on each claim largely overlapped. Thus, this case is the quintessential case where the common core of facts doctrine applies.

*Tinsley*, 397 F. Supp. 3d 809 (W.D.N.C. 2019)[4]

This Court should apply a similar analysis. Again, Plaintiff used the *same McDonnell Douglas* circumstantial evidence proof scheme to prove both his ERISA and discrimination claims. The same core facts were used to support both claims.

---

[4] The Fourth Circuit reversed the jury verdict in *Tinsley*, 854 F. App'x 495 (4th Cir. 2021), and thus did not address the District Court's attorney's fees analysis, which can inform this Court's assessment of the fee petition.

And the same facts supported the state and federal claims for punitive damages, and this Court found those facts supported the federal claim, but Plaintiff had not requested the necessary instruction for the jury to decide the state law claim.   [ECF 164, pp. 8-15]

The second *Hensley* question, which the Court need not reach, asks if the Plaintiff achieved a "level of success that makes the hours reasonably expended."   461 U.S. at 434.   The answer is yes.

As to the Title VII and state law equitable award of backpay with prejudgment interest and front pay, prevailing on the ERISA claim would not have increased that recovery at all.   The remedy for the two claims was the same equitable relief – backpay with reinstatement or front pay in lieu it. See 29 U.S.C. § 1140 and § 1132.   And because the circumstantial proof of pretext was the same for both claims, the time expended at trial on the ERISA claim was negligible.   It involved asking Jesse Cureton about the difference in the 2013 and 2015 severance plans and, when he claimed he had a separate severance agreement, getting Carl Armato to testify that he did not know of any separate severance agreement for Cureton, and defense counsel challenging Plaintiff about the note on his offer letter noting the promise of a 5th year severance enhancement.

And, as to the punitive damage award, if the Court reviews Defendant's post-trial briefing on setting aside punitive damages, some 90% of it challenged the factual and legal basis for awarding *any* punitive damages at all, arguments this Court denied.   [ECF 128, pp. 1-22; ECF 155, pp. 1-6 ]. Only about 10% of the briefing addressed the issue of the lack of a separate state law instruction. [ECF 128, pp. 22-24; ECF 155, pp. 6-7 ] Thus, Plaintiff prevailed on the vast majority of Defendant's arguments against punitive damages, which the Court upheld but capped under 42 U.S.C. § 1981a(b)(3)(D).

Thus, the answer to both *Hensley* questions supports a full attorney's fee award.

And, whether the Court uses the straight lodestar approach under *Perdue* or a hybrid approach that uses the *Johnson* factors, this Court should award Plaintiff the attorney's fees requested.

### D. Other Costs

Plaintiff also seeks other costs in this litigation under 42 U.S.C. § 2000e-5(k).   The Fourth Circuit has ruled that where attorneys' fees are expressly authorized by statute, the recoverable costs under Rule 54(d) and 28 U.S.C. § 1920 are no longer relevant.   *Daly v. Hill, 7*90 F. 2d 1071, 1083 (4th Cir. 1986) (emphasis in original). Fee shifting provisions are intended to reimburse a prevailing plaintiff for "reasonable litigation expenses." *Id.* at 1083-84.

Rule 54(d) and § 1920 are premised on the traditional "American Rule" that each party to a lawsuit bear its own costs. Section 1988 was intended as an exception to the American Rule and is premised on the idea of fee shifting. Because meritorious civil rights plaintiffs are "private attorneys general" enforcing important congressional policies, § 1988 is intended to encourage them to bring suit by shifting the costs of litigation to defendants who have been found to be wrongdoers.

*Id.* (cleaned up). Again, the fee-shifting principles from § 1988 apply to other federal fee-shifting statutes like 42 U.S.C. § 2000e-5(k).

Plaintiff attaches a detailed chronological bill of costs in the amount of $15,482.11, at the end of the attorney's fee billing detail. Plaintiff attaches as Exhibit C copies of the invoices regarding the deposition expenses and mediation fee.

Note that the costs include a $5,000 payment to Peter Vogel, then a recent law clerk of Judge Wynn in the Fourth Circuit, who assisted counsel with the trial which he attended from October 19 to October 26, 2021. Because Mr. Vogel was not admitted to the North Carolina bar nor admitted *pro hac vice* in the case, he did not serve as co-counsel and thus Plaintiff does not submit an attorney's fee billing record for him. Instead, Plaintiff asks the Court to take judicial notice that in the six business days that Vogel participated, including conducting research after hours on issues that the Court allowed Mr. Vogel to argue orally at one point, that he spent at least 40 hours working at the trial and that the $5,000 payment amounts to a charge of $125 per hour. That is eminently reasonable for a recent clerk of the Fourth Circuit.

The other expenses include the cost of the filing fee, of deposition transcripts, witness fees for depositions and the trial, including the cost for the appearance of Mr. Matthias Krebs from out of state, postage

incurred in the course of the litigation, and a single charge from Nova Office for copying discovery documents.

**CONCLUSION**

Plaintiff respectfully asks the Court for an award of attorney's fees of $399,105 and other litigation costs in the amount of $15,482.11.

Respectfully submitted, this the 26th day of August, 2012.

/s/ S. Luke Largess
_____

S. LUKE LARGESS
N.C. Bar No. 17486
TIN, FULTON, WALKER, & OWEN, PLLC
301 East Park Avenue
Charlotte, North Carolina 28203
(704) 338-1220 telephone
(704) 338-1312 facsimile
llargess@tinfulton.com
Counsel for Plaintiff

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record:

This is the 26th day of August, 2022.


<u>/s/S. Luke Largess</u>
N.C. Bar No. 17486
*Attorney for Plaintiff*